IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| JOSHAWA WEBB, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | 07 C 3290 |
| ) | |
| THE UNITED STATES OF AMERICA, *et al.* ) | Judge Boyko |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' SUPPLEMENT TO THEIR PENDING COMBINED RULE 59(e), 60(b)(1) AND 60(b)(6) MOTION TO ADD A CLAIM UNDER RULE 60(b)(2)**

Plaintiffs, through their attorneys, LOEVY & LOEVY, under Federal Rule of Civil Procedure 60(b)(2), supplement their pending Combined Rule 59(e), 60(b)(1) and 60(b)(6) Motion as follows:

## I. INTRODUCTION

Defendant Lucas won summary judgment here without ever filing a sworn statement to support his claim for qualified immunity, and before plaintiffs were ever allowed to test through discovery the purported factual basis for his claim. Lucas' incredible claim of immunity is now thoroughly undermined by the evidence coming out of his own criminal trial for having deprived plaintiff, Joshawa Webb, and others of their civil rights. The evidence newly unearthed at Lucas' criminal trial establishes that his claim of being an innocent bystander, as dozens of Mansfield residents were framed for crimes they did not commit, is a lie. Plaintiffs now submit supplemental newly discovered evidence to support their pending motion challenging the Court's grant of summary judgment to Lucas.

## II. PROCEDURAL BACKGROUND

On October 19, 2009, this Court granted defendant Lee Lucas' motion for summary judgment, finding that the motion was unopposed. (Rec. Ent. 97). Specifically, before this Court ruled on Lucas' motion for summary judgment, plaintiffs were alerted to their inadvertent failure to respond specifically to Lucas' motion (they had already responded to the other defendants' similar motions) and asked this Court to consider their already filed response to the other defendants' motions for summary judgment as a response to Lucas' motion as well. (Rec. Ent. 92). The Court declined to do so and instead ruled on Lucas' motion as if plaintiffs had filed no response at all. (Rec. Ent. 94). Plaintiffs then filed a combined Rule 59(e), 60(b)(1), and 60(b)(6) motion on October 26, 2009, asking this Court to reconsider that ruling and to allow plaintiffs an opportunity to respond to Lucas' motion. (Rec. Ent. 98).

Soon thereafter, plaintiffs prematurely filed an appeal of this Court's grant of summary judgment to the other defendants and then moved to dismiss those appeals in order to restore jurisdiction to this Court for the pending reconsideration motion. (Rec. Ent. 95, 101, 105, 106). The reconsideration motion remains pending before this Court and argues that plaintiffs' failure to respond to Lucas' motion for summary judgment was excusable neglect, no party would be prejudiced by allowing plaintiffs an opportunity to respond to summary judgment, and given the seriousness of the allegations and the available evidence implicating Lucas in the conspiracy alleged in the complaint, a decision on the merits is warranted.

Lee Lucas presently stands trial on criminal charges alleging that he knowingly testified falsely, knowingly withheld exculpatory information, and knowingly placed false information in his reports, as part of the conspiracy to convict innocent Mansfield citizens. *See United States v. Lee Michael Lucas*, 1:09-CR-0222 (N.D. Ohio), indictment. In particular, the indictment that

Lucas is presently being tried on alleges that he knowingly included false information in a DEA report regarding a drug deal that supposedly occurred with Joshawa Webb. *Id.*, COUNT V. These are the very allegations set forth in plaintiffs' complaint here.

### III. ARGUMENT

**Federal Rule 60(b)(2) Warrants Reconsideration in Light of Newly Discovered Evidence**

Starting on day one of defendant Lucas' ongoing criminal trial, certain new testimony came to light that defeats summary judgment here.[1] Because this new evidence arose for the first time at Lucas' criminal trial and could not have been uncovered in time to file a motion under Rule 59(b), reconsideration of this Court's summary judgment ruling is warranted under Federal Rule of Civil Procedure 60(b)(2). *See* FED. R. CIV. P. 60(b)(2) ("On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b).").

A. **Jerrell Bray's Testimony Creates a Genuine Issue of Fact Defeating Summary Judgment**

This case centers around false criminal charges against Joshawa Webb alleging that in October 2005, he sold crack cocaine to DEA agent Lee Lucas. *See* Rec. Ent. 5, First Amended Complaint, ¶ 16. In reality, a "stand-in" drug seller named Jeremiah Conrad was used, and Mr. Webb had nothing to do with the drug purchase that Lucas made. *Id.*, ¶¶ 16, 22. Lucas actually got into a car with Conrad, who was impersonating Mr. Webb, and the two spoke during the fake drug buy. Lucas Criminal Trial Transcript ("Tr.") (attached hereto) at 268:1-268:22. Even

---

[1] Presently, plaintiffs have only received transcripts for the testimony from day one of the criminal trial. Having watched portions of Lucas' trial, however, counsel is confident that as new transcripts become available, additional evidence will support plaintiffs' allegations. Plaintiffs will supplement this motion when the remaining transcripts become available.

though Lucas was personally aware that Conrad did not look and sound like Webb, at no point during Webb's arrest and/or prosecution did Lucas ever tell anyone that Conrad was not Webb.

