IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

JOSHAWA WEBB, *et al.*,                    )
                                           )
          Plaintiffs,                      )
                                           )
     v.                                    )          07 C 3290
                                           )
THE UNITED STATES OF AMERICA, *et al*.     )          Judge Boyko
                                           )
          Defendants.                      )

**PLAINTIFFS' SECOND 60(b)(2) MOTION FOR RELIEF FROM
SUMMARY JUDGMENT RELATING TO DEFENDANT LEE LUCAS**

Jon Loevy
Mark Loevy-Reyes
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

Attorneys for Plaintiffs

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    **Lucas' Behavior During Specific Drug Buys Establishes**
    **His Efforts to Help Bray Frame Innocent People** . . . . . . . . . . . . . . . . . . . . . . 5

        *Roosevelt Williams* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        *Dwayne Nabors* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        *Lowesco Ballard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        *Danny Lee Brown* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        *Joe Ward* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        *Noel Mott* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        *Ronald Davis (a.k.a. Herman Price) and Geneva France* . . . . . . . . . . . . . . 11

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    **Summary Judgment in Favor of Lucas Should Be**
    **Reversed Because Newly Discovered Evidence Create**
    **Disputes of Fact About Lucas' Participation in the Frame-Up**
    **Conspiracy and His *Brady* Violations in the**
    **Criminal Case Against Webb** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    **A.**    **The Evidence Presented Here is Newly Discovered** . . . . . . . . . . . . . . . . 13

    **B.**    **The Newly Discovered Evidence Defeats Summary Judgment** . . . . . . . . . . 14

        **1.**    **The Standards For Assessing Qualified Immunity** . . . . . . . . 14

    **C.**    **The Newly Discovered Evidence is Sufficient to Defeat**
        **Lucas' Summary Judgment Motion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Table of Authorities

*Brady v. Maryland, 373 U.S. 83, 87 (1963)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*California v. Trombetta, 467 U.S. 479, 488 (1984)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Erickson's Flooring and Supply Co., Inc. v. Basic Coatings, Inc.,*
    2010 WL 1029036, *4 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gregory v. City of Louisville*, 444 F.3d 725, 745 n.2 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 16

*Johnson v. Bell*, 525 F.3d 466, 496 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kyles v. Whitley*, 514 U.S. 419, 433 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 15, 16

*Napue v. Illinois*, 360 U.S. 264, 269 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Bagley*, 473 U.S. 667, 682, 678 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Bagely*, 473 U.S. 667, 679 n.7 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


FED. R. CIV. P. 59(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

FED. R. CIV. P. 60(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## Statement of the Issues

This case comes before the Court on plaintiffs' second Rule 60(b)(2) motion. On January 29, 2010, plaintiffs filed a supplement to their currently pending motion for combined Rule 59(e), 60(b)(1) and 60(b)(6) motion to add a request for relief under Rule 60(b)(2) based on newly discovered evidence unearthed at defendant Lucas' criminal trial. (Doc. No. 109). Defendant Lucas never responded to the supplemental motion, presumably because there was not much he could say to it – the early testimony coming out of his trial irrefutably created a dispute of fact about whether Lucas participated in the Mansfield frame-ups and committed numerous *Brady* violations. That motion remains pending before the Court. Now, even more evidence has become available from Lucas criminal trial. Accordingly, plaintiffs file this supplement to their original motion seeking relief from summary judgment. The questions before the Court are two-fold: (1) is the evidence presented herein newly discovered? and (2) is the new evidence of Lucas' participation in the frame-ups powerful enough to defeat summary judgment?

## Summary of the Argument

The evidence from defendant Lucas' criminal trial creates an unmistakable dispute of fact about whether Lucas was aware that his purported confidential informant, Jerrell Bray, was intentionally framing innocent people and whether Lucas played a pivotal role in the frame-up conspiracy by: overlooking blatantly obvious frame-ups; altering DEA reports and transcripts to enable the frame-ups to succeed; testifying falsely; failing to include exonerating information in his reports; failing to pass on exonerating information to the prosecutors; and sitting silently at the prosecution's table during the frame-up victims' criminal trials, with the knowledge that other witnesses were testifying falsely. There is powerful evidence showing that Lucas worked

1

money from the DEA during a deal.  (App. ¶ 12-13).  Indeed, Lucas lied to the prosecutor on more than one occasion to cover for Bray.  (App. ¶ 36, 39).

