IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

JOSHAWA WEBB, *et al.*,                    )
                                           )
                Plaintiffs,                )
                                           )
        v.                                 )        07 C 3290
                                           )
THE UNITED STATES OF AMERICA, *et al*.     )        Judge Boyko
                                           )
                Defendants.                )

**PLAINTIFFS' 60(b)(2) MOTION FOR RELIEF FROM JUDGMENTS
RELATING TO DEFENDANTS GEORGE, FAITH, METCALF,
MAYER, ANSARI AND CROSS**

Jon Loevy
Mark Loevy-Reyes
Debra Loevy-Reyes
Attorneys for Plaintiff
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
loevyreyes@aol.com

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Statement of the Issues  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Newly Discovered Evidence in Opposition to Summary Judgment  . . . . . . . . . . . . . . . . . . . 2

    *Charles Metcalf*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    *Matt Mayer*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    *Larry Faith*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    *Robert Cross*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    *Jamaal Ansari* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    *Dan George* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.    Federal Rule 60(b)(2) Warrants Reconsideration in
Light of Newly Discovered Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.    The Standard For Assessing Qualified Immunity in
Terms of Burying Exculpatory Evidence  . . . . . . . . . . . . . . . . . . . 12

        B.    The Newly Discovered Evidence is Sufficient to Defeat
Defendants' Summary Judgment Motions . . . . . . . . . . . . . . . . . . . 14

            1.    The New Evidence Defeats Metcalf's
Claim for Summary Judgment . . . . . . . . . . . . . . . . . . . . . 14

            2.    The New Evidence Defeats Mayer's
Claim for Summary Judgment . . . . . . . . . . . . . . . . . . . . . 16

            3.    New Evidence Defeats Faith's
Summary Judgment Motion . . . . . . . . . . . . . . . . . . . . . . 17

            4.    New Evidence Defeats Cross' Claim
for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

5.   New Evidence Defeats Ansari's Claims
for Summary Judgment ............................... 20

II.   **Alternatively, Plaintiffs' Rule 56(f) Affidavit Warrants Reversal of Summary
Judgment and an Opportunity for Discovery** ............................... 20

**Conclusion** ............................................................. 22

Table of Authorities

*Brady v. Maryland, 373 U.S. 83, 87 (1963)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*California v. Trombetta, 467 U.S. 479, 488 (1984)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Erickson's Flooring and Supply Co., Inc. v. Basic Coatings, Inc.,*
    2010 WL 1029036, *4 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Johnson v. Bell*, 525 F.3d 466, 496 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Kyles v. Whitley*, 514 U.S. 419, 433 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 16

*Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 13, 14

*Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Bagley*, 473 U.S. 667, 682, 678 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Westerfield v. United States*, 2010 WL 653535, *5 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . 21


FED. R. CIV. P. 60(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

FED. R. CIV. P. 59(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## Statement of the Issues

This case comes before the Court on plaintiffs' Rule 60(b)(2) motion seeking relief from the Court's two summary judgment orders, granting pre-discovery summary judgment based on assertions of qualified immunity by defendants George, Faith, Metcalf, Mayer, Ansari, and Cross (Doc. Nos. 89, 93). The issues before the Court are as follows:

(1)     Is the newly discovered evidence presented in this motion sufficient to warrant reversal of summary judgment?

(2)     Alternatively, is plaintiffs' supplemental Rule 56(f) affidavit, based on newly discovered evidence, sufficient to warrant reversal of summary judgment and an opportunity for discovery?

## Summary of the Argument

Since the time summary judgment was adjudicated, defendants' claims of qualified immunity have been severely undermined by newly discovered evidence produced at defendant Lucas' criminal trial, which supports the inference that defendants were all part of a larger conspiracy to frame innocent people, including Joshawa Webb. Moreover, the evidence from Lucas' criminal trial demonstrates that defendants repeatedly violated their *Brady* obligations by failing to report or disclose exonerating evidence. Plaintiffs now submit this newly discovered evidence in opposition to summary judgment, along with a supplemental Rule 56(f) affidavit to argue that the Court should reverse its rulings granting summary judgment.

1

## Newly Discovered Evidence in Opposition to Summary Judgment

In September 2009, the Court granted defendants George, Faith, Metcalf, Mayer, Ansari, and Cross' motions for summary judgment. (Doc. Nos. 89, 93). Since that time, beginning in January 2010, Lucas has had a criminal trial on the eighteen count federal indictment he faced for violating 18 U.S.C. §§ 1503(a) (obstruction of justice), 1001(a)(3) (knowing creation of a false government document), 1623(a) (false testimony and/or creation of a material false declaration), and 242 (deprivation of rights under color of law). The allegations at trial all related to Lucas' actions in conjunction with using Jerrell Bray as a confidential informant.

