UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

JOSHAWA WEBB, *et al.*,          )
                                 )
            Plaintiffs,          )          Case No. 1:07-cv-03290
                                 )
      v.                         )          Judge Christopher Boyko
                                 )
LEE LUCAS, *et al.*              )
                                 )
            Defendants.          )          JURY TRIAL DEMANDED


**PLAINTIFFS' RESPONSE TO DEFENDANT LEE LUCAS'
SUPPLEMENTAL MOTION TO DISMISS COMPLAINT**


Jon Loevy
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

Attorneys for Plaintiffs

## Table of Contents

Table of Authorities ....................................................................................................... iii

Statement of the Issues ................................................................................................... 1

Summary of the Argument .............................................................................................. 1

Factual Background ........................................................................................................ 2

Argument ...................................................................................................................... 14

    I.     Lucas is Not Entitled to Relief Under Rule 12(b)(6) ............................................ 14

         A.      The Standard for 12(b)(6) Motions .......................................................... 14

         B.      Accepting the Allegations in the Complaint as True and
                 Construing Them in Plaintiffs' Favor, the Allegations
                 Properly State a Claim for Relief ............................................................ 15

    II.    The Applicable Legal Standards, Should this Motion Be
          Considered One for Summary Judgment ............................................................. 16

         A.      The Standard for Adjudicating Summary Judgment ................................. 16

         B.      The Standard for Assessing Qualified Immunity Generally ..................... 17

              1.     The Standard For Assessing Qualified Immunity in
                   Terms of Framing an Innocent Accused ..................................... 17

              2.     The Standards for Assessing Qualified Immunity in
                   Terms of Plaintiff's Conspiracy Theory ..................................... 18

               3.     The Standard for Assessing Qualified Immunity in
                   the Context of *Brady* Violations ............................................... 19

              4.     Assessing Claims of Qualified Immunity in the
                   Context of Probable Cause .......................................................... 21

    III.   Lucas is Not Entitled to Summary Judgment Because the Available
          Evidence Creates Disputes of Fact About Whether Lucas Can Invoke
          Qualified Immunity ............................................................................................. 22

         A.      Lucas is not Entitled to Summary Judgment on the Claim that
                 He Framed Joshawa Webb ....................................................................... 22

B.    Lucas is Not Entitled to Summary Judgment on the
Conspiracy Claim ...................................................................................23

C.    Lucas is Not Entitled to Summary Judgment on the
*Brady* Allegations ...................................................................................24

D.    Summary Judgement Fails With Regards to Unlawful
Arrest and/or Malicious Prosecution Claims ...........................................26

Conclusion ........................................................................................................................28

## Table of Authorities

Cases

*Ahlers v. Schebil*, 188 F.3d 365 (6th Cir.1996) ........................................................ 21

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................... 16

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................*passim*

*Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598 (6th Cir. 2005).................... 14

*California v. Trombetta*, 467 U.S. 479, 488 (1984)..................................................... 20

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ............................................................ 16

*Franks v. Delaware*, 438 U.S. 154 (1978)................................................................. 22

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)................................. 15, 17

*Hardesty v. Hamburg Twp.*, 461 F.3d 646 (6th Cir. 2006)................................... 17, 22

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ........................................................ 16, 17

*Hill v. McIntyre*, 884 F.2d 271 (6th Cir. 1989)................................................... 21, 22

*Johnson v. Bell*, 525 F.3d 466 (6th Cir. 2008)........................................................... 20

*Johnson v. Hayden*, 67 Fed. Appx. 319 (6th Cir. 2003) ............................................ 21

*Kain v. Nesbitt*, 156 F.3d 669 (6th Cir. 1998)........................................................... 16

*Kinkus v. Village of Yorkville, Ohio*, 289 Fed. Appx. 86 (6th Cir. 2008).................. 16

*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................................. 19, 20

*Lanman v. Hinson*, 529 F.3d 673 (6th Cir. 2008)...................................................... 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................. 17

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .................................................................. 16

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) ...................................... 20

*Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539 (6th Cir. 2008) ....................... 16

*Napue v. Illinois*, 360 U.S. 264 (1959) ............................................................... 17, 20

*United States v. Avery,*  128 F.3d 966 (6th Cir. 1997) .................................................................. 18

*United States v. Bagely*, 473 U.S. 667 (1985) ........................................................... 15, 17

*United States v. Blakeney*, 942 F.2d 1001 (6th Cir. 1991) ........................................... 18

*United States v. Carney*, 387 F.3d 436 (6th Cir. 2004) ............................................... 18

*United States v. Lattner*, 385 F.3d 947 (6th Cir. 2004) ............................................... 18

*United States v. Melendez*, 2004 WL 162937 (E.D.Mich. 2004) ................................ 18

*United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001) ........................................... 3

*Yancey v. Carroll County*, 876 F.2d 1238 (6th Cir.1989) ...................................... 21, 22

<u>Other Rules and Authorities</u>

Rule 12(b)(6) ........................................................................................... 14, 15, 16, 28

Fed. R. Civ. P. 56(c) .......................................................................................... 16

Federal Rule of Evidence 404(b) .......................................................................... 18

## Statement of the Issues

This case comes before the Court on defendant Lucas' supplemental motion to dismiss the complaint on qualified immunity grounds.  In the motion, Lucas does not dispute that crediting the allegations in the complaint, plaintiffs state claims upon which relief can be granted. Instead, Lucas argues that certain facts he delineates in his motion refute plaintiffs' allegations. All Lucas' motion does is underscore the dispute of facts present, making dismissal improper.

## Summary of the Argument

Lucas argues that certain "facts" require dismissal: confidential source Jerrell Bray has denied that Lucas participated in a frame-up conspiracy; in the government's criminal case against Lucas, the indictment did not allege that Lucas committed the acts plaintiffs allege; and, in that criminal case, the government made concessions that it could not prove beyond a reasonable doubt claims like the allegations in this complaint.  However, the indictment against Lucas and the government's concessions have no bearing on what evidence plaintiffs can use to prove their claims.  Moreover, Bray's denial of Lucas' involvement in the spate of frame-ups is just one piece of evidence, creating a dispute of fact in the face of the abundant evidence to the contrary presented herein, demonstrating Lucas' efforts to frame Joshawa Webb in violation of his clearly established constitutional rights.