In response to plaintiffs' complaint, Lucas filed a summary judgment motion claiming that while his confidential informant, Jerrell Bray, might have framed Webb, plaintiffs have no evidence supporting their claim that Lucas had any knowledge of or role in the frame-up. (Rec. Ent. 68). Lucas, however, did not attach his affidavit swearing that he was unaware of Bray's misconduct or swearing that he did not actively participate in the conspiracy. Although Plaintiff never had the opportunity in discovery to gather evidence of the conspiracy, this Court held that the only available evidence (from the alleged co-conspirators themselves) demonstrated that any wrongdoing was instigated by Bray, not by defendant Lucas. (Rec. Ent. 97 at12).

Now, however, at Lucas' criminal trial for violating the civil rights of many Mansfield citizens stung by the conspiracy to frame innocent people for drug crimes they did not commit, for the first time, Bray has given new sworn testimony that creates a genuine issue of material fact about whether Lucas did, in fact, know that Bray was setting up innocent people and using stand-in drug dealers, rather than ensnaring actual drug dealers. Lucas' claim for summary judgment is directly refuted by the evidence that Lucas knew of and condoned Bray's lies, in general, and his fictional drug deals, in particular, which were then used by the government to support criminal charges against uninvolved innocents.

Bray's new testimony establishes that:

(1) Lucas knew that Conrad, the stand-in for Webb, did not look or sound like Mr. Webb. Tr. at 268:1-268:22. Lucas did not tell anyone during the arrest or prosecution of Joshawa Webb that the man Lucas purportedly bought drugs from in the car was not the same man as the one being prosecuted for the crime.

(2) Lucas was aware that Bray was stealing money from the DEA during his purported drug deals. Tr. 212:21-214:14. Lucas did not document that fact. Nor

did he discipline or confront Bray, which Bray understood as permission to continue lying and cheating. Tr. 214:12-214:14; 215:9-215:22.

(3) Lucas was present when Bray used the same stand-in, Darren Transou, to impersonate both Noel Mott and Lowesco Ballard. Tr. 170:2-170:4 (Mott was the first target for the DEA); Tr. 172:5-172:9 (Lucas was overseeing Bray then); Tr. 170:21-171:16 and 175:3-175:8 (Bray conducted a drug deal with Transou instead of Mott); Tr. 175:9-176:11 (Bray drove to Detroit to pick up drugs, with Transou impersonating Mott); Tr. 184:2-184:12 (Bray conducted a deal with Transou instead of Ballard); Tr. 190:20-191:17 (Transou came into full view during the purported Ballard deal). Thus, Lucas could see for himself that it was the same man who Bray claimed was two separate people. The obviousness of this ruse was augmented by the fact that Transou looked nothing at all like Ballard, who Lucas would have seen during the arrest and prosecution. Tr. 186:20-187:1 (Transou and Ballard look nothing alike, including a significant height discrepancy). Additionally, Transou got "his own" supposed first name wrong during a recorded telephone conversation. Tr. 193:1-193:6 (Transou refers to "Westco" instead of "Lowesco" and Bray groans because of the blatant mistake).

(4) When Lucas was conducting surveillance during the fake Joe Ward drug deal, Bray had his girlfriend bring him drugs while they were standing outside the house, so that Bray could go inside, pretend to make a purchase, and come back out with drugs. Tr. 200:2-200:3; 201:1-201:2. The girlfriend's exchange was captured in the audio recording of the deal. Tr. 202:10-202:13. Lucas monitored the audio. After purchasing just $20 worth of marijuana at Ward's house, Bray claimed Ward sold him the crack that his girlfriend delivered during the deal. Tr. 202:14-203:2. The purported crack purchase was not on the audio recording.

(5) Lucas was present and turned a blind eye to the fact that stand-in Robert Harris played both the part of Roosevelt Williams and Johnny Robertson during each's fake drug deal. Tr. 260:4-260:17. As above with Transau, Lucas observed that one man was posing as two and would have seen any discrepancy in appearance between the stand-in and the two men falsely arrested and prosecuted.

(6) Lucas was present when Robert Harris was playing the part of Roosevelt Williams and drove up in Bray's car; and Lucas saw and commented on the fact that drove Bray's car to Bray's home after the purported drug deal. Tr. 249:19-250:10; 250:23-252:2.