Additionally, during the conspiracy to frame innocent Mansfield citizens, Lucas testified falsely against conspiracy victims, suborned perjury, and failed to correct patently false testimony.  For example, Lucas testified falsely and/or watched several individuals get prosecuted when it was readily apparent to him that they were wrongly accused.  (App. ¶ 21, 23-25, 34-35, 42-44, 51, 56, 62, 63-66, 67-68, 75-76, 83, 87, 91-92).  Lucas also sat silently at the prosecutors' table while defendant Metcalf perjured himself during Nabors' trial (a fact Metcalf now openly admits), and Lucas was aware that Metcalf's testimony was false, but he did nothing to address the perjury.  (App. ¶ 32-33, 37).  Likewise, although Lucas knew the testimony to be false, he repeatedly sat silently while Bray perjured himself and even backed up Bray's false testimony with false testimony of his own.  (App. ¶ 39, 48-50, 81-82, 86).  Lucas also knowingly drafted a false search warrant affidavit for Metcalf to sign.  (App. ¶ 40).

On May 12, 2009, Lucas was indicted in an eighteen count federal indictment for violating 18 U.S.C. §§ 1503(a) (obstruction of justice), 1001(a)(3) (knowing creation of a false government document), 1623(a) (false testimony and/or creation of a material false declaration), and 242 (deprivation of rights under color of law).  (App. ¶ 6).  The indictment's allegations all related to Lucas' actions in conjunction with using Jerrell Bray as a duplicitous informant.  (App. ¶ 6).  After Lucas was indicted, he drafted a memo that he distributed to others, including some of the defendants here.  (App. ¶ 10).  The memo had false information about Lucas' investigations regarding who saw what and how certain deals were verified, and Lucas now admits that the memo was inaccurate.  (App. ¶ 10).  Lucas admits that his intention in drafting

the memo was to coordinate what the witnesses would say at his trial about the investigations.

(App. ¶ 10). The government failed to prove Lucas guilty beyond a reasonable doubt.

## Lucas' Behavior During Specific Drug Buys Establishes
## His Efforts to Help Bray Frame Innocent People

### *Roosevelt Williams*

Lucas' misconduct during conspiracy victim Roosevelt Williams' frame-up is evidence of

his role supporting and enabling Bray's false allegations. Williams has proven with evidence

that he was in Chicago when the deal he was accused of participating in happened in Ohio.

(App. ¶ 21). Detective Wheeler was very familiar with Williams from well before this deal,

having encountered Williams countless times, having followed his doings for five to six months,

and having spent hours watching him during surveillance. (App. ¶ 22). According to Wheeler,

who was conducting surveillance with Lucas during the deal, even though Roosevelt Williams is

tall, thin, and light-skinned with freckles, the person Lucas identified as Williams was short,

dark-skinned, and stocky. (App. ¶ 23).

Immediately after the drug deal, detective Wheeler informed Lucas that the suspect Lucas

identified as Williams was misidentified. (App. ¶ 24). Ignoring this informed opinion, Lucas

insisted that the identification was correct, and Lucas' report of the buy omitted Wheeler's

credible claim that the suspect was not Williams. (App. ¶ 25-26). In order to support Bray's

frame-up of Williams, Wheeler's findings were not documented by Lucas, and Wheeler's claim

of misidentification was, therefore, never revealed to the defense. (App. 26-27).

In actuality, Robert Harris acted as a "stand-in," impersonating Roosevelt Williams.

(App. ¶ 28). Harris also acted as a stand-in during Johnny Robertson's fake drug deal, wearing

the same shirt during both deals.  (App. ¶ 28).  The exonerating fact that the same man wearing

the same shirt was identified as both Williams and Robertson was never noted or documented by

Lucas in his reports nor disclosed during either's prosecution.  (App. ¶ 28).