Five out of the seven defendants seeking summary judgment in this matter – Lucas, Mayer, Metcalf, Faith, and Cross – testified at Lucas' trial. Because no discovery has been permitted in this case, and the defendants' testimony included admissions far beyond the claims in their affidavits in support of summary judgment, this testimony constitutes newly discovered evidence that could not have been discovered earlier through due diligence. As set forth below, the evidence from Lucas' trial establishes defendants' participation in the Mansfield frame-up conspiracy and/or defendants' suppression of exculpatory evidence.[1]

The Mansfield investigations that defendants participated in involved a number of people accused of committing drug crimes with defendants' purported confidential informant, Jerrell Bray. The evidence at Lucas' criminal trial established that in each instance, the accused was actually innocent and was falsely framed for the offense. In their summary judgment motions, no

---

[1] On June 9, 2010, defendants tendered approximately 20,000 pages of documents from Lucas' criminal trial. Plaintiffs have not yet had an opportunity to sift through those documents, but they will seek to supplement this motion upon doing so, should they uncover further evidence of defendants' conspiracy.

2

defendant disputes that the frame-ups occurred – rather, each asserts that he did not participate. As set forth below, newly discovered evidence blows away these "I didn't do it" claims, establishing defendants' direct participation in some frame-ups and their failure to report exculpatory evidence from other frame-ups relating to Bray and each other's misconduct, all of which would have been *Brady* material in the case against Webb.

### Charles Metcalf

Metcalf was primarily responsible for overseeing Bray as an informant and was involved in "the vast majority" of the fake drug buys perpetrated by Bray, not one of which led to an actual trial conviction. (Appendix (hereinafter "App.") ¶ 3, 6). Metcalf was also responsible for setting up the buys involving Bray. (App. ¶ 5). In this capacity, Metcalf supervised every single call Bray made to set up a drug deal. (App. ¶ 17). While Metcalf was overseeing the calls, Bray routinely dialed the identical telephone numbers for unrelated alleged suspects, called one suspect while claiming he called another, and/or had a different phone encounter from the one detailed in the case report form, and Metcalf never documented the obvious subterfuge. (App. ¶ 17-18).

Additionally, Metcalf was aware of numerous inaccuracies in the case reports generated documenting the details of the various Mansfield investigations, but he never alerted the prosecution or defense counsel for the conspiracy victims about the false reporting. (App. ¶ 9). Nor did Metcalf ever confirm whether the addresses Bray attributed to suspects were actually tied to the alleged occupants, who were then charged with crimes purportedly occurring at their home. (App. ¶ 15). Metcalf also routinely overlooked obvious discrepancies between the drug weights allegedly transferred by Bray during the deals and the reality, which allowed Bray to steal drugs from the deals and to deal his own drugs on the side. (App. ¶ 20).

Metcalf was aware that Bray was arrested for drug possession during the time he was acting as a confidential informant, a fact directly related to Bray's credibility that was not reported to Webb's defense. (App. ¶ 22, 25). In fact, Metcalf intervened on Bray's behalf, so that Bray was not prosecuted. (App. ¶ 24). As the person overseeing Bray, Metcalf also should have been aware that Bray flagrantly shorted the DEA thousands of dollars during the deal framing Dwayne Nabors, an exculpatory fact that goes directly to Bray's credibility, but that Metcalf never documented or revealed to the defense. (App. ¶ 42).

Additionally, Metcalf facilitated targeting the person Bray wanted to seek revenge on. (App. ¶ 33). With Metcalf's assistance, Bray's buys were expanded to accommodate targeting his old grudge (who does not appear to have any connection to the Harris murder, which according to defendants, was supposedly at the heart of the undercover operation). (App. ¶ 33).

Metcalf also now admits that he blatantly lied under oath during the criminal trial of another Mansfield conspiracy victim, Dwayne Nabors. (App. ¶ 34). Metcalf's fictitious testimony included his false identification of the defendant and his false claim that the deal was not videotaped, when Metcalf himself had worked the video camera. (App. 34, 39). In explaining his perjury, Metcalf alluded to a conspiracy among the defendants, explaining, "I really thought this is what everybody else was going to testify to. This is what was on paper. . . . it had to make sense." (App. ¶ 35). Metcalf also alluded to the existence of co-conspirators when he admitted that he swore under oath to the veracity of a search warrant affidavit drafted by one of the other officers even though the affidavit contained numerous false statements in it about what Metcalf supposedly observed in support of probable cause. (App. ¶ 40).

Metcalf falsely identified Roosevelt Williams as the seller in one of his deals even though

4

Williams was in Chicago at the time, the person impersonating Williams looked nothing like him, and the impersonator was driving a car Metcalf knew to be Bray's.  (App. ¶ 43-44, 48).  Metcalf did not alert the prosecution or Webb's defense to the fact that the case report for that deal was altered, changing the make of the car driven (to hide that it was Bray's), or that the case report failed to include detective Wheeler's adamant contention that Williams was falsely identified.  (App. ¶ 46, 49-50).