Evidence from defendant Lucas' criminal trial creates an unmistakable dispute of fact about whether Lucas was aware that his purported confidential informant, Jerrell Bray, was intentionally framing innocent people and whether Lucas played a pivotal role in the frame-up conspiracy by overlooking blatantly obvious frame-ups, altering DEA reports and transcripts to enable the frame-ups to succeed, testifying falsely, failing to include exonerating information in

1

his reports, failing to pass on exonerating information to the prosecutors, and sitting silently at the prosecution's table during the frame-up victims' criminal trials, with the knowledge that other witnesses were testifying falsely.  There is powerful evidence showing that Lucas worked very hard to keep prosecutors and counsel for the accused unaware of the proof of the frame-ups and unaware that Bray was stealing from the DEA, cheating, and dealing his own drugs while framing innocents.  The evidence also establishes that the probable cause Lucas purports to have relied on in this case was premised on his own false testimony and doctored evidence.

Lucas is not entitled to qualified immunity for violating Joshawa Webb's clearly established constitutional rights in that manner nor for the countless *Brady* violations he perpetrated, and summary dismissal and/or judgment must therefore be denied.

### Factual Background

Plaintiff Joshawa Webb was wrongfully arrested, indicted, and incarcerated on charges that have since proven to be pure fabrication.  Confidential informant Jerrell Bray framed Webb using a stand-in drug dealer, Jeremiah Conrad, to pose as Webb.  (App.[1] ¶ 51).  Conrad has now admitted that he posed as Webb during this deal.  (App. ¶ 51).  Lucas conducted a drug deal in the close quarters of a car with Conrad, but when Webb was prosecuted for the crime committed by Conrad, Lucas did not tell anyone during Webb's arrest shortly thereafter or during Webb's prosecution that the man Lucas bought drugs from in the car was not the same man as the one being prosecuted for the crime.  (App. ¶ 51).  In fact, Lucas sat at the prosecution table during Webb's trial and watched the wrong man get prosecuted.  (App. ¶ 4).

---

[1] The evidentiary support for plaintiffs' factual allegations is set forth in the appendix to this response, hereinafter cited as "App."

2

Defendant-DEA agent Cross has now admitted that the Webb deal did not abide by DEA procedures.  (App. ¶ 52).  The Court of Appeals for the Eleventh Circuit has found that Lucas has engaged in such duplicity in the past.  *See United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001) ("We find troubling Agent Lucas' apparent misrepresentations . . . . it is unclear how Agent Lucas could have made such statements of an affirmative character for which there was no basis without having acted either deliberately or recklessly.").[2]

Audiotapes were made purporting to record the deal between Bray, Lucas, and the person they claimed was Webb, to be used in the criminal case against Webb.  Three different experts analyzing the recordings have found that the recordings were tampered with or altered.  (App. ¶ 93).  Expert Greg Stuhman opines that anomalies in the recording lead him to believe the recording tendered to Webb's defense was edited or altered.  (App. ¶ 93).  Analyst Steve Cain found at least three separate anomalies during the recording of the alleged deal.  (App. ¶ 93).  And expert Tom Owen found that the recording device was stopped and started in order to omit material.  (App. ¶ 93).

This frame-up of Joshawa Webb occurred in the midst of a larger conspiracy in which dozens of Mansfield citizens were falsely implicated based on Bray's false testimony and defendants' doctored and fictitious evidence in support of that testimony.  At prosecutors' requests, federal judges have now freed most of those who were wrongfully convicted and incarcerated in this mass frame-up, and Bray is in custody for his role in the frame-up.

_____

[2] In his supplemental motion, Lucas argues that during his criminal trial, Webb admitted his participation in this drug deal.  That claim is absolutely false.  While Webb admitted to an innocuous telephone call with Bray, he has always denied committing the deal attributed to him and he has always denied being the person present in the car with Bray and Lucas.

3

Defendant Lucas is the DEA agent who worked directly with Bray in a surveillance or undercover capacity during most of the frame-ups and who assisted in the prosecution of the conspiracy victims.  (App. ¶ 2-4).  Lucas' role in this conspiracy permeated every stage and provided the key support so that Bray's lies would go undetected.  First of all, Lucas drafted reports about each of the deals Bray was involved with, and those reports (called DEA-6 reports) included false support for the charges and omitted exonerating evidence.  (App. ¶ 11, 12, 18-20, 26, 28, 30-31, 33, 38, 41, 56, 80, 89).  For instance, Bray routinely dialed the identical telephone numbers for unrelated suspects, called one suspect while claiming he had called another, and/or had a different phone encounter from the one described by Bray or detailed in Lucas' report, but Lucas never documented these subterfuges.  (App. ¶ 18).  Instead, Lucas actually altered the text of at least two telephone transcripts to mask inconsistencies between the calls and Bray's claims. (App. ¶ 45-47, 60-61).

Lucas worked hard to protect Bray's credibility, despite Bray's blatant cheating, stealing and lying.  In furtherance of that goal, Lucas' reports neglected to note obvious discrepancies between the drug weights allegedly transferred by Bray during the deals and the actual weights, which allowed Bray to deal his own drugs or steal money from the DEA without being caught. (App. ¶ 18, 20, 72).  When a defendant's proffer revealed that Bray was selling his own drugs on the side, in addition to the buying he was doing for the government, Lucas buried that impeaching fact as well.  (App. ¶ 20).  Lucas also buried the fact that Bray was caught stealing money from the DEA during a deal.  (App. ¶ 12-13).  Indeed, Lucas lied to the prosecutor on more than one occasion to cover for Bray.  (App. ¶ 36, 39).

Additionally, during the conspiracy to frame innocent Mansfield citizens, Lucas testified

4

falsely against conspiracy victims, suborned perjury, and failed to correct patently false testimony.  For example, Lucas testified falsely and/or watched several individuals get prosecuted when it was readily apparent to him that they were wrongly accused.  (App. ¶ 21, 23-25, 34-35, 42-44, 51, 56, 62, 63-66, 67-68, 75-76, 83, 87, 91-92).  Lucas also sat silently at the prosecutors' table while defendant Metcalf perjured himself during Nabors' trial (a fact Metcalf now openly admits), and Lucas was aware that Metcalf's testimony was false, but he did nothing to address the perjury.  (App. ¶ 4, 32-33, 37).  Likewise, although Lucas knew the testimony to be false, he repeatedly sat silently while Bray perjured himself and even backed up Bray's false testimony with false testimony of his own.  (App. ¶ 4, 39, 48-50, 81-82, 86).  Lucas also knowingly drafted a false search warrant affidavit for Metcalf to sign.  (App. ¶ 40).