(7) Bray flagrantly shorted the DEA thousands of dollars during the deal framing Dwayne Nabors, a fact that goes to Bray's credibility but is nowhere documented or produced to any of those charged for committing the fake drug buys. Tr. 236:3-237:24.

(8) During Nabors' trial, Bray tried to cover up the fact that he was paid for

the drugs in part with a Cutlass, which he kept for himself, by falsely testifying that the recorded discussion about a "Cutty" was actually a discussion about Nabors' "Caddy" (Cadillac). Tr. 240:8-241:4. When a prosecutor angrily confronted Bray about his apparently false testimony, Lucas stepped up to cover up Bray's false testimony by falsely telling the prosecutor that "Cutty" was another word for "dope." Tr. 242:18-243:14.

(9) A stand-in, Bray's friend "Shea Shea", was used to impersonate Geneva France. "Shea Shea" got into a car with Lucas and conducted a drug deal in the close proximity of the inside of a car. Tr. 276:19-276:24. Lucas would have seen France during her arrest and prosecution, but he never alerted anyone that France was not the person who sold him the drugs.

Bray's testimony establishes a genuine issue of material fact regarding whether Lucas can credibly claim in this case that he had no idea Bray was framing Joshawa Webb. Bray was lying with abandon throughout the cases preceding Webb's, and Lucas was either feigning ignorance and/or actively covering up Bray's lies. This new evidence is sufficient to defeat Lucas' motion for summary judgment, which is really quite vacuous.

This is especially true, given the virtually non-existent evidence attached to Lucas' motion. Significantly, Lucas did not attach an affidavit in support of his motion for summary judgment. Instead, Lucas attached co-defendant Robert Cross' affidavit, in which Cross declared that he was unaware of anyone falsely implicating Webb. That is a far cry from a denial by Lucas – Lucas has never denied the allegations in plaintiffs' complaint. In that context, this newly discovered evidence is a smoking gun.

**B.    Jerrell Bray's Testimony Could Not Have Been Discovered Earlier**

Evidence is considered new for Rule 60(b)(2) purposes if, with "reasonable diligence, [it] could not have been discovered in time to move for a new trial under Rule 59(b)," which is 28 days after entry of judgment. FED. R. CIV. P. 59(b), 60(b)(2). As summary judgment was entered in this case on October 19, 2009, plaintiffs must show why they were unable to obtain Bray's

testimony before November 16, 2009. (Rec. Ent. 97). The most obvious reason for this lapse, of course, is that Bray did not testify until January 8, 2010. (142). Thus, his testimony was not available two months earlier.

Furthermore, Bray's testimony was not available to plaintiff in affidavit form any earlier. Bray received significant consideration for giving his trial testimony: he agreed to testify in exchange for the government's agreement that Bray could seek up to a four year reduction on the fifteen year term of imprisonment he is presently serving. Tr. 301:25-303:1. Presumably, the government would not have offered Bray this deal in exchange for his testimony if Bray was willing to freely testify without it. Thus, Webb could not have gone to the man who framed him and caused his unlawful prosecution and gotten an affidavit from him admitting Lucas' role in the conspiracy. There is no requirement that a party get an affidavit from an adverse witness in order to show diligence. Hence, this newly discovered evidence is properly submitted now in support of plaintiffs' pending motions challenging the grant of summary judgment.

### III. CONCLUSION

Before Lucas' criminal trial, plaintiffs were denied any insight into what went on behind the scenes of the miscarriage of justice that happened under Lucas' watch in Mansfield, Ohio. Plaintiffs were not part of the conspiracy and, therefore, had no way to rebut defendant Cross' affidavit vaguely implying Lucas' innocence in a sting operations that ensnared dozens of innocent men and women.

That all changed with the advent of Lucas' criminal trial in January 2010. The evidence outlined above was obtained through transcripts from just day one of Lucas' criminal trial. That transcript of the first day of Lucas' criminal trial blows away any notion that Lucas was an innocent bystander to Bray's deceit. Instead, the sworn testimony from the Lucas criminal trial

establishes that Lucas aided and abetted Bray's lies. In short, on the record now available – even before civil discovery – summary judgment granting qualified immunity to Lucas is a travesty. Plaintiffs ask that the Court reverse its ruling of summary judgment and allow this matter to proceed.

Respectfully submitted,

S/ Mark Loevy-Reyes

Jon Loevy
Mark Loevy-Reyes
Attorneys for Plaintiff
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
loevyreyes@aol.com

**CERTIFICATE OF SERVICE**

I, Mark Loevy-Reyes, an attorney, certify that on January 29, 2010, I served this document by ECF electronic filing as to each party who is represented by counsel who uses electronic filing.

S/ Mark Loevy-Reyes