As if Harris' unlawful impersonation was not obvious enough, during the supposed

Williams deal, Lucas saw the drug dealer alleged to be Williams actually arrive in Bray's car –

the same car that Lucas previously saw Bray use during the alleged Nabors drug deal.  (App. ¶

29).  In fact, during the so-called Williams deal, defendant Ansari ran the license plate of the car

driven by the dealer and confirmed that the car was Bray's.  (App. ¶ 30).  To hide this startling

fact, a second DEA-6 report was generated, falsely identifying the make of car driven by the fake

drug-dealer.  (App. ¶ 30).

Additionally, Lucas saw and commented on the fact that the seller not only drove Bray's

car, but he drove it back to Bray's house after the purported drug deal.  (App. ¶ 31).  That

important observation was also omitted from Lucas' DEA-6 report.  (App. ¶ 31).

*Dwayne Nabors*

Lucas' false testimony in support of the frame-up conspiracy was unmistakable in the

fabricated case against Dwayne Nabors.  Defendant Chuck Metcalf now admits that he blatantly

lied during Dwayne Nabors' criminal trial.  (App. ¶ 32).  Metcalf's fictitious testimony included

his false identification of Dwayne Nabors as a participant during the drug deal at issue.  (App. ¶

32).  Metcalf now admits that in actuality, during the fake Nabors deal, Metcalf saw Nabors go

into Platinum Status (where Nabors worked), and Nabors was not outside in the car dealing

drugs, as Metcalf and Lucas falsely testified.  (App. ¶ 32).  When questioned about why he

testified falsely against Nabors, Metcalf answered, "Because I really thought this is what

6

everybody else was going to testify to.  This is what was on paper. . . . Because it had to make

sense."  (App. ¶ 33).  Metcalf explained that he perjured himself "because I regurgitated what

[came] off the DEA-6 report."  (App. ¶ 33).  The DEA-6 report, of course, was full of the false

statements that typified Lucas' reports in the Mansfield cases.

Although there is "a vast difference" in the physical appearances of Nabors and the

person who admitted to driving the car, Lucas falsely identified Nabors as the driver of the car.

(App. ¶ 34-35).  In support of their false identification, defendants Lucas and Metcalf lied to the

prosecutor Blas Serrano, telling him that there was no video capturing this deal when there was

in fact a video taken.  (App. ¶ 36).  Metcalf then falsely testified that there was no video tape

taken of the supposed Nabors deal, and although Lucas sat at the prosecutors' table during this

false testimony, he did not alert the prosecutor to Metcalf's lie.  (App. ¶ 37).

Lucas' express efforts to falsely bolster Bray's credibility were also readily apparent in

the alleged Nabors deal.  During that deal, Bray flagrantly stole thousands of dollars from the

DEA, an exculpatory fact that goes directly to Bray's credibility, but that Lucas never

documented or revealed to any of the conspiracy victims during their prosecutions.  (App. ¶ 38).

During Nabors' trial, Bray tried to cover up the fact that he was paid for the drugs in part with a

Cutlass that he kept for himself (leading to the DEA's shortfall) by falsely testifying that the

recorded discussion about a "Cutty" was actually a discussion about Nabors' "Caddy" (Cadillac).

(App. ¶ 39).  When a prosecutor angrily confronted Bray about his obviously false explanation,

Lucas stepped up to cover up Bray's false explanation by telling the prosecutor that "Cutty" was

another word for "dope."  (*Id.*).  Lucas never told anyone that he was lying about that.

7

*Lowesco Ballard*

Lucas' role in the frame-up conspiracy is also demonstrated by the evidence arising from the Ballard case. Lucas saw the same stand-in, Darren Transou, impersonate both Noel Mott and Lowesco Ballard in two separate drug deals. (App. ¶ 42). The obviousness of this ruse was augmented by the fact that Transou looked nothing at all like Ballard, who Lucas saw during the prosecution. (App. ¶ 4, 43). Lucas testified that he looked at a picture of Darren Transou to rule him out before (falsely) identifying Ballard. (App. ¶ 44). But, defendant Cross did not actually order the identification picture of Transou for the DEA file until more than a year after Lucas' false identification, so Lucas' testimony was pure fiction. (App. ¶ 44). Lucas' testimony is laughable regardless because Transou admits that he was in fact used as a stand-in for Ballard.