During the Lowesco Ballard frame up, Metcalf monitored a recorded telephone conversation, in which Transou referred to Ballard in the third person, even though he was supposed to be impersonating Ballard.  (App. ¶ 56, 59).  In the written transcript of that call, Lucas changed the identity of the speaker from Ballard to Davis and eliminated the reference to "Westco" altogether, presumably to mask the obvious inconsistencies.  (App. ¶ 57-58).  Metcalf did nothing to correct these changes or to alert the prosecution or Webb's defense about the subterfuge.  (App. ¶ 59).

While Metcalf was responsible for monitoring the calls in the Danny Brown case, Bray made 30 unsuccessful phone call attempts, trying to get Brown to commit to a drug deal.  (App. ¶ 17, 61-62).  Bray then told the officers that Brown's telephone number was changed to a number that was actually registered to Robert Harris, another target of the investigation.  (App. ¶ 63).  Two subsequent monitored calls were attributed to Brown, but were instead recognizable as being to Robert Harris.  (App. ¶ 64).  Metcalf did not inform the prosecution or Webb's defense about the ruse to ensnare Brown.

While defendant Metcalf monitored Bray's recorded telephone call to set up the deal in the Ronald Davis investigation, Bray claimed that he was speaking with Davis, when the recording

shows that he was actually speaking to a woman.  (App. ¶ 78-79).  In the recording, it sounds as if the woman was trying to deepen her voice to sound like a man.  (App. ¶ 78).  Immediately after the call, Bray told Metcalf and the other officers that the phone conversation was with Davis and that he agreed to the deal.  (App. ¶ 78).  Bray's false claim to the officers was captured in an audio recording.  (App. ¶ 80).  The officers' case report, however, actually correctly identifies the phone call as one to a female recipient, but does not include that Bray lied and tried to pass the call off as one to Davis.  (App. ¶ 79).  Webb's defense was not informed of Bray's lie.  (Appendix Exhibit 3).

Then, during a recorded meeting allegedly between Bray and Davis, Bray lied and said that Davis gave him directions for completing the drug deal.  (App. ¶ 81-82).  Although Metcalf monitored Bray's body transmitter during this meeting, and was therefore aware of Bray's inculpatory lie, he did not report Bray's false attempt to incriminate Davis.  (App. ¶ 82, 86).

Metcalf's affidavit in support of qualified immunity denies having committed any specific wrongdoing during the Webb investigation, but it does not address (much less deny) the numerous delineated *Brady* violations that have been uncovered in this newly discovered evidence.

***Matt Mayer***

Mayer, along with Metcalf, was responsible for overseeing Bray as an informant.  (App. ¶ 3).  Mayer was personally involved in almost every deal involving Bray and was responsible for setting up the undercover buys, which supports an inference that Mayer was aware of most of the same deceit and subterfuge Metcalf knew about.  (App. ¶ 3, 5).  Like Metcalf, Mayer was aware of some of the false reporting that went on during the Mansfield investigations, a fact he never disclosed to the prosecution or Webb's defense.  (App. ¶ 9).  Mayer also never confirmed the addresses Bray attributed to suspects and never alerted anyone to blatant discrepancies between

6

the drug weights Bray claimed to buy and the actual weight of the drugs received, which allowed Bray to steal drugs. (App. ¶ 15, 20). In fact, Mayer was the officer who found hidden crack cocaine behind the steering wheel in Bray's car after one drug deal. (App. ¶ 23). Bray's attempted embezzlement of some of the drugs from the deal was not reported or prosecuted. (App. ¶ 22-24). Mayer's affidavit in support of qualified immunity does not address the *Brady* violations delineated here.

### *Larry Faith*

Faith was responsible for setting up Bray's drug buys and for supervising Mayer and Metcalf, which supports the inference that Faith was aware of some or all of the subterfuge that the two participated in or became aware of. (App. ¶ 4-5). For example, Faith knew that Bray hid drugs in his car after one deal, in an attempt to steal some of the drugs from the deal for himself. (App. ¶ 22). Faith also indicated that he was aware of some of the false reporting in the Mansfield investigation, and he admitted to inaccurate statements in his sworn affidavit in one of the investigations. (App. ¶ 9, 12).

Faith usually monitored the transmitter Bray wore during the undercover buys. (App. ¶ 4). In that capacity, Faith sometimes heard the reality of a situation on the transmitter, along with Bray's fictionalized version, yet he failed to report or challenge the inconsistencies. For instance, Faith monitored the transmitter when Bray claimed that he paid a higher amount than what he actually paid for drugs during a staged drug deal and then hid the balance of the money inside his car radio. (App. ¶ 26). Faith was present when the theft was uncovered and the money Bray tried to hide was found, but Faith never reported this highly impeaching fact to the prosecution or Webb's defense. (App. ¶ 26-27). Additionally, during the Ronald Davis investigation, during a

7

recorded meeting allegedly between Bray and Davis, Bray lied and said that Davis gave him directions for completing the drug deal. (App. ¶ 81-82). Faith monitored Bray's body transmitter during this meeting, and thus knew Bray was falsely trying to inculpate Davis, but he did not report Bray's lie. (App. ¶ 82, 86). Instead, he falsely swore to its veracity in a search warrant affidavit. (App. ¶ 85).