On May 12, 2009, Lucas was indicted in an eighteen count federal indictment for violating 18 U.S.C. §§ 1503(a) (obstruction of justice), 1001(a)(3) (knowing creation of a false government document), 1623(a) (false testimony and/or creation of a material false declaration), and 242 (deprivation of rights under color of law).  (App. ¶ 6).  The indictment's allegations all related to Lucas' actions in conjunction with using Jerrell Bray as a duplicitous informant.  (App. ¶ 6).  After Lucas was indicted, he drafted a memo that he distributed to others, including some of the defendants here.  (App. ¶ 10).  The memo had false information about Lucas' investigations regarding who saw what and how certain deals were verified, and Lucas now admits that the memo was inaccurate.  (App. ¶ 10).  Lucas admits that his intention in drafting the memo was to coordinate what the witnesses would say at his trial about the investigations.  (App. ¶ 10).  The government failed to prove Lucas guilty beyond a reasonable doubt.

5

**Lucas' Behavior During Other Drug Buys Establishes His Participation in
this Conspiracy and is Proof of His Efforts to Help Bray Frame Innocent People**

*Roosevelt Williams*

Lucas' misconduct during conspiracy victim Roosevelt Williams' frame-up is evidence of his role supporting and enabling Bray's false allegations.  Williams has proven with evidence that he was in Chicago when the deal he was accused of participating in happened in Ohio. (App. ¶ 21).  Detective Wheeler was very familiar with Williams from well before this deal, having encountered Williams countless times, having followed his doings for five to six months, and having spent hours watching him during surveillance.  (App. ¶ 22).  According to Wheeler, who was conducting surveillance with Lucas during the deal, even though Roosevelt Williams is tall, thin, and light-skinned with freckles, the person Lucas identified as Williams was short, dark-skinned, and stocky. (App. ¶ 23).

Immediately after the drug deal, detective Wheeler informed Lucas that the suspect Lucas identified as Williams was misidentified.  (App. ¶ 24).  Ignoring this informed opinion, Lucas insisted that the identification was correct, and Lucas' report of the buy omitted Wheeler's credible claim that the suspect was not Williams.  (App. ¶ 25-26).  In order to support Bray's frame-up of Williams, Wheeler's findings were not documented by Lucas, and Wheeler's claim of misidentification was, therefore, never revealed to the defense.  (App. 26-27).

In actuality, Robert Harris acted as a "stand-in," impersonating Roosevelt Williams. (App. ¶ 28).  Harris also acted as a stand-in during Johnny Robertson's fake drug deal, wearing the same shirt during both deals.  (App. ¶ 28).  The exonerating fact that the same man wearing the same shirt was identified as both Williams and Robertson was never noted or documented by

6

Lucas in his reports nor disclosed during either's prosecution.  (App. ¶ 28).

As if Harris' unlawful impersonation was not obvious enough, during the supposed Williams deal, Lucas saw the drug dealer alleged to be Williams actually arrive in Bray's car – the same car that Lucas previously saw Bray use during the alleged Nabors drug deal.  (App. ¶ 29).  In fact, during the so-called Williams deal, defendant Ansari ran the license plate of the car driven by the dealer and confirmed that the car was Bray's.  (App. ¶ 30).  To hide this startling fact, a second DEA-6 report was generated, falsely identifying the make of car driven by the fake drug-dealer.  (App. ¶ 30).  On information and belief, only the second DEA-6 report was tendered to Williams' attorneys.

Additionally, Lucas saw and commented on the fact that the seller not only drove Bray's car, but he drove it back to Bray's house after the purported drug deal.  (App. ¶ 31).  That important observation was also omitted from Lucas' DEA-6 report.  (App. ¶ 31).

*Dwayne Nabors*

Lucas' false testimony in support of the frame-up conspiracy was unmistakable in the fabricated case against Dwayne Nabors.  Defendant Chuck Metcalf now admits that he blatantly lied during Dwayne Nabors' criminal trial.  (App. ¶ 32).  Metcalf's fictitious testimony included his false identification of Dwayne Nabors as a participant during the drug deal at issue.  (App. ¶ 32).  Metcalf now admits that in actuality, during the fake Nabors deal, Metcalf saw Nabors go into Platinum Status (where Nabors worked), and Nabors was not outside in the car dealing drugs, as Metcalf and Lucas falsely testified.  (App. ¶ 32).  When questioned about why he testified falsely against Nabors, Metcalf answered, "Because I really thought this is what everybody else was going to testify to.  This is what was on paper. . . . Because it had to make

7

sense."  (App. ¶ 33).  Metcalf explained that he perjured himself "because I regurgitated what [came] off the DEA-6 report."  (App. ¶ 33).  The DEA-6 report, of course, was full of the false statements that typified Lucas' reports in the Mansfield cases.

Although there is "a vast difference" in the physical appearances of Nabors and the person who admitted to driving the car, Lucas falsely identified Nabors as the driver of the car. (App. ¶ 34-35).  In support of their false identification, defendants Lucas and Metcalf lied to the prosecutor Blas Serrano, telling him that there was no video capturing this deal when there was in fact a video taken.  (App. ¶ 36).  Metcalf then falsely testified that there was no video tape taken of the supposed Nabors deal, and although Lucas sat at the prosecutors' table during this false testimony, he did not alert the prosecutor to Metcalf's lie.  (App. ¶ 4, 37).

Lucas' express efforts to falsely bolster Bray's credibility were also readily apparent in the alleged Nabors deal.  During that deal, Bray flagrantly stole thousands of dollars from the DEA, an exculpatory fact that goes directly to Bray's credibility, but that Lucas never documented or revealed to any of the conspiracy victims during their prosecutions.  (App. ¶ 38). During the Nabors investigation, Bray tried to hide the fact that he was paid for the drugs in part with a Cutlass that he kept for himself (leading to the DEA's shortfall) by falsely testifying that the recorded discussion about a "Cutty" was actually a discussion about Nabors' "Caddy" (Cadillac).  (App. ¶ 39).  When a prosecutor confronted Bray about his obviously false explanation, Lucas stepped up to cover Bray's false explanation by telling the prosecutor that "Cutty" was another word for "dope."  (*Id.*).