Additionally, during a recorded telephone conversation, Transou referred to Lowesco Ballard in the third person, even though it was supposed to be a call with Ballard. (App. ¶ 45). In the written transcript of that call, Lucas falsely changed the identity of the speaker from Ballard to Ronald Davis in order to mask the obvious inconsistency. (App. ¶ 46). In the new telephone transcript, Lucas also inserted ellipses to eliminate the reference to "Westco," altogether, even though the portion eliminated could be clearly heard. (App. ¶ 47). During Bray's cross-examination at Ballard's criminal trial, even though this phone call was to the same phone number Bray had used for the earlier purported Ballard calls, to a person who sounded just like the person who was supposedly Ballard in the earlier calls, but to a person who spoke of Ballard in the third person, Bray claimed that the call was actually to Ron Davis. (App. ¶ 48). Lucas backed Bray's lies with his own false testimony that the call where the recipient referred to "Westco" in the third person was actually to Davis. (App. ¶ 48). Obviously, if the call was with

8

Davis, that call would have needed to be disclosed to Davis' defense, but it was not.  (App. ¶ 50).

### Danny Lee Brown

In an effort to frame Danny Brown, Bray made two recorded telephone calls to Brown, but Bray was unable to set up a drug deal during those two calls  – in the first Bray left a message and in the second, Brown asked Bray to call him back in twenty minutes.  (App. ¶ 53).  Phone records show that Bray then tried to call Brown 28 times, but that Brown did not take Bray's calls.  (App. ¶ 54).  When Brown would not speak to Bray, Bray told the officers that Brown's telephone number was changed to a number that was actually registered to Robert Harris, another target of the investigation.  (App. ¶ 55).  This pivotal fact was not documented, and the two later calls that the DEA-6 report attributed to Brown were instead readily recognizable as being to Robert Harris.  (App. ¶ 56).

During the resulting the drug deal, falsely attributed to Danny Brown, Frank Douglas was the courier who delivered the drugs.  (App. ¶ 57).  The deal took place close to the home of Chris Jordan, Bray's known friend and fellow drug dealer whom Bray worked to keep free of allegations in the Mansfield roundup.  (App. ¶ 57-58).  Bray's body recording during the deal recorded Bray saying at the end of the buy, "That's cool, that's cool.  Here, give that to Chris," which would alert a listener that the money was going to Chris, not Danny Brown.  (App. ¶ 60).  Because Bray's slip undermined his contention that Danny Brown, not Chris Jordan, was the person behind the drug deal, the copy of the transcript of the body wire prepared by defendants for Danny Brown's trial omitted the statement, "give that to Chris."  (App. ¶ 61).

Lucas then gave false testimony during the criminal trial against Brown to bolster Bray's testimony.  At his own criminal trial, Lucas testified that during the alleged Danny Brown deal, it

was raining so hard that Lucas could not see the person who delivered the drugs.  (App. ¶ 62).
But at Danny Brown's criminal trial, Lucas testified that he identified the courier as Frank
Douglas.  (App. ¶ 62).

### Joe Ward

In order to frame Joe Ward,  Bray had his girlfriend bring drugs to him outside the house,
so that Bray could go inside, pretend to make a purchase, and come back out with drugs that he
could claim to have purchased.  (App. ¶ 62, 66).  The recording device that Bray wore recorded
that a woman said "take it" to Bray before he went into the house.  (App. ¶ 64).  Bray's
girlfriend's delivery occurred in Lucas' plain view – at Ward's criminal trial, Lucas testified that
he never let Bray out of his sight before the Ward deal and that he specifically watched for a drug
hand-off.  (App. ¶ 65).  Although Bray now admits that there was a hand-off, and the recording
device actually captured the hand-off, Lucas falsely testified at Ward's criminal trial that it never
happened.  (App. ¶ 64-65).

### Noel Mott

The Mott deal is further evidence Lucas' efforts to hide Bray's sloppy frame-ups from
plaintiff and Lucas' other victims.  For instance, Lucas ignored that Bray did not turn on his
recording device until after the alleged Noel Mott deal was completed.  (App. ¶ 67).  Also, Lucas
was present when Bray used the same stand-in, Darren Transou, to impersonate both Mott and
Lowesco Ballard, but did not tell anyone about that fact.  (App. ¶ 68).