Faith also became aware that Bray was using his role as a confidential informant to pursue at least one personal vendetta, targeting an individual who had nothing to do with the Mansfield investigation, but who did not testify favorably to Bray years ago when Bray was charged with manslaughter. (App. ¶ 32). Faith did not disclose Bray's efforts to target personal nemeses, even though that fact impeaches Bray's credibility generally. (App. ¶ 33).

Additionally, Faith buried exculpatory evidence during the alleged Roosevelt Williams deal, when Williams was in Chicago and the person impersonating Williams looked nothing like him. (App. ¶ 43, 48). Detective Wheeler was very familiar with Williams prior to this deal, having encountered Williams countless times, having followed his doings for five to six months, and having spent hours watching him during surveillance. (App. ¶ 47). Immediately after the deal, detective Wheeler informed defendant Faith that the suspect identified as Roosevelt Williams was misidentified – Williams is tall, thin, and light-skinned with freckles, while the person defendants identified as Williams was short, dark-skinned, and stocky. (App. ¶ 48-49). The case report for this deal, however, not only omits Wheeler's claims, it omits his presence at the scene altogether. (App. ¶ 50). Faith never alerted anyone to the misidentification, nor did he ever tell Webb's defense of the other officers' false report, omitting exculpatory evidence. (App. ¶ 50, 52).

Finally, during the deal attributed to Danny Brown, the transmitter that Faith likely monitored recorded Bray accidentally slipping and telling the courier, "Here, give that to Chris," instead of telling him to give the money to Danny. (App. ¶ 68-69). When the transcript of the exchange was altered by one of the defendants to omit the statement, "give that to Chris," Faith was again silent about the defendants' subterfuge. (App. ¶ 70-71).

Faith's affidavit in support of qualified immunity focuses exclusively on the Webb investigation and does not address his *Brady* violations from the investigation as a whole.

### Robert Cross

Law enforcement officer after officer testified at Lucas' trial that the case reports generated in the Mansfield investigations were full of false statements, but no defendant ever alerted the prosecution or defense counsel for the conspiracy victims about the reports' inaccuracies. (App. ¶ 9). Defendant Cross was largely responsible for the inaccurate reports. (App. ¶ 11). The false reporting is even more suspicious because even though Cross was required by law to preserve his notes, he has admitted that he might have destroyed his notes relating to the Mansfield investigations. (App. ¶ 28). Cross' likely destruction of evidence was not disclosed to Webb's defense. (App. ¶ 29).

Cross also participated in the false identification of Roosevelt Williams, who was in Chicago at the time of the drug deal and looked nothing like the person impersonating him. (App. ¶ 43-44, 48). The false reporting resulting from that deal changed the make of the car driven by the dealer, to hide that the car was actually Bray's, and omitted detective Wheeler's presence and his claim that Williams was falsely identified. (App. ¶ 45-46, 49).

Finally, Cross admits that the Joshawa Webb deal did not abide by DEA procedures, but

9

he did nothing to alert the prosecution or Webb's defense counsel about the irregularities. (App. ¶ 60).

### *Jamaal Ansari*

Because Ansari and the remaining defendants did not testify at Lucas' criminal trial, there is less information available pre-discovery about their roles in the Mansfield frame-up conspiracy. Nonetheless, there is evidence showing that Ansari caught Bray stealing money given to him for a drug buy, while acting as a DEA informant. (App. ¶ 13). Although this is undeniably exculpatory evidence, severely impeaching Bray, Ansari did not document this theft, and it was not disclosed to Webb – instead, the report of that buy affirmatively hid the theft, stating that Bray returned the money to Lucas after the buy. (App. ¶ 13).

Ansari also falsely identified the stand-in impersonator at Roosevelt Williams' deal as Williams and the stand-in impersonator at Dwayne Nabors' deal as Nabors. (App. ¶ 36, 43-44). Moreover, Ansari ran the license plate on the car driven by the Williams impersonator during that deal and learned that the car was actually registered to Bray. (App. ¶ 45). Ansari did not alert anyone to the fact that this information was omitted from the report and the report was amended to falsely change the make of the car, in order to hide the fact that it was Bray's car used by Bray in an earlier deal. (App. ¶ 46, 52).

Ansari's affidavit in support of summary judgment addresses his involvement in the Webb investigation, but does not deny his failure to disclose exculpatory evidence.