*Lowesco Ballard*

Lucas' role in the frame-up conspiracy is also demonstrated by the evidence arising from

8

the Ballard case.  Lucas saw the same stand-in, Darren Transou, impersonate both Noel Mott and Lowesco Ballard in two separate drug deals. (App. ¶ 42).  The obviousness of this ruse was augmented by the fact that Transou looked nothing at all like Ballard, who Lucas saw during the prosecution.  (App. ¶ 4, 43).  Lucas testified that he looked at a picture of Darren Transou to rule him out before (falsely) identifying Ballard. (App. ¶ 44).  But, defendant Cross did not actually order the identification picture of Transou for the DEA file until more than a year after Lucas' false identification, so Lucas' testimony was pure fiction.  (App. ¶ 44).   Lucas' testimony is laughable regardless because Transou admits that he was in fact used as a stand-in for Ballard.

Additionally, during a recorded telephone conversation, Transou referred to Lowesco Ballard in the third person, even though he was supposed to be Ballard. (App. ¶ 45).  In the written transcript of that call, Lucas falsely changed the identity of the speaker from Ballard to suspect Ronald Davis to mask the obvious inconsistency.  (App. ¶ 46).  In the new telephone transcript, Lucas also inserted ellipses to eliminate the reference to "Westco," altogether, even though the portion eliminated could be clearly heard.  (App. ¶ 47).  During Bray's cross-examination at Ballard's criminal trial, even though this phone call was to the same phone number Bray had used for the earlier purported Ballard calls, to a person who sounded just like the person who was supposedly Ballard in the earlier calls, but to a person who spoke of Ballard in the third person, Bray claimed that the call was actually to Ron Davis.  (App. ¶ 48).  Lucas backed Bray's lies with his own false testimony that the call where the recipient referred to "Westco" in the third person was actually to Davis.  (App. ¶ 48).  Obviously, if the call was with Davis, that call would have needed to be disclosed to Davis' defense, but it was not.  (App. ¶ 50).

*Danny Lee Brown*

In an effort to frame Danny Brown, Bray made two recorded telephone calls to Brown, but Bray was unable to set up a drug deal during those two calls – in the first Bray left a message, and in the second Brown asked Bray to call him back in twenty minutes.  (App. ¶ 53). Phone records show that Bray then tried to call Brown 28 times, but that Brown did not take Bray's calls.  (App. ¶ 54).  When Brown would not speak to Bray, Bray told the officers that Brown's telephone number was changed to a number that was actually registered to Robert Harris, another target of the investigation.  (App. ¶ 55).  This fact was not documented, and the two later calls that the DEA-6 report attributed to Brown were instead recognizable as being to Robert Harris.  (App. ¶ 56).

During the resulting the drug deal, falsely attributed to Danny Brown, Frank Douglas was the courier who delivered the drugs.  (App. ¶ 57).  The deal took place close to the home of Chris Jordan, Bray's friend and fellow drug dealer whom Bray worked to keep free of allegations in the Mansfield roundup.  (App. ¶ 57-58).  Bray's body recording during the deal recorded Bray saying at the end of the buy, "That's cool, that's cool.  Here, give that to Chris," which would alert a listener that the money was going to Chris, not Danny Brown.  (App. ¶ 60).  Because Bray's slip undermined his contention that Danny Brown, not Chris Jordan, was the person behind the drug deal, the copy of the transcript of the body wire prepared by defendants for Danny Brown's trial omitted the statement, "give that to Chris."  (App. ¶ 61).

Lucas also gave false testimony during the criminal trial against Brown to bolster Bray's testimony.  At his own criminal trial, Lucas testified that during the alleged Danny Brown deal, it was raining so hard that Lucas could not see the person who delivered the drugs.  (App. ¶ 62).

10

But at Danny Brown's criminal trial, Lucas testified that he identified the courier as Frank Douglas.  (App. ¶ 62).

*Joe Ward*

In order to frame Joe Ward,  Bray had his girlfriend bring drugs to him outside the house, so that Bray could go inside, pretend to make a purchase, and come back out with drugs that he could pretend to have purchased.  (App. ¶ 62, 66).  The recording device that Bray wore recorded that a woman said "take it" to Bray before he went into the house.  (App. ¶ 64).  Bray's girlfriend's delivery occurred in Lucas' plain view – at Ward's criminal trial, Lucas testified that he never let Bray out of his sight before the Ward deal and that he specifically watched for a drug hand-off.  (App. ¶ 65).  Although Bray now admits that there was a hand-off, and the recording device actually captured the hand-off, Lucas falsely testified at Ward's criminal trial that it never happened.  (App. ¶ 64-65).

*Noel Mott*

The Mott deal is further evidence of Lucas' efforts to hide Bray's sloppy frame-ups from plaintiff and Lucas' other victims.  For instance, Lucas ignored that Bray did not turn on his recording device until after the alleged Noel Mott deal was completed.  (App. ¶ 67).  Also, Lucas was present when Bray used the same stand-in, Darren Transou, to impersonate both Mott and Lowesco Ballard, but did not tell anyone about that fact. (App. ¶ 68).

The Mott case also demonstrates how above the law Lucas believed himself to be.  He admits that he ordered Ohio state troopers to steal money from Mott.  (App. ¶ 69).  According to Lucas, Mott and others were driving to Detroit allegedly to buy a large quantity of drugs.  (*Id.*).  Lucas came up with a plan to have Ohio troopers stop the car and essentially steal the money:

"Our game plan was to take the money that they were going to use to make the buy up in Detroit before they got up to Detroit.  That way, no one would get arrested, if we just took the money and we didn't arrest anyone, so the case could keep going. . . ."  (*Id.*).  At Lucas' instruction, the "ruse" was for the officers to find the money, "seize the money and identify who was in the vehicles" without charging anyone with doing anything illegal.  (*Id.*).

*Ronald Davis and Geneva France.*

As in the other sham deals, Bray was the confidential informant who purportedly purchased drugs from Davis and France.  (App. ¶ 71).  Bray now admits under oath that neither Davis nor France was actually involved in the deal.  Instead, selling his own drugs, Bray "staged a set-up deal" to frame the person that he thought was Davis.  (App. ¶ 71-72).  Bray sought to make it appear as if Davis was delivering drugs through Geneva France by staging the deal near Davis' house and using Bray's friend "Shea Shea" (Karmiya Moxley) to pose as France.  (App. ¶ 73).  Karmiya Moxley has described how she, not France, delivered the drugs and how she did so for Bray, not Davis.  (App. ¶ 74).  Davis did not know Bray, did not authorize anyone to sell drugs to Bray on his behalf, and had no knowledge of this drug deal.  (App. ¶ 88).