The Mott case also demonstrates how above the law Lucas believed himself to be during
this conspiracy.  He admits that he ordered Ohio state troopers to steal money from Mott.  (App.
¶ 69).  According to Lucas, Mott and others were driving to Detroit to allegedly buy a large

10

quantity of drugs.  (*Id*.).  Lucas came up with a plan to have Ohio troopers stop the car and essentially steal the money:  "Our game plan was to take the money that they were going to use to make the buy up in Detroit before they got up to Detroit.  That way, no one would get arrested, if we just took the money and we didn't arrest anyone, so the case could keep going. . . ."  (*Id*.).  At Lucas' instruction, the "ruse" was for the officers to find the money, "seize the money and identify who was in the vehicles" without charging anyone with doing anything illegal.  (*Id*.).

### *Ronald Davis (a.k.a. Herman Price) and Geneva France*

As in the other sham deals, in the Ron Davis/Geneva France investigation, Bray was the confidential informant who purportedly purchased the drugs, supposedly Davis' drugs with France acting as a courier.  (App. ¶ 70).  Bray now admits under oath that neither Davis nor France was actually involved in the deal.  Instead, selling his own drugs, Bray "staged a set-up deal" to frame the person that he thought was Davis.  (App. ¶ 70).  Bray sought to make it appear as if Davis was delivering drugs through France by staging the deal near Davis' house and using Bray's friend "Shea Shea" (Karmiya Moxley) to pose as France.  (App. ¶ 71).

Lucas participated directly in this frame-up drug purchase.  Moxley/"Shea Shea" got into the car with Lucas, had a conversation with him, and conducted a drug deal in the close confines of inside a car.  (App. ¶ 73).  Soon thereafter, Lucas arrested and prosecuted France but never identified that she was not the same person he spoke with earlier in the car, nor did Lucas ever alert plaintiff or any other conspiracy victim to this difference.  (App. ¶ 73-74).

As in the other deals, the conspirators' efforts to connect Davis and France to the deal was fiction.  While defendants Lucas and Metcalf monitored Bray's recorded telephone call to set up the deal, Bray claimed that he was speaking with Davis, when the recording shows that he

11

was actually speaking to a woman. (App. ¶ 76). In the recording, it sounds as if the woman was

trying to deepen her voice to sound like a man, and she said that she would "send the girl."

(App. ¶ 76). Immediately after the call, Bray told Lucas and Metcalf that the phone conversation

was with Davis and said, "He [Davis] said he's sending his girl." (App. ¶ 77). Bray's false claim

to the officers was recorded. (App. ¶ 77-78). The DEA-6 form generated, however, actually

correctly identifies the phone call as one to a female recipient, but does not include that Bray lied

and tried to pass the call off as one to Davis. (App. ¶ 77). In an effort to bolster Bray's false

testimony at Price's criminal trial, Lucas testified that he overheard the telephone call between

Bray and Davis, though he now admits that this testimony was a lie. (App. ¶ 80).

     Given that the phone call connecting Davis to the deal was actually not a phone call with

Davis, defendants needed some way to tie Davis to the deal. Accordingly, immediately before

the deal Bray stopped by to see the person he believed to be Davis. (App. ¶ 81). But in the

recording of that meeting, that person never said anything about the deal, never alluded to Bray

needing to meet with a person delivering drugs, and never directed Bray to a location. (App. ¶

81). Nevertheless, Bray falsely claimed (and later testified) that during this meeting Davis

instructed Bray where to meet Davis' drug courier. (App. ¶ 82). Lucas had heard the recording

of the meeting and knew this was false testimony, but did nothing to correct it or to alert the

defense or any other victim of the conspiracy that the recordings contradicted Bray's testimony

and impaired his credibility. (App. ¶ 82-83).

     To further bolster Bray's false testimony about this meeting, Lucas testified falsely at

Davis' criminal trial that he saw Davis outside with a gun in his hand when he did not actually

see Davis with a gun. (App. ¶ 84). Lucas also testified falsely about an incident during the deal

in an effort to salvage Bray's credibility.  During the drug deal, there was a dispute about the

weight of the drugs being delivered.  (App. ¶ 85).  Bray pretended to call Davis to resolve the

matter, but in actuality did not dial anyone and merely pretended to have a conversation with

Davis, in which Davis agreed to give $200 back because the drugs were short.  (App. ¶ 85).