### *Dan George*

Because no depositions or written discovery – not even basic 26(a)(1) disclosures – has been tendered in this matter, plaintiffs do not yet have evidence of George's involvement in the

10

case.  The complaint alleges that George participated in this frame-up conspiracy and suppressed

exculpatory evidence.  It is noteworthy that George's affidavit in support of his claims does not

deny allegations relating to his failure to turn over exculpatory information.  Plaintiffs'

supplemental Rule 56(f) affidavit addresses the need for discovery against George.

**Argument**

I.      **Federal Rule 60(b)(2) Warrants Reconsideration in Light of Newly Discovered
        Evidence**

As evidence from Lucas' criminal trial becomes available, certain new testimony has come

to light that defeats summary judgment here.  Because this new evidence arose for the first time at

Lucas' criminal trial and could not have been uncovered in time to file a motion under Rule 59(b),

reconsideration of this Court's summary judgment ruling is warranted under Federal Rule of Civil

Procedure 60(b)(2).  *See* FED. R. CIV. P. 60(b)(2) ("On motion and just terms, the court may

relieve a party or its legal representative from a final judgment, order, or proceeding for the

following reasons: . . . newly discovered evidence that, with reasonable diligence, could not have

been discovered in time to move for a new trial under Rule 59(b).").

Evidence is considered new for Rule 60(b)(2) purposes if, with "reasonable diligence, [it]

could not have been discovered in time to move for a new trial under Rule 59(b)," which is 28

days after entry of judgment.  FED. R. CIV. P. 59(b), 60(b)(2).  As summary judgment was entered

in this case in September 2009, plaintiffs must show why they were unable to obtain the new

evidence presented herein before October 2009.  (Rec. Ent. 97).  The reason for this lapse, of

course, is that Lucas' criminal trial did not begin until January 2010.  Thus, the evidence cited in

plaintiff's pleading was not available earlier.

11

To prevail on a 60(b)(2) motion, plaintiffs must also show "the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment." *Erickson's Flooring and Supply Co., Inc. v. Basic Coatings, Inc*., 2010 WL 1029036, *4 (6th Cir. 2010) (citation omitted).  The evidence set forth in this motion is more than enough to defeat defendants' summary judgment motions, thus it meets this standard as well.

### A.    The Standard For Assessing Qualified Immunity in Terms of Burying Exculpatory Evidence

In accordance with *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Even when the defense has not specifically requested information in discovery, the prosecution has a duty to volunteer exculpatory evidence if it is "material." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), *quoting Brady*, 373 U.S. at 108.  Material evidence is evidence that, if disclosed, "undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 682, 678 (1985).

In keeping with that definition of materiality, for *Brady* purposes, exculpatory evidence includes evidence that impeaches a witness for the prosecution. *See Johnson v. Bell*, 525 F.3d 466, 496 (6th Cir. 2008) ("The Supreme Court has repeatedly 'disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes.'"), *citing Kyles*, 514 U.S. at 433; *Bagley*, 473 U.S. at 676.  Each individual bit of impeachment should not be considered separately; rather the impeachment evidence should be considered cumulatively to assess whether the collective evidence was material. *Kyles*, 514 U.S. at 437-38

12

A police officer commits "a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009).  In other words, officers inflict "constitutional injury when they hide, conceal, destroy, withhold, **or even fail to disclose material exculpatory information**." *Moldowan*, 578 F.3d at 379 (emphasis added); *see also Id.*, *quoting California v. Trombetta*, 467 U.S. 479, 488 (1984) (a constitutional violation occurs when an officer makes a "calculated effort to circumvent the disclosure requirements established by *Brady* [ ] and its progeny.").  Where exculpatory evidence is withheld or destroyed by the police, the defendant is not required to prove that the officer acted in bad faith. *Moldowan*, 578 F.3d at 382-89.

A police officer's failure to disclose impeachment evidence is particularly significant when the impeachment of an informant reflects on both the informant's credibility and the caliber of the police work. *Kyles*, 514 U.S. 442, 445-45.  In *Kyles*, for instance, the prosecution was aware of evidence impeaching the government's informant.  *Id.* at 424-27.  Specifically, the police did not report or question the informant's numerous inconsistencies in accusing the defendant.  *Id.* at 426-27.  The Court held that such evidence was *Brady* material that had to be disclosed both because it undermined the witness directly and also because it was evidence of the police officers' shoddy work.  *Id.* at 442 n.13, 445 ("disclosure would have revealed a remarkably uncritical attitude on the part of the police"), 446 n.15 (when "the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it").

An officer is not entitled to qualified immunity for the constitutional violation resulting

13

from a *Brady* violation because "any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights." *Moldowan*, 578 F.3d at 382. In *Moldowan*, the Sixth Circuit held that application of the due process guarantees recognized in *Brady* to police officers was "clearly established" as of the early 1990's, when the defendant police officer in that case failed to reveal exculpatory evidence to the plaintiff who then faced criminal charges. *Id*. at 381. *See also Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir.1999) (relying on *Brady* to conclude that plaintiff had raised claims against a police officer that implicated clearly established constitutional rights).