Lucas participated directly in this frame-up drug purchase.  Moxley got into the car with Lucas, had a conversation with him, and conducted a drug deal in the close confines of inside a car.  (App. ¶ 75).  Soon thereafter, Lucas arrested and prosecuted France but never identified that she was not the same person he spoke with earlier in the car, nor did Lucas ever alert plaintiff or any other conspiracy victim to this difference.  (App. ¶ 75-76).

The conspirators' efforts to connect Ronald Davis to the deal was pure fabrication.  While defendants Lucas and Metcalf monitored Bray's recorded telephone call to set up the deal, Bray

12

claimed that he was speaking with Davis, when the recording shows that he was actually speaking to a woman. (App. ¶ 79). In the recording, it sounds as if the woman was trying to deepen her voice to sound like a man, and she said that she would "send the girl." (App. ¶ 79). Immediately after the call, Bray told Lucas and Metcalf that the phone conversation was with Davis and said, "He [Davis] said he's sending his girl." (App. ¶ 80). The DEA-6 form generated, however, actually correctly identifies the phone call as one to a female recipient, but does not include that Bray lied and tried to pass the call off as one to Davis. (App. ¶ 80). In an effort to bolster Bray's false testimony at France's criminal trial, Lucas testified that he overheard the telephone call between Bray and Davis, though he now admits that this testimony was a lie. (App. ¶ 82-83).

Immediately before the deal Bray stopped by to see the person he believed to be Davis. (App. ¶ 84). But in the recording of that meeting, that person never said anything about the deal, never alluded to Bray needing to meet with a person delivering drugs, and never directed Bray to a location. (App. ¶ 84). Nevertheless, Bray falsely claimed (and later testified) that during this meeting Davis instructed Bray where to meet Davis' drug courier. (App. ¶ 85). Lucas had heard the recording of the meeting and knew this was false testimony, but did nothing to correct it or to alert the defense or any other victim of the conspiracy that the recordings contradicted Bray's testimony and impaired his credibility. (App. ¶ 85-86).

To further bolster Bray's false testimony about this meeting, Lucas testified falsely at Davis' criminal trial that he saw Davis outside with a gun in his hand when he did not actually see Davis with a gun. (App. ¶ 87). Lucas also testified falsely about an incident during the deal in an effort to salvage Bray's credibility. During the drug deal, there was a dispute about the

13

weight of the drugs being delivered.  (App. ¶ 91).  Bray pretended to call Davis to resolve the matter, but in actuality did not dial anyone and merely pretended to have a conversation with Davis, in which Davis agreed to give $200 back because the drugs were short.  (*Id.*).  Bray's phone records support that no call was actually made.  (*Id.*).  Even though this was an entirely fictional conversation and there is evidence that no such call was made, Lucas testified falsely at both Geneva France's criminal trial and at his own that he was sitting close enough to Bray that he actually heard Davis say "take two back" on Bray's cell phone.  (*Id.*).

**Lucas' Grand Jury Testimony Against Webb**

Lucas testified before the grand jury that he sat in the back seat of a car with Joshawa Webb and purchased $2000-$2500 worth of crack cocaine from Webb.  (App. ¶ 94).  Webb was indicted for two counts of drug related charges based solely on Lucas' testimony.  (App. ¶ 95).

**Argument**

**I.     Lucas is Not Entitled to Relief Under Rule 12(b)(6)**

**A.     The Standard for 12(b)(6) Motions**

In ruling on Lucas' Rule 12(b)(6) motion, this Court "must accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff."  *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 605 (6th Cir. 2005) (internal quotation marks and citations omitted).  Dismissal of plaintiffs' complaint is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Id.* (quotation marks and citations omitted).

**B.      Accepting the Allegations in the Complaint as True and Construing Them in Plaintiffs' Favor, the Allegations Properly State a Claim for Relief**

Because for the purpose of a 12(b)(6) motion, the allegations in the complaint must be credited as true, there are abundant facts for the purposes of this motion supporting defendant Lucas' culpability for an egregious illegal frame-up of Joshawa Webb.  Specifically, "In order to build a false case against [Webb], the Defendants fabricated evidence which falsely implicated Mr. Webb in the drug ring, and destroyed and/or otherwise withheld from the prosecutors and from Mr. Webb evidence which would have helped exonerate him, all in violation of the Constitution."  (First Amended Complaint, Doc. 5; at 6-7).  The complaint explains about the expert findings regarding the doctored audiotapes and alleges that the buy attributed to Mr. Webb was actually simulated in order to falsely accuse him.  (*Id.* at 6)

Lucas does not argue in his supplemental motion that the complaint fails as a legal matter. The reason for that lapse is obvious – if Lucas did participate in a conspiracy and intentionally developed false evidence, tampered with evidence, misled prosecutors, and buried exculpatory evidence, all in order to frame plaintiff for a crime that he did not commit, he would not be entitled to qualified immunity, and plaintiffs would have stated claims upon which relief may be granted.  *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725, 745 n.2 (6th Cir. 2006) (fabricating evidence violates clearly established law); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (knowingly using false evidence violates clearly established rights); *United States v. Bagely*, 473 U.S. 667, 679 n.7 (1985) (use of perjured testimony and the deliberate suppression of favorable evidence violates established rights).

Instead, Lucas argues only that under his version of the facts, he is entitled to qualified

15

immunity because he had probable cause to support Webb's arrest.  That argument, of course, does not credit the allegations in the complaint and construe them in the light most favorable to plaintiffs, as required for a 12(b)(6) motion.  Accordingly, Lucas' request for 12(b)(6) relief must be denied.

Because it appears that Lucas is attempting to craft a summary judgment argument, claiming that under his version of the facts, he is entitled to qualified immunity, plaintiffs will respond to any attempt at summary judgment, which is equally unavailing.