Bray's phone records support that no call was actually made.  (App. ¶ 85).  Although this was an

entirely fictional conversation and there is evidence that no such call was made, Lucas testified

falsely at both Geneva France's criminal trial and at his own that he was sitting close enough to

Bray that he actually heard Davis say "take two back" on Bray's cell phone.  (App. ¶ 86).

### Argument

**Summary Judgment in Favor of Lucas Should Be Reversed Because Newly
Discovered Evidence Create Disputes of Fact About Lucas' Participation in the
Frame-Up Conspiracy and His *Brady* Violations in the Criminal Case Against Webb**

#### A.    The Evidence Presented Here is Newly Discovered

Federal Rule of Civil Procedure 60(b)(2) provides that the court may relieve a party from

a final judgment based on "newly discovered evidence that, with reasonable diligence, could not

have been discovered in time to move for a new trial under Rule 59(b)."  Evidence is considered

new for Rule 60(b)(2) purposes if, with "reasonable diligence, [it] could not have been

discovered in time to move for a new trial under Rule 59(b)," which is 28 days after entry of

judgment. FED. R. CIV. P. 59(b), 60(b)(2).

Because the evidence cited in this motion arose for the first time at Lucas' criminal trial

and could not have been uncovered in time to file a motion under Rule 59(b), reconsideration of

this Court's summary judgment ruling is warranted.  Summary judgment was entered in this case

in October 2009, so plaintiffs must show why they were unable to obtain the new evidence

13

presented herein before November 2009. (Rec. Ent. 97). The reason for this lapse is obvious –

Lucas' criminal trial did not even begin until January 2010. Thus, the evidence cited in

plaintiff's pleading was not available earlier.

Importantly, discovery was never permitted in this case before summary judgment was

adjudicated. Without discovery, plaintiffs had no means of securing the testimony cited

throughout this motion, as they never had an opportunity to depose the numerous witnesses cited

herein. In fact, without discovery, plaintiffs had not even been aware of many of the witnesses

whose testimony now inculpates Lucas. Moreover, at the time summary judgment was

adjudicated, plaintiffs did not have access to Lucas' fictionalized DEA-6 reports, which

document the bulk of his subterfuge. Accordingly, the evidence from Lucas' criminal trial

should be considered newly discovered evidence.

### B.    The Newly Discovered Evidence Defeats Summary Judgment

To prevail on a 60(b)(2) motion, plaintiffs must also show "the evidence is material and

controlling and clearly would have produced a different result if presented before the original

judgment." *Erickson's Flooring and Supply Co., Inc. v. Basic Coatings, Inc.*, 2010 WL

1029036, *4 (6th Cir. 2010) (citation omitted). The evidence set forth in this motion is more

than enough to defeat Lucas' summary judgment motion, thus it meets this standard as well.

### 1.    The Standards For Assessing Qualified Immunity

In accordance with *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the

prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution." Even when the defense has not specifically requested information in discovery,

14

the prosecution has a duty to volunteer exculpatory evidence if it is "material." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), *quoting Brady*, 373 U.S. at 108.  Material evidence is evidence that, if disclosed, "undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 682, 678 (1985).

In keeping with that definition of materiality, for *Brady* purposes, exculpatory evidence includes evidence that impeaches a witness for the prosecution. *See Johnson v. Bell*, 525 F.3d 466, 496 (6th Cir. 2008) ("The Supreme Court has repeatedly 'disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes.'"), *citing Kyles*, 514 U.S. at 433; *Bagley*, 473 U.S. at 676.  Each individual bit of impeachment should not be considered separately; rather the impeachment evidence should be considered cumulatively to assess whether the collective evidence was material. *Kyles*, 514 U.S. at 437-38

A police officer commits "a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009).  In other words, officers inflict "constitutional injury when they hide, conceal, destroy, withhold, **or even fail to disclose material exculpatory information**." *Moldowan*, 578 F.3d at 379 (emphasis added); *see also Id.*, *quoting California v. Trombetta*, 467 U.S. 479, 488 (1984) (a constitutional violation occurs when an officer  makes a "calculated effort to circumvent the disclosure requirements established by *Brady* [ ] and its progeny.").  Where exculpatory evidence is withheld or destroyed by the police, the defendant is not required to prove that the officer acted in bad faith. *Moldowan*, 578 F.3d at 382-89.