## B. The Newly Discovered Evidence is Sufficient to Defeat Defendants' Summary Judgment Motions

### 1. The New Evidence Defeats Metcalf's Claim for Summary Judgment

Viewing the evidence in the light most favorable to plaintiffs and drawing all reasonable inferences on plaintiffs' behalf, as required for summary judgment motions, one could also easily conclude that Metcalf was well aware of the widespread deceit in the Mansfield investigations generally and that he gave his stamp of approval to the wider conspiracy by never reporting or confronting Bray or the other defendants about the subterfuge replete throughout the other investigations. Thus, Metcalf was a direct participant in this conspiracy, and there is evidence supporting countless *Brady* violations.

As detailed in the factual background section, Metcalf supervised Bray, oversaw all of the fake phone calls purporting to set up the deals, and was well aware of the rampant false case reports. (App. ¶ 3, 5-6, 17). Metcalf let Bray fudge phone numbers and addresses to make the cases work, and he ignored discrepancies in the drug weights, so that Bray could steal drugs from

14

the deals and deal his own drugs on the side.  (App. ¶ 15, 18, 20).  When Bray was arrested for

drug possessing, involving drugs he stole from an investigation, Metcalf not only failed to report

it, he intervened on Bray's behalf to protect Bray from prosecution.  (App. ¶ 22, 24-25).

Additionally, it is reasonable to infer that Metcalf knew Bray flagrantly shorted the government

thousands of dollars during the deal framing Dwayne Nabors, and Metcalf admitted that he

assisted Bray in targeting old vendettas through the investigation.  (App. ¶ 33, 42).  All of this

information fits squarely into impeaching evidence for the prosecution's key witness against

Webb, and Metcalf's efforts to bury the information constitute *Brady* violations.

Metcalf's admissions that he blatantly lied under oath to falsely identify Dwayne Nabors is

also evidence both of the conspiracy Metcalf was a part of (he testified because he believed it was

"what everybody else was going to testify to" and he wanted to support the false reports) and

evidence of yet another *Brady* violation, as Metcalf was a witness in Webb's case and his

knowingly false testimony is undoubtedly impeaching.  (App. ¶ 34-35, 39).  Likewise, Metcalf's

false identification of Roosevelt Williams and his failure to alert anyone to the deceptive reports

drafted and altered by his colleagues to support that misidentification is both evidence of

Metcalf's participation in the conspiracy and evidence of even more *Brady* violations.  (App. ¶ 43-

44, 46, 48-50).  The same is true of Metcalf's complicity in the altered transcripts in the Lowesco

Ballard frame-up and in the phone call gamesmanship in the Danny Brown frame-up.  (App. ¶ 17,

56-59, 61-64).

There is evidence demonstrating that defendant Metcalf participated directly in the Ronald

frame-up as well.  Metcalf monitored the only telephone call purporting to tie Davis to the deal,

where Bray claimed that he was speaking with Davis, but the recording shows (and the officers'

15

report reflects) that he was actually speaking to a woman.  (App. ¶ 81-83).  Metcalf helped hide

the fact that Bray lied and tried to pass the call off as one to Davis, which was clear *Brady*

material.  Metcalf also monitored Bray's body transmitter when Bray lied and said that Davis

instructed Bray where to meet Davis' drug courier, when in fact the suspect never mentioned the

drug deal during the audio transmission.  (App. ¶ 86).  Finally, Metcalf monitored Bray's body

transmitter when Bray purportedly called Davis to confirm that the deal went smoothly, but in

actuality, no mention of the deal was made.(App. ¶ 91).  A jury could certainly infer from

Metcalf's blind eye to Bray's lies and his failure to question or document Bray's inconsistencies

that Metcalf was an active participant in this frame-up and that he violated *Brady* by failing to

report all the deception.  *See Kyles*, 514 U.S. 442, 445-45.

Metcalf's affidavit in support of qualified immunity does not address (much less deny) any

of these allegations.  Because they are more than sufficient to create a dispute of fact about

Metcalf's participation in the frame-up conspiracy, the newly discovered evidence defeats

summary judgment.

### 2.     The New Evidence Defeats Mayer's Claim for Summary Judgment

Given that Mayer was responsible for overseeing Bray as an informant and was personally

involved in almost every deal involving Bray, it is reasonable to infer that Mayer was aware of the

same general frame-up efforts Metcalf knew about.  (App. ¶ 3, 5).  Like Metcalf, Mayer was

aware of but never disclosed some of the false reporting that went on during the Mansfield

investigations, Mayer never confirmed the addresses Bray attributed to suspects, and Mayer never

alerted anyone to blatant discrepancies between the drug weights Bray claimed to buy and the

actual weight of the drugs received.  (App. ¶ 9, 15, 20).  Mayer's failure to disclose these

16

impeaching facts is evidence of further *Brady* violations.