## II.     The Applicable Legal Standards, Should this Motion Be Considered One for Summary Judgment

### A.     The Standard for Adjudicating Summary Judgment[3]

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 546 (6th Cir. 2008); Fed. R. Civ. P. 56(c).  The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Nance*, 527 F.3d at 547, *quoting Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986).  When deciding a motion for summary judgment, a court must view the evidence in favor of the non-moving party and draw

---

[3] Of course, if this were a summary judgment motion, plaintiff would not be obligated to defend against it until after being afforded the opportunity to take discovery because the issue turns on a question of fact.  *See, e.g., Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982); *Kinkus v. Village of Yorkville, Ohio*, 289 Fed. Appx. 86, 91 (6th Cir. 2008); *Kain v. Nesbitt*, 156 F.3d 669 (6th Cir. 1998); *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).  For the sake of argument, plaintiff argues against any summary judgment analysis, because even if adjudication was proper at this juncture, summary judgment should be denied.

all reasonable inferences in that party's favor.  *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 650 (6th Cir. 2006), *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.  The Standard for Assessing Qualified Immunity Generally

Government actors are shielded from liability by qualified immunity when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In order to determine whether a defendant is entitled to qualified immunity, the Sixth Circuit usually uses a two-part test, asking:  (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated; and (2) whether that right was clearly established.  *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008) (citations omitted).

#### 1.  The Standard For Assessing Qualified Immunity in Terms of Framing an Innocent Accused

Officers are liable for violating an accused's constitutional rights if they intentionally developed false evidence, tampered with evidence, assisted a witness in committing perjury, and/or misled prosecutors, in an effort to frame an accused for a crime that he did not commit. *See, e.g., Gregory v. City of Louisville*, 444 F.3d 725, 745 n.2 (6th Cir. 2006) (fabricating evidence violates clearly established law); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (knowingly using false evidence violates clearly established rights); *United States v. Bagely*, 473 U.S. 667, 679 n.7 (1985) (use of perjured testimony and the deliberate suppression of favorable evidence violates established rights).

Evidence that Lucas participated in framing the other Mansfield conspiracy victims is also directly relevant to the issue of whether he also assisted in framing plaintiff.  Federal Rule of

Evidence 404(b) provides, in pertinent part, that evidence of other crimes, wrongs, or acts may be admissible for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EV. 404(b).  Rule 404(b) evidence is also admissible to show "*a common scheme or plan*."  *United States v. Carney*, 387 F.3d 436, 450 (6th Cir. 2004) (emphasis in original; citation omitted).   A defendant's claims "of innocent presence or association . . .  routinely open the door to 404(b) evidence. . . ." *United States v. Lattner*, 385 F.3d 947, 957 (6th Cir. 2004).  When there is a similarity between the conduct at issue and the other acts, "this renders proof of the prior acts admissible under FRE 404(b) to show plan and method of operation."  *Id*. at 957-58.

### 2.      The Standards for Assessing Qualified Immunity in Terms of Plaintiff's Conspiracy Theory

The Mansfield frame-ups can be viewed as part of a single conspiracy that was ongoing when Lucas joined, so his active participation in any part of the greater frame-up conspiracy is sufficient to inculpate him in framing Webb.  *See United States v. Avery,*  128 F.3d 966, 971 (6th Cir. 1997) (to be liable for a conspiracy a defendant need not have participated in all aspects of the conspiracy; it is sufficient that the defendant "was a party to the general conspiratorial agreement," and "the connection between the defendant and the conspiracy need only be slight").

The conspiratorial agreement "may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan."  *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)  (citation omitted).  In *United States v. Melendez*, 2004 WL 162937, *2 (E.D.Mich. 2004), for instance, the court found that police officers had a single conspiracy to violate the civil rights of a number of accused, where "the same *modus operandi*

18

was repeated in many of the civil rights violations."  The court noted that the defendants planted incriminating evidence in many of the cases, falsified police reports in a number of the cases, and used force to unlawfully enter residences in a number of the cases.  *Id.*  The pattern of conduct occurred within a ten square mile radius, during a two year time period.  *Id*.

Here, the pattern of conduct is similarly apparent – every conspiracy victim was framed within a nine month period in an alleged sale involving Bray as the buyer.  Stand-ins were frequently used and audio recordings were often altered to make the deals more plausible.  Most of the fake deals involved false case reporting to bury contrary information.  All of the fake deals occurred in the City of Mansfield.

### 3.    The Standard for Assessing Qualified Immunity in the Context of *Brady* Violations

Law enforcement officers are not entitled to qualified immunity for committing *Brady* violations because such conduct violates an accused's clearly established constitutional rights.  In accordance with *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Even when the defense has not specifically requested information in discovery, the prosecution has a duty to volunteer exculpatory evidence if it is "material."  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), *quoting Brady*, 373 U.S. at 108.  Material evidence is evidence that, if disclosed, "undermines confidence in the outcome of the trial."  *United States v. Bagle*y, 473 U.S. 667, 682, 678 (1985).

In keeping with that definition of materiality, for *Brady* purposes, exculpatory evidence

19

includes evidence that impeaches a witness for the prosecution.  *See Johnson v. Bell*, 525 F.3d 466, 496 (6th Cir. 2008) ("The Supreme Court has repeatedly 'disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes.'"), *citing Kyles*, 514 U.S. at 433; *Napue v. Illinois*, 360 U.S. 264 (1959) ("jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); *Bagley*, 473 U.S. at 676.  Each individual bit of impeachment should not be considered separately; rather the impeachment evidence should be considered cumulatively to assess whether the collective evidence was material.  *Kyles*, 514 U.S. at 437-38.

A police officer commits "a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material."  *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009).  In other words, officers inflict "constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information." *Moldowan*, 578 F.3d at 379; *see also Id.*, *quoting California v. Trombetta*, 467 U.S. 479, 488 (1984) (a constitutional violation occurs when an officer  makes a "calculated effort to circumvent the disclosure requirements established by *Brady* [ ] and its progeny.").  Where exculpatory evidence is withheld or destroyed by the police, the defendant is not required to prove that the officer acted in bad faith.  *Moldowan*, 578 F.3d at 382-89.

A police officer's failure to disclose impeachment evidence is particularly significant when the impeachment of an informant reflects on both the informant's credibility and the caliber of the police work.  *Kyles*, 514 U.S. 442, 445-45.  In *Kyles*, for instance, the prosecution was aware of evidence impeaching the government's informant.  *Id.* at 424-27.  Specifically, the police did not report or question the informant's numerous inconsistencies in accusing the

20

defendant.  *Id*. at 426-27.  The Court held that such evidence was *Brady* material that had to be disclosed both because it undermined the witness directly and also because it was evidence of the police officers' shoddy work.  *Id*. at 442 n.13, 445 ("disclosure would have revealed a remarkably uncritical attitude on the part of the police"), 446 n.15 (when "the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it").