A police officer's failure to disclose impeachment evidence is particularly significant when the impeachment of an informant reflects on both the informant's credibility and the

15

caliber of the police work. *Kyles*, 514 U.S. 442, 445-45. In *Kyles*, for instance, the prosecution

was aware of evidence impeaching the government's informant. *Id.* at 424-27. Specifically, the

police did not report or question the informant's numerous inconsistencies in accusing the

defendant. *Id.* at 426-27. The Court held that such evidence was *Brady* material that had to be

disclosed both because it undermined the witness directly and also because it was evidence of the

police officers' shoddy work. *Id.* at 442 n.13, 445 ("disclosure would have revealed a

remarkably uncritical attitude on the part of the police"), 446 n.15 (when "the probative force of

evidence depends on the circumstances in which it was obtained and those circumstances raise a

possibility of fraud, indications of conscientious police work will enhance probative force and

slovenly work will diminish it").

An officer is not entitled to qualified immunity for the constitutional violation resulting

from a *Brady* violation because "any reasonable police officer would know that suppressing

exculpatory evidence was a violation of the accused's constitutional rights." *Moldowan*, 578

F.3d at 382. In *Moldowan*, the Sixth Circuit held that application of the due process guarantees

recognized in *Brady* to police officers was "clearly established" as of the early 1990's, when the

defendant police officer in that case failed to reveal exculpatory evidence to the plaintiff who

then faced criminal charges. *Id.* at 381. *See also Spurlock v. Satterfield*, 167 F.3d 995, 1005-06

(6th Cir.1999) (relying on *Brady* to conclude that plaintiff had raised claims against a police

officer that implicated clearly established constitutional rights).

Additionally, an officer violates an individual's clearly established rights when he frames

that person for a crime the individual did not commit. *See, e.g., Gregory v. City of Louisville*,

444 F.3d 725, 745 n.2 (6th Cir. 2006) (fabricating evidence violates clearly established law);

16

*Napue v. Illinois*, 360 U.S. 264, 269 (1959) (knowingly using false evidence violates clearly established rights); *United States v. Bagely*, 473 U.S. 667, 679 n.7 (1985) (use of perjured testimony and the deliberate suppression of favorable evidence violates established rights).

### C.   The Newly Discovered Evidence is Sufficient to Defeat Lucas' Summary Judgment Motion

There is abundant newly discovered evidence supporting the propositions that Lucas deliberately lied in order to support the indictment and prosecution against Webb and that during Webb's prosecution Lucas suppressed abundant *Brady* material about himself, Bray, the other defendants, and the Mansfield investigations generally. Summary judgment should be reversed because, based on the new evidence, plaintiffs can easily establish a dispute of fact regarding those contentions, defeating Lucas' claim that he is entitled to summary judgment on the issue of qualified immunity.

The newly discovered evidence supports the inference that Lucas committed a slew of *Brady* violations. First, throughout the Mansfield investigations, Lucas appeared to lie with abandon, either directly or through pregnant omissions, including: (1) the DEA-6 reports drafted by Lucas documenting his investigations were rife with inaccuracies and patently false statements and omitted significant exonerating information (App. ¶ 11, 12, 18-20, 26, 28, 30-31, 33, 38, 41, 56, 77); (2) Lucas affirmatively changed a DEA-6 report to hide exonerating information (App. ¶ 30); (3) although it was contemporaneously reported to Lucas and he had first-hand knowledge, Lucas did not document or address Bray's theft(s) from the DEA (App. ¶ 12-13); (4) Lucas was aware that a highly credible police officer believed that a person criminally charged was not the same person as the one who participated in the buy, but this fact was not documented by Lucas,

17

remedied by Lucas, or reported to the accused's defense, and it was expressly omitted from the