Along that same vein, Mayer found hidden crack cocaine behind the steering wheel in Bray's car after one drug deal, a fact that was neither reported or prosecuted. (App. ¶ 22-24). Construing that evidence in plaintiffs' favor, it is reasonable to infer that Bray was trying to steal the drugs, which is powerful *Brady* material, but Mayer never reported that theft attempt, despite its profound impeachment value. Accordingly, the new evidence creates disputes of fact about whether Mayer participated in the frame-up conspiracy generally and violated Webb's constitutional rights by burying exculpatory evidence.

### 3. New Evidence Defeats Faith's Summary Judgment Motion

One could infer from the fact that Faith was responsible for setting up Bray's drug buys and for supervising Mayer and Metcalf, that Faith was aware of much of the subterfuge Mayer and Metcalf were aware of or perpetrated. (App. ¶ 4-5). Faith knew that Bray was using his role as an informant to target a personal vendetta who had nothing to do with the investigation. (App. ¶ 32). Faith also knew that Bray hid drugs in his car after one deal, in an attempt to steal some of the drugs from the deal for himself, and Bray claimed a higher amount than what he actually paid for drugs during a staged drug deal and then hid the balance of the money inside his car radio. (App. ¶ 22, 26-27). Additionally, Faith was aware of some of the false reporting in the investigations, and he admitted to inaccurate statements in his own sworn affidavit in one of the investigations. (App. ¶ 9, 12). Faith never reported or disclosed the two attempted thefts, the false reports, or any of the other highly impeaching *Brady* material.

Faith also buried exculpatory evidence during the alleged Roosevelt Williams deal. When detective Wheeler informed Faith that Williams was misidentified, Faith failed to report that

17

exculpatory claim and remained silent when Wheeler's participation in the investigation was excised from the case report entirely. (App. ¶ 47-50, 52). Faith also failed to disclose when the transcript in the Danny Brown case was altered to omit Bray's statement to give the money to Chris instead of Danny. (App. ¶ 68-71). Such complicity demonstrates Faith's direct participation in the conspiracy as well as his complete disregard for his obligations under *Brady*. This evidence defeats summary judgment.

Faith participated directly in framing Ronald Davis in that he was the person monitoring Bray's audio transmission during two out of three of the conversations that were blatantly misconstrued in order to falsely tie Davis to the drug deal. In one, Bray claimed that Davis (a.k.a. Herman Price) told him where to meet the person delivering the drugs, but in the audio transmission Faith monitored, there was no acknowledgment of a drug deal and no such instruction occurred. (App. ¶ 85-86). In the other conversation, Bray supposedly called Davis to confirm that the deal went smoothly, but there was again no mention whatsoever of the drug deal, which supports an inference that Davis was unaware of the deal. (App. ¶ 91). Faith did not disclose or report either of Bray's blatant lies. (App. ¶ 87, 92).

After that fake drug deal, defendant Faith filed an affidavit in support of a search warrant of Davis' residence. (App. ¶ 97). The affidavit included a statement that Faith – as the person who monitored the audio transmissions – had to know was false or deceptive. In the affidavit, Faith reported that Bray told Lucas that Davis told Bray to meet "his girl" at a specific address (App. ¶ 85), but Faith had been listening to Bray's body wire and therefore knew that Bray was baldly lying about what Davis said. (App. ¶ 85-86). Faith also falsely claimed in his sworn affidavit that Bray had spoken to Davis before the deal and that Davis had promised to send his

18

girl, when the officers' report acknowledged that Bray was actually speaking to a woman, not Davis during that conversation.  (App. ¶ 81-82, 85).  Thus, Faith perpetrated multiple frauds on the court in an effort to obtain the search warrant against Price.

### 4.  New Evidence Defeats Cross' Claim for Summary Judgment

Cross' participation in this conspiracy is apparent from the fact that he was largely responsible for drafting the case reports for the Mansfield investigations, and those reports were full of patently false statements, a fact that was not disclosed to Webb's defense.  (App. ¶ 9, 11).  A jury could easily infer Cross' intentional participation in the conspiracy from his multitude of false reports, especially because even though Cross was required by law to preserve his notes, he has admitted that he might have destroyed his notes relating to the Mansfield investigations.  (App. ¶ 28).  Cross' likely destruction of evidence was not disclosed to Webb's defense, constituting yet another potential *Brady* violation.  (App. ¶ 29).