### 4. Assessing Claims of Qualified Immunity in the Context of Probable Cause

A law enforcement officer is not entitled to immunity and is liable for violating an individual's constitutional rights when the officer "deliberately or recklessly submits false and material information in a warrant affidavit."  *Johnson v. Hayden*, 67 Fed. Appx. 319, 323 (6th Cir. 2003).  *See also Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir.1996) (an officer can be held liable "for requesting a warrant which allegedly led to a false arrest if he 'stated a deliberate falsehood or acted with a reckless disregard for the truth'") (citation omitted); *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) ("An action under § 1983 does lie against an officer who obtains an invalid search warrant by making, in his affidavit, material false statements either knowingly or in reckless disregard for the truth.").

The officer cannot rely on the fact that an indictment issued to establish his right to immunity when that judicial determination was based on his own deliberate subterfuge.  *See Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir.1989).  The question of whether the indictment would have been issued, even without the defendant's knowingly or recklessly false

statement, is one that should be left for the jury.  *Hill*, 884 F.2d at 276, *citing Yancey*.

Defendant cites a slew of cases for the general proposition that when an officer acts pursuant to a judicially secured warrant or indictment, the issue of probable cause is conclusively determined.  (Doc. 139 at 8, 10).  None of those cases, however, addresses the situation here, when the judicial action relies on the officer's own deceptions.  In that situation, it is clear that the officer cannot use his falsely induced judicial determination to shroud him in immunity. *Yancey*, 876 F.2d at 1243.

In a nutshell, to overcome an officer's claim of qualified immunity, a plaintiff must establish:  "(1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause."  *Hill*, 884 F.2d at 275 (applying the test set forth in *Franks v. Delaware*, 438 U.S. 154 (1978), to evaluate a § 1983 claim).  Treating Lucas' argument as one for summary judgment, plaintiffs would merely need to show that crediting their evidence and drawing all reasonable inferences in their favor, there is a dispute of fact about these two issues.  *Hardesty*, 461 F.3d at 650.

**III.    Lucas is Not Entitled to Summary Judgment Because the Available Evidence Creates Disputes of Fact About Whether Lucas Can Invoke Qualified Immunity**

**A.    Lucas is not Entitled to Summary Judgment on the Claim that He Framed Joshawa Webb**

A stand-in, Jeremiah Conrad, has come forward and sworn that he impersonated Webb in the drug deal used to incriminate Webb.  (App. ¶ 51).  Bray has also admitted that Conrad, not Webb, participated in this drug deal.  (App. ¶ 51).  At this stage Webb is entitled to the reasonable inference that Conrad, not Webb, sold Lucas the drugs within the close confines of a

22

car.  Nevertheless, Lucas never told a soul when Webb was prosecuted for a deal committed by Conrad.  A jury could certainly find, based on Lucas' proximity and opportunity to view Conrad, that Lucas intentionally misidentified Webb.  Moreover, in light of all of Lucas' other false identifications and perjured testimony, a jury is likely to make such a finding.

Additionally, multiple experts have found that the audio tapes of this drug deal were tampered with in order to eliminate certain information.  (App. ¶ 93).  Based on those facts, and given Lucas' direct participation in the drug sale attributed to Webb, a jury could certainly find that Lucas participated in framing Webb.

A jury could also consider all of the evidence of Lucas framing other Mansfield conspiracy victims – claiming, for instance, that Karmiya Moxley was Geneva France, Darren Transou was both Lowesco Ballard and Noel Mott, and Robert Harris was both Roosevelt Williams and Johnny Robertson – to determine that Lucas had a *modus operandi* of turning a blind eye to Bray's obvious ruses to incriminate innocent people.  Given all of Lucas' efforts to distort the reports and transcripts in order to hide the duplicity, a jury could easily conclude that Lucas was responsible for the altered recording and false identification in this case.  There is a dispute of fact precluding summary judgment.

**B.      Lucas is Not Entitled to Summary Judgment on the Conspiracy Claim**

There is abundant evidence supporting that the Webb frame-up occurred during a larger conspiracy where stand-ins were routinely used to falsely inculpate innocent people.  Bray's testimony that Lucas was not a knowing participant does not put the matter to rest – it merely creates a dispute of fact.  Countering Bray's testimony is all of the false reports, doctored transcripts, and perjured testimony, showing that Lucas was a full participant in this conspiracy.

23

There is enough evidence to create a dispute of fact.

The fact that the government chose not to indict Lucas for participating in the conspiracy or conceded that it could not prove him guilty of participating beyond a reasonable doubt has no bearing on the question before this Court, whether construing the evidence in the light most favorable to plaintiff, there is a dispute of fact about whether Lucas was a member of the frame-up conspiracy.  Defendant tries to dismiss plaintiffs' entire liability as "discredited" because the government did not pursue it.  (Doc. 139 at 14).  Yet, the government's trial strategy (likely pursued because of its much higher burden of proof) is simply not relevant to whether there is sufficient evidence to create a dispute of fact.[4]  There is ample evidence to meet this burden.

### C.    Lucas is Not Entitled to Summary Judgment on the *Brady* Allegations

Plaintiffs have presented this Court with evidence that before Webb's criminal trial, Lucas was aware that Bray was stealing money and drugs from the DEA, framing innocent people, falsely relating his encounters with suspects, targeting personal enemies, and lying with abandon.  Lucas drafted false case reports and failed to report any of the exculpatory evidence he unearthed, often altering reports or transcripts to hide the exonerating evidence.  Plaintiffs are also entitled to the inference that Lucas was aware of his own subterfuge in all of the Mansfield investigations, all of which occurred before Webb's criminal trial.  Finally, at this juncture, Webb is entitled to the reasonable inference that Lucas doctored the audio recordings in the

---

[4] Defendant accuses Webb of trying to "have it both ways" by embracing Lucas' criminal indictment when it suits him and then ignoring Lucas' acquittal.  (Doc. 139 at 14-15).  Plaintiffs have no idea what Lucas is getting at.  An indictment is never evidence, and an acquittal merely means that there was insufficient evidence for the jury to find guilt beyond a reasonable doubt. Neither has any relevance to the question before this Court, whether construing the evidence in the light most favorable to plaintiffs there is a dispute of fact about Lucas' immunity claims.