DEA-6 report (App. ¶ 14, 24, 26-27); (5) Bray, routinely dialed the identical telephone numbers

for unrelated alleged suspects, called one suspect while claiming he called another, or had a

different phone encounter from the one described by Bray and/or detailed in the DEA-6 form,

and Lucas never documented the obvious blunders (App. ¶ 18); (6) Lucas overlooked obvious

discrepancies between the drug weights allegedly transferred by Bray during the deals and the

reality, which allowed Bray to deal his own drugs or steal money from the DEA without being

caught  (App. ¶ 19); (7) when one defendant revealed that Bray was selling his own drugs on the

side, in addition to the buying he was doing for the government, Lucas DEA-6 report of

defendant's statements omitted that revelation (App. ¶ 20); (8) Lucas lied to the prosecutor on

more than one occasion, including one lie to cover up the fact that Bray received a car as

compensation for a deal in which the DEA was shorted payment. (App. ¶ 36, 39); (9) Lucas

altered telephone transcripts to mask inconsistencies between the calls and Bray's claims (App. ¶

45-47, 60-61).

Second, Lucas' ready willingness to testify falsely, suborn perjury, and fail to correct

patently false testimony defeats summary judgment.  For example, Lucas sat silently at the

prosecutors' table while Metcalf perjured himself during Nabors trial (a fact Metcalf now openly

admits), and Lucas was aware that Metcalf's testimony was false, but did nothing to address the

perjury. (App. ¶ 32-33, 37).  Likewise, Lucas sat silently while Bray perjured himself, and Lucas

knew the testimony to be false and even backed up Bray's false testimony.  (App. ¶ 39, 48-50,

81-82, 86).  Lucas also drafted a false search warrant affidavit for Metcalf to swear to.  (App. ¶

40).  Lucas himself testified falsely and watched several individuals get prosecuted when it was

18

readily apparent that they were wrongly accused. (App. ¶ 21, 23-25, 34-35, 42-44, 51, 56, 62, 63-66, 67-68, 73-74, 80, 84-86).  Finally, Lucas enlisted Ohio troopers to steal money from a drug dealer.  (App. ¶ 69).

All of these facts support the inference that Lucas committed *Brady* violations in the Webb case by failing to disclose his own dishonesty, other defendants' subterfuge, and significant impeaching facts about Bray, when they were the witnesses against Webb.  Evidence of all of Lucas' perjury, direct subterfuge, and suppression of impeaching materials, such as failing to report information about Bray's repeated thefts while acting as an informant, would have changed the outcome of summary judgment.

In previously filed, currently pending motions, plaintiff has argued that Lucas directly participated in framing Webb by hiding the obvious fact that Lucas conducted a deal with someone else altogether.  That claim, when viewed in the context of Lucas' false identifications of Roosevelt Williams, Dwayne Nabors, Lowesco Ballard, Geneva France, Noel Mott, and Frank Douglas carries profoundly more weight.  Six false identifications in the span of a few weeks is evidence of lack of mistake in Lucas' misidentification of Webb.  Such evidence plainly creates a dispute of fact, defeating summary judgment.

19

## Conclusion

Lucas' empty summary judgment claim that he is entitled to qualified immunity because there is no evidence that he committed any wrongdoing in the Webb investigation is decimated by the newly discovered evidence indicating that Lucas intentionally framed Webb and that he failed to report mounds of exculpatory and impeaching information.  Lucas had no response to plaintiffs' original 60(b)(2) motion, which was based exclusively on Bray's testimony at Lucas' trial.  Now that the testimony of the other trial witnesses has become available and the evidence of Lucas' conspiratorial acts comes from a host of sources, Lucas will have even less to say.  The new evidence creates an unmistakable dispute of fact, warranting reversal of summary judgment.

RESPECTFULLY SUBMITTED,


/s/ Mark Loevy-Reyes
Attorneys for Plaintiff


Jon Loevy
Mark Loevy-Reyes
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

20

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2010, I filed electronically a copy of the foregoing plaintiffs' second 60(b)(2) motion for relief from summary judgment relating to defendant Lee Lucas.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Any other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

<div style="margin-left:40%">

s/ Mark Loevy-Reyes
Mark Loevy-Reyes
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
Ph. – 312-243-5900
Fx. – 312-243-5902
loevy@loevylaw.com

</div>