Cross also participated in the false identification of Roosevelt Williams, who was in Chicago at the time of the drug deal and looked nothing like the person impersonating him.  (App. ¶ 43-44, 48).  The false report from that deal changed the make of the car driven by the dealer, to hide that the car was actually Bray's and omitted detective Wheeler's presence and Wheeler's claim that Williams was falsely identified.  (App. ¶ 45-46, 49).  Finally, Cross admits that the Joshawa Webb deal did not abide by DEA procedures, but he did nothing to alert the prosecution or Webb's defense counsel about the irregularities.  (App. ¶ 60).  Cross' silence in the face of serious police misconduct, in this very case, and his own pattern of false reporting subjects him to potential liability and defeats summary judgment.

5.    **New Evidence Defeats Ansari's Claims for Summary Judgment**

The newly discovered evidence indicates that Ansari committed several *Brady* violations by burying exculpatory evidence. Most significantly, Ansari caught Bray stealing money given to him for a drug buy, while acting as a DEA informant. (App. ¶ 13). Although this is undeniably exculpatory evidence, severely impeaching Bray, Ansari did not document this theft and did not take any action when the report of that buy affirmatively hid the theft, stating that Bray returned the money to Lucas after the buy. (App. ¶ 13).

Ansari also falsely identified the stand-in impersonator at Roosevelt Williams' deal as Williams and the stand-in impersonator at Dwayne Nabors' deal as Nabors. (App. ¶ 36, 43-44). In fact, Ansari ran the license plate on the car driven by the Williams impersonator during that deal and learned that the car was actually registered to Bray. (App. ¶ 45). Yet, Ansari remained silent when this information was omitted from the report and when the report was amended to falsely change the make of the car, in order to hide the fact that it was Bray's car used by Bray in an earlier deal. (App. ¶ 46, 52).

Ansari's affidavit in support of summary judgment addresses his involvement in the Webb investigation, but does not deny his failure to disclose exculpatory evidence. Because there is evidence demonstrating several *Brady* violations committed by Ansari, summary judgment is improper.

II.    **Alternatively, Plaintiffs' Rule 56(f) Affidavit Warrants Reversal of Summary Judgment and an Opportunity for Discovery**

Federal Rule of Civil Procedure 56(f) provides that if a party opposing a motion for summary judgment "shows by affidavit that, for specified reasons, it cannot present facts essential

20

to justify its opposition," the court may order a continuance to allow discovery. FED. R. CIV. P. 56(f). An affidavit complies with Rule 56(f) when "it states with particularity why an opportunity to conduct discovery is crucial by detailing what discovery plaintiff would seek, what it might uncover, and how it would affect her ability to prove her client's allegations." *Westerfield v. United States*, 2010 WL 653535, *5 (6th Cir. 2010).

Here, the newly discovered evidence supports a supplemental Rule 56(f) affidavit (attached hereto as Exhibit A) that more than complies with those standards. Specifically, the affidavit sets forth why plaintiffs expect discovery to yield responsive evidence. As described in that affidavit, in the criminal trial against defendant Lucas, the testimony of many of the witnesses suggested that there were many law enforcement officers, including the defendant officers, who were aware that innocent people were being framed for crimes they did not commit and either affirmatively participated in the ruse or helped to propagate the fiction. The examples delineated in the affidavit are far-reaching and compelling – they are more than sufficient to warrant discovery. As described in plaintiffs' affidavit, defendants' recent document production is no substitute for depositions. At a minimum, there is no substitute for deposing the defendants and the other witnesses set forth in the affidavit, at least as to the issue of qualified immunity, before requiring an answer to summary judgment.

Plaintiffs have already filed a Rule 60(b)(6) motion explaining how their Rule 56(f) affidavit is more than sufficient under the Sixth Circuit's ruling in *Westerfield v. United States*, 2010 WL 653535 (6th Cir. 2010). That motion has been fully briefed but has not yet been ruled upon. Because the Sixth Circuit has already held that plaintiffs' original 56(f) affidavit was sufficient to warrant discovery, plaintiffs' far more detailed supplemental affidavit, based on the

21

newly discovered evidence, is more than sufficient to require discovery.

### Conclusion

Defendants have never contested as a legal matter that if the allegations in the complaint are credited, they would not be entitled to immunity. Newly discovered evidence now defeats defendants' claims of immunity. The new evidence shows that defendants directly participated in the conspiracy and failed to report pivotal exculpatory material. Alternatively, the newly discovered evidence supports a detailed Rule 56(f) affidavit that warrants discovery under clear Sixth Circuit dictates. Either way, the Court's summary judgment ruling should be reversed.

Respectfully submitted,

S/ Mark Loevy-Reyes

Jon Loevy
Mark Loevy-Reyes
Attorneys for Plaintiff
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
loevyreyes@aol.com

### CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2010, I filed electronically a copy of the foregoing Plaintiffs' 60(b)(2) Motion for Relief from Judgments Relating to Defendants George, Faith, Metcalf, Mayer, Ansari and Cross. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Any other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

S/ Mark Loevy-Reyes