24

Webb investigation.

Aside from the stand-in Jeremiah Conrad, who was not identified prior to the criminal trial, there were only two witnesses against Webb – Lucas and Bray.  A jury could certainly infer that had Webb and the prosecution been aware of all of the impeaching evidence buried by Lucas, Webb's prosecution never would have gone forward.  There is a strong claim, supported by significant evidence, that Lucas personally concealed material exculpatory evidence from Webb's defense.

To be clear, despite Lucas' claims to the contrary, Webb has never admitted to participating in this drug deal.  He has always claimed that he was framed.  The fact that Webb might have committed other drug crimes does not make him an "unworthy" claimant, as Lucas argues.  (Doc. 139 at 14).  One of the beautiful things about our country is that our constitution's protections are extended to all, without restriction to only those deemed worthy of protecting.

Part of what made defendants' frame-up conspiracy so insidious is that many of the people they framed for false drug crimes happened to be drug dealers with criminal histories and perceived propensities for dealing drugs.  Hand-selecting disreputable victims gave the conspiracy better chances of succeeding because it is likely juries would credit law enforcement officers over the claims of known drug dealers.  But, importantly, the fact that Webb may have admitted that he dealt drugs does not refute that he was also framed for a drug deal he did not commit.  If Lucas wants to argue at trial that Webb is entitled to recover less damages because he was a drug dealer, that is his prerogative.  Such argument, however, has no place here.

25

**D.     Summary Judgement Fails With Regards to Unlawful Arrest and/or Malicious Prosecution Claims**

There is abundant evidence supporting the proposition that Lucas deliberately lied in order to support the indictment against Webb.  If plaintiffs can establish a dispute of fact regarding that contention, then Lucas is not entitled to summary judgment on the issue of qualified immunity.

As an initial matter, there is significant general information available supporting the inference that Lucas intentionally misled the grand jury.  For instance, a jury could reasonably conclude that Lucas lied to the grand jury based on the numerous other instances when Lucas appeared to lie with abandon, either directly or through pregnant omissions, during the Mansfield investigations:  (1) the DEA-6 reports drafted by Lucas documenting his investigations were rife with inaccuracies and patently false statements and omitted significant exonerating information (App. ¶ 11, 12, 18-20, 26, 28, 30-31, 33, 38, 41, 56, 80, 89); (2) Lucas affirmatively changed a DEA-6 report to hide exonerating information (App. ¶ 30); (3) although it was contemporaneously reported to Lucas and he had first-hand knowledge, Lucas did not document or address Bray's theft(s) from the DEA (App. ¶ 12-13); (4)  Lucas was aware that a highly credible police officer believed that a person criminally charged was not the same person as the one who participated in the buy, but this fact was not documented by Lucas, remedied by Lucas, or reported to the accused's defense, and it was expressly omitted from the DEA-6 report (App. ¶ 14, 24, 26-27); (5) Bray, routinely dialed the identical telephone numbers for unrelated alleged suspects, called one suspect while claiming he called another, or had a different phone encounter from the one described by Bray and/or detailed in the DEA-6 form, and Lucas never documented

26

the obvious blunders (App. ¶ 18); (6) Lucas overlooked obvious discrepancies between the drug weights allegedly transferred by Bray during the deals and the reality, which allowed Bray to deal his own drugs or steal money from the DEA without being caught  (App. ¶ 18, 20, 72); (7) when one defendant revealed that Bray was selling his own drugs on the side, in addition to the buying he was doing for the government, Lucas DEA-6 report of defendant's statements omitted that revelation (App. ¶ 20); (8) Lucas lied to the prosecutor on more than one occasion, including one lie to cover up the fact that Bray received a car as compensation for a deal in which the DEA was shorted payment.  (App. ¶ 36, 39); (9) Lucas altered telephone transcripts to mask inconsistencies between the calls and Bray's claims (App. ¶ 45-47, 60-61).

Similarly, a jury could consider Lucas' ready willingness to testify falsely, suborn perjury, and fail to correct patently false testimony in deciding this issue.  For example, Lucas sat silently at the prosecutors' table while Metcalf perjured himself during Nabors trial (a fact Metcalf now openly admits), and Lucas was aware that Metcalf's testimony was false, but did nothing to address the perjury.  (App. ¶ 4, 32-33, 37).  Likewise, Lucas sat silently while Bray perjured himself, and Lucas knew the testimony to be false and even backed up Bray's false testimony. (App. ¶ 4, 39, 48-50, 81-82, 86).  Lucas also drafted a false search warrant affidavit for Metcalf to swear to.  (App. ¶ 40).  Lucas himself testified falsely and watched several individuals get prosecuted when it was readily apparent that they were wrongly accused. (App. ¶ 4, 21, 23-25, 34-35, 42-44, 51, 56, 62, 63-66, 67-68, 75-76, 83, 87, 91-92).  Finally, Lucas enlisted Ohio troopers to steal money from a drug dealer.  (App. ¶ 69).

All of these facts support the inference that in the Webb case, Lucas knowingly gave false testimony when he told the jury that Joshawa Webb sold him drugs, when in fact Jeremiah Conrad did so.  Lucas disputes Conrad's participation, but this again emphasizes that there is an

unmistakable dispute of fact, precluding summary judgment.

## Conclusion

Quite simply, Lucas' misguided motion has no factual or legal merit.  On the merits, Lucas' 12(b)(6) motion must concede the facts in plaintiffs' complaint.  The allegations in the complaint are more than sufficient to preclude summary dismissal.

For the sake of argument and to put all of Lucas' claims to rest, plaintiffs have addressed Lucas' motion as if it were one for summary judgment.  Based on the available evidence, plaintiffs have demonstrated a clear dispute of fact supporting all of their allegations against Lucas.  Plaintiffs ask that defendant's motion be denied so that discovery may finally begin.

RESPECTFULLY SUBMITTED,


/s/ Debra Loevy-Reyes
Attorneys for Plaintiff


Jon Loevy
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 27, 2010, I filed electronically a copy of the foregoing Plaintiffs' Response to Defendant Lee Lucas' Supplemental Motion to Dismiss Complaint. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Any other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

s/ Debra Loevy-Reyes  

Debra Loevy-Reyes

LOEVY & LOEVY

312 North May Street, Suite 100

Chicago, IL 60607

Ph. – 312-243-5900

Fx. – 312-243-5902

loevy@loevylaw.com
