IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

JOSHAWA WEBB,                          )
                                       )
                    Plaintiff,         )        Case No. 1:07-CV-3290
                                       )
          v.                           )
                                       )        JUDGE BOYKO
LEE LUCAS, *et al.*,                   )
                                       )
                    Defendants.        )        JURY TRIAL DEMANDED


**PLAINTIFF JOSHAWA WEBB'S CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
<u>BASED UPON QUALIFIED IMMUNITY</u>**


Jon Loevy
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900
Attorneys for Plaintiff

## Table of Contents

Table of Authorities ............................................................................................ iv

Statement of the Issues......................................................................................... 1

Summary of the Argument.................................................................................... 2

Factual Background .............................................................................................. 3

        A.     The Background of Operation Turnaround in Mansfield, Ohio ................. 3

        B.     The Investigation of Plaintiff Joshawa Webb ............................................ 9

Argument ............................................................................................................ 13

  I.    The Relevant Legal Standards for Adjudicating Summary Judgment on the Basis of Qualified Immunity ......................................................................... 14

        A.     The Standard for Adjudicating Summary Judgment ............................... 14

        B.     The Standard For Assessing Qualified Immunity.................................... 15

  II.   The Defendants Are Not Entitled to Summary Judgment on Plaintiff's Fourth Amendment Malicious Prosecution Claim ........................................... 15

        A.     The Legal Standard to Adjudicate Malicious Prosecution ...................... 16

        B.     The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For Malicious Prosecution in a Manner For Which Qualified Immunity Is Not Available ...................................................... 16

        C.     For All Of The Reasons Set Forth In Prior Sections, Defendants Are Also Not Entitled To Qualified Immunity......................................................... 26

  III.  The Defendants Are Not Entitled to Summary Judgment Based on Plaintiff's Fourth Amendment Fabrication of Evidence Claim .............................................. 27

        A.     The Legal Standard to Adjudicate Fabrication of Evidence .................... 27

        B.     Defendants Fabricated The Set-Up Call of October 13, 2005 ................. 27

        C.     Defendants Tampered with the Audio Recording of the Drug Purchase.. 28

        D.     Defendants Lucas and Cross Fabricated Evidence of a Controlled Drug Purchase in the DEA-6 Report of October 14, 2005 ............................... 29

E.    There Is a Reasonable Likelihood That the False Evidence Affected the Grand Jury's Finding of Probable Cause .................................................. 30

IV.   The Defendants Are Not Entitled to Summary Judgment Based on Plaintiff's Fourth Amendment False Arrest and False Imprisonment Claim ....................... 31

A.    The Legal Standard to Adjudicate False Arrest/ Imprisonment ............. 31

B.    The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For False Arrest/ False Imprisonment ................ 32

V.    The Defendants Are Not Entitled to Summary Judgment on Plaintiff's Fifth Amendment *Brady* Claim .................................................................... 32

A.    The Legal Standard to Adjudicate a *Brady* Claim .................................. 32

B.    The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For *Brady* Violations ........................................... 34

VI.   Should The Court Be Inclined Not to Find the Evidence Sufficient to Overcome Summary Judgment, Plaintiff Should Be Granted Further Discovery Before Any Dispositive Order Is Issued .................................................................. 37

Conclusion ............................................................................................................. 40

# Table of Authorities

**Cases**                                                                                           **Page(s)**

*Ahlers v. Schebil,* 188 F.3d 365, 371 (6th Cir. 1999) ................................................................. 32

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986) ............................................................. 14

*Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006) ................................................................. 17, 31

*BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir.1986) ................................................................. 32

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................. 32, 33, 34

*California v. Trombetta*, 467 U.S. 479 (1984) ................................................................. 30, 33

*Carroll v. United States*, 267 U.S. 132 (1925) ................................................................. 26

*Dietrich v. Burrows*, 167 F.3d 1007 (6th Cir. 1999) ................................................................. 18

*Dixon v. Donald*, No. 07-5587, 2008 WL 4148515 (6th Cir. Sept. 5, 2008) ............................... 15

*Fridley v. Horrighs,* 291 F.3d 867 (6th Cir.2002) ................................................................. 31

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006) ................................................................. 27

*Hardesty v. Hamburg Twp*., 461 F.3d 646 (6th Cir. 2006) ................................................................. 14

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................................................................. 15

*Higgason v. Stephens*, 288 F.3d 868 (6th Cir. 2002) ................................................................. 31

*Hill v. McIntyre*, 884 F.2d 271 (6th Circ. 1989) ................................................................. 17

*Hinchman v. Moore*, 312 F.3d 198 (6th Cir. 2002) ................................................................. 31

*Johnson v. Bell*, 525 F.3d 466 (6th Cir. 2008) ................................................................. 33

*Kuehl v. Burtis*, 173 F.3d 646, 651 (8th Cir.1999) ................................................................. 32

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................. 33, 34, 35

*Lanman v. Hinson*, 529 F.3d 673 (6th Cir. 2008) ................................................................. 15

*Malley v. Briggs*, 475 U.S. 335 (1986) ................................................................. 17

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010)..................................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)...................................14

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ..................................................................................15

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) .................................................33, 34

*Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539 (6th Cir. 2008) ......................................14

*Napue v. Illinois*, 360 U.S. 264 (1959) ...........................................................................27, 31, 33

*Newsome v. McCabe*, 260 F.3d 824 (7th Cir. 2001)...................................................................26

*Painter v. Robertson*, 185 F.3d 557 (6th Cir. 1999) ............................................................16, 18

*Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123 (2d Cir. 1997) ............................................22

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) .............................................................*passim*

*Wilson v. Russo*, 212 F.3d 781 (3d Cir.2000) ............................................................................31

*United States v. Agurs*, 427 U.S. 97 (1976) ...............................................................................35

*United States v. Bagley*, 473 U.S. 667 (1985) .................................................................27, 33, 35

*United States v. Hamilton*, 684 F.2d 380 (6th Cir. 1982) ..........................................................21

*United States v. Higgins*, 557 F.3d 381 (6th Cir. 2009).........................................................19, 22

*United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001)............................................................5

*Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669 (6th Cir. 2005) .....................................31

*Yancey v. Carroll County*, 876 F.2d 1238 (6th Cir. 1989).........................................................17

**Statutes and Rules**

Fed. R. Civ. P. 56(d) .............................................................................................................18, 43

**Statement of the Issues**

Plaintiff, Joshawa Webb, responds to Defendants' motions for summary judgment based on qualified immunity (Dkt. Nos 175, 176, 177, 179). The following issues are raised in response to Defendants' motions for summary judgment:

(1)     Does the available evidence raise a genuine issue as to whether there was probable cause to prosecute Plaintiff?

(2)     Does the available evidence raise a genuine issue as to whether Defendants influenced or participated in the decision to prosecute Plaintiff?

(3)     Does the available evidence raise a genuine issue as to whether Defendants fabricated evidence falsely incriminating Plaintiff?

(4)     Does the available evidence raise a genuine issue as to whether Defendants violated their *Brady* obligations toward Plaintiff?

(5)     Is Plaintiff entitled to further discovery before the Court adjudicates Defendants' motions?

## Summary of the Argument

Defendants do not deny that Webb's allegations that Defendants fabricated evidence to arrest him for a crime he did not commit, when considered in the  light most favorable to Plaintiff, are sufficient to show that they violated his clearly-established constitutional rights. Defendants simply deny that Webb can demonstrate that his allegations are true, and claim that they are entitled to summary judgment on the basis of Plaintiff's failure to meet this impermissibly heightened burden. Defendants, however, ignore the significant evidence Plaintiff has been able to marshal – within the scope of the Court's ruling on the boundaries of qualified immunity discovery  – that supports his allegations. That evidence is more than enough to show that there are significant disputes of material fact and to survive Defendants' motions for summary judgment.

Indeed, the available evidence creates an unmistakable dispute of fact about whether Defendants were aware that the investigation's confidential informant, Jerrell Bray, intentionally framed Plaintiff, and whether Defendants played a material role in the constitutional violations by overlooking Bray's history of blatantly obvious frame-ups, and whether Defendants in fact deliberately allowed Plaintiff's wrongful prosecution to happen by relaxing control procedures over Bray and fabricating evidence to corroborate Bray's false information. There is powerful evidence showing that Defendants worked very hard to keep prosecutors and counsel for the accused unaware of the proof of the stand-ins and unaware that Bray was stealing from the DEA, cheating, and dealing his own drugs while framing innocents. The evidence also establishes that the probable cause Defendants purport to have relied upon in this case was premised on their own false testimony and doctored evidence. The evidence is so strong, in fact, that certain of the Defendants were prosecuted criminally for their misconduct in connection with Bray. Summary judgment is unavailable here.

2

## Factual Background

Plaintiff Joshawa Webb was wrongfully arrested, indicted, and incarcerated on charges that have since proven to be pure fabrication. Confidential informant Jerrell Bray framed Webb using a stand-in drug dealer, Jeremiah Conrad, to pose as Webb. Conrad has now admitted that he unwittingly posed as Webb during this deal. Lucas conducted a drug deal in the close quarters of a car with Conrad, but when Webb was prosecuted for Conrad's crime, Lucas did not tell anyone during Webb's arrest shortly thereafter or during Webb's prosecution that the man Lucas bought drugs from in the car was not the same man as the one being prosecuted for the crime. Defendants were aware that, during the same investigation, Bray stole from law enforcement, misidentified targets and lied with abandon. With the apparent goal of securing convictions regardless of actual guilt or innocence, Defendants continued to work with Bray, covering up his deceptions and, in Plaintiff's case, fabricating evidence and tampering with an audio recording of the staged buy to corroborate Bray's unsupported version of events. Throughout his prosecution and incarceration, Webb never ceased to claim that he was innocent and that he had been framed.

### A.      The Background of Operation Turnaround in Mansfield, Ohio

In January 2005, following the murder of Timothy Harris, which was believed to be drug-related, the Richland County Sheriff's Office ("RCSO") began an investigation into drug trafficking in Mansfield, Ohio. Tr. 1654, 3193-94.[1] The investigation was named "Operation Turnaround." Tr. 1692-93. Almost from the beginning of the operation, county sheriffs used an undercover informant, Jerrell Bray, to assist in the investigation. Tr. 3193-94. Bray had been

---

[1] All transcript citations labeled "Tr." refer to testimony in *United States v. Lucas*, Case No. 1:09-CR-0222, attached hereto in numerical order as Exhibit 1.

released in April 2004 from a 14-year term of imprisonment for involuntary manslaughter. Tr. 150-151.

Between February and August 2005, Bray assisted the RCSO in setting up and completing controlled drug buys with 9 individuals who were later indicted in the case *United States v. Nabors et al.*, 1:05-CR-537. Tr. 161-161; Ex. 2, Superseding Indictment, March 15, 2006, *United States v. Nabors et al.*, 1:05-CR-537. On almost every controlled drug purchase, Bray was under the direct supervision of Defendant Chuck Metcalf, a Richland County sheriff. Tr. 1740-41. Bray also worked closely with Defendant Matt Mayer, another Richland County sheriff whose role in the staged buys was to film the transactions on video. Tr. 162-62, 1153.

In March or April 2005, Bray was arrested for possession of crack cocaine, a mere month or so after becoming a confidential informant for the RCSO. The crack was found in a secret compartment in his car, and violated his informant agreement with the RCSO. As a result of Metcalf's intervention, Bray was nonetheless released without being charged. Tr. 371-74, 1738-40.

In late August 2005, several DEA Agents joined Operation Turnaround, including Defendants Lee Lucas and Robert Cross. Lucas became the lead investigator of Operation Turnaround. The RCSO presented Bray to the DEA as a reliable informant with whom they had never had any problems, and did not mention Bray's arrest five or six months earlier. Tr. 3196-97. In fact, Metcalf and Mayer told Lucas that Bray was "the best informant we've ever had." Tr. 3196-97. In August 2005, Lucas registered Bray as a paid DEA informant under the joint supervision of himself and Cross. Tr. 563, 2952-53. Between September 6 and November 9, 2005, the joint Mansfield investigation conducted numerous controlled buys and searches,

4

resulting in the indictment of 17 individuals. *See* Ex. 2. The investigation of every one of these individuals relied upon information provided by Bray.

Agent Lucas is a controversial investigator. The Mansfield investigation was not the first time that he crossed the boundaries of proper law enforcement methods in order to secure convictions regardless of guilt or innocence. His prior misconduct caused him to be singled out for censure by the Court of Appeals for the 11th Circuit, which stated: "We find troubling Agent Lucas' apparent misrepresentations . . . . it is unclear how Agent Lucas could have made such statements of an affirmative character for which there was no basis without having acted either deliberately or recklessly." *United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001).

Throughout the Mansfield investigation, Bray's conduct demonstrated an obvious pattern of lies and deceit which should have led legitimate law enforcement officers to stop working with him, or at the very least severely limit their reliance on him by implementing more stringent requirements of supervision and corroboration. Instead, Defendants covered for Bray lying, stealing from the police and continuing to deal drugs; relaxed their surveillance of him; and compensated for weaknesses in their investigation by fabricating evidence supporting Bray's false testimony.

At prosecutors' requests, federal judges have now freed most of those who were wrongfully convicted and incarcerated during this improper investigation, and Bray is in custody for his role.

The following examples demonstrate the glaring obviousness of Bray's duplicity and Defendants' efforts to cover up and collude in his lies. At the very least, these incidents show that by the time Webb's investigation began, each Defendant was aware that Bray was feeding law enforcement false information and had stolen government funds. None of this crucial

5

exculpatory evidence, which goes directly to Bray's credibility, was ever documented in the

investigation files or disclosed to defense counsel during the prosecution of Plaintiff.

Defendants knew that Bray used "stand-ins" for targets from his first transactions with

the DEA. On September 6 and 9, 2005, at three days' interval, Bray used the same stand-in,

Darren Transou, to impersonate two separate targets, Noel Mott and Lowestco Ballard. Tr. 170-

171, 184. The obviousness of this ruse was augmented by the fact that Transou looked nothing

like Ballard, whom Lucas would have seen during his prosecution. Tr. 186-87. Instead of

reporting the incident and dropping the informant, however, Defendants embarked upon a pattern

of covering up for Bray and supporting his patently false testimony. Lucas, in particular, testified

that he looked at a picture of Darren Transou to rule him out before (falsely) identifying Ballard.

However, Defendant Cross did not actually order the identification picture of Transou for the

DEA file until more than a year after Lucas' false identification, so Lucas' testimony was pure

fiction. Tr. 688-92, 790, 3322. Lucas' testimony is laughable regardless because Bray admits that

he in fact used Transou as a stand-in for Ballard. Tr. 187-93.

Very quickly, it also emerged that Bray had stolen government funds from a staged deal.

On September 15, 2005, Bray stole "buy money" during a controlled sale allegedly implicating

Noel Mott. Upon returning from the buy, Bray informed Defendants that the seller had wanted

more money for the drugs and that he had given him $20 of his own money so that the deal

would not "go sour." In fact, he had given the seller less money for the drugs. Two DEA Agents

working with Lucas, Ansari and Verhiley, searched Bray's car following these statements, and

found the extra $780 hidden behind his car radio. Tr. 210-14, 3062-68.  Lucas' report did not

disclose the theft, and instead reported: "The CS returned the remaining $780.00 OGF to S/A

Lucas. The CS and his/her vehicle were again searched with negative results for any drugs or money." Tr. 3069. Ex. 3, DEA-6 Report by Lee Lucas, September 15, 2005, para. 9.

Bray testified at Lucas's trial that when the Defendants found the money hidden in his car, he thought that "it was over." Tr. 215. When the Defendants instead continued working with him as before, he was "kind of amazed." *Id*. The Defendants' decision to cover up for him emboldened him to continue lying to the police. As he stated, the incident "[k]ind of made me feel like I could get away with just about anything." *Id*.

The Defendants' acquiescence to Bray's obvious deceptions encouraged Bray to use stand-ins systematically on almost every subsequent controlled buy. On September 20, 2005, the Defendants and Bray set up a controlled drug sale targeting Dwayne Nabors. Bray used Albert Lee as a stand-in for Nabors. Tr. 220-21. When Bray was asked at Lucas's trial if he had any "concerns [that] if any of your surveillance people were to see you meeting Albert Lee instead of Dwayne Nabors, that you would get caught," Bray answered no, "because [he] had got away with it a few times." Tr. 242.

During the purported drug deal with Nabors, Bray again stole thousands of dollars from the DEA. Bray tried to hide the fact that he was paid for the drugs in part with a Cutlass that he kept for himself (leading to the DEA's shortfall) by falsely testifying that the recorded discussion about a "Cutty" was actually a discussion about Nabors' "Caddy" (Cadillac). Tr. 236, 240-41. When a prosecutor confronted Bray about his obviously false explanation, Lucas stepped up to cover Bray's false explanation by telling the prosecutor, falsely, that "Cutty" was just another word for "dope." Tr. 242-43.

Defendant Metcalf now admits that he blatantly lied during Nabors' criminal trial. Tr. 1721-29. His fictitious testimony included his false identification of Nabors as a participant in

the deal. Tr. 1722. When questioned about why he testified falsely, Metcalf answered, "because I regurgitated what [came] off the DEA-6 report … Because I really thought this is what everybody else was going to testify to. This is what was on paper … It had to make sense." Tr. 1722, 1724, 1727.

Defendants' insistence on turning a blind eye to the obvious fact that Bray was unreliable became more marked as the investigation progressed. On October 5, 2005, Bray purportedly bought drugs from Roosevelt Williams. One of the surveillance officers, Detective Wheeler, was familiar with Williams from prior investigations, and knew him to be tall, thin and light skinned with freckles. Tr. 2086, 2112, 2091. The person Bray identified as Williams was short, dark skinned and stocky. Tr. 2091. Officer Wheeler immediately informed Lucas that the suspect had been misidentified by Bray. *Id*. Ignoring this informed opinion, Lucas insisted that the identification was correct, and Lucas' report of the buy omitted Wheeler's credible information that the suspect was not Williams. In fact, Lucas's report even omitted Wheeler's presence at the deal. Tr. 1838-39. Metcalf was aware of Wheeler's assertion that Bray had misidentified the target. Tr. 1686-87. Moreover, Defendants Lucas, Cross and Metcalf observed Williams' stand-in arrive at the deal in Bray's car, and drive back to Bray's house after the alleged drug sale. Tr. 1832, 1835-36, 250-52. Lucas also omitted this information from his reports, and actively concealed it from prosecutors and Williams' criminal defense attorney.

As a result of Lucas's actions in conjunction with using Jerrell Bray as a duplicitous informant, Lucas was indicted on May 12, 2009 in an eighteen count federal indictment for violating 18 U.S.C. §§ 1503(a) (obstruction of justice), 1001(a)(3) (knowing creation of a false government document), 1623(a) (false testimony and/or creation of a material false declaration), and 242 (deprivation of rights under color of law). The indictment's allegations all related to

Lucas' actions in Operation Turnaround. *See* Ex. 4, Indictment, May 12, 2009, *United States v. Lucas*, 1:09-CR-0222.

After Lucas was indicted, he drafted a memo that he distributed to others. Lucas admits that the memo contained false information about Lucas' investigations regarding who saw what and how certain deals were verified, and that his intention in drafting the memo was to coordinate what the witnesses would say at his trial about the investigations. Tr. 3470-73.

### B.  The Investigation of Plaintiff Joshawa Webb

As detailed above, by the time Webb's investigation began, all Defendants knew and had covered up for the fact that Bray had lied to and stolen from the police. Nevertheless, they not only relaxed essential control procedures over Bray during the Webb deal, they also doctored and fabricated evidence to corroborate Bray's false information, causing Web to be wrongfully indicted and incarcerated for over 21 months.

Webb is a professional mechanic. Tr. 2259. Bray had previously bought a car from Webb. Tr. 263. Before the investigation, Webb and Bray had never conducted a drug deal together. Tr. 263, 2266. Bray was not even certain that Webb dealt drugs. Tr. 263.

Given their distant relationship, Bray stated that he did not feel he could simply go to Webb and attempt to make a purchase of crack cocaine. Tr. 264. Moreover, Bray attempted two or three times to set up a buy with Webb and was unsuccessful. Tr. 3224-225. Bray therefore came up with a plan "to stage another drug deal." Tr. 264. Encouraged by his DEA handlers' acceptance of his earlier staged deals, Bray did not even bother to try to get Webb to show up for the "deal". Nor did he take the trouble to try to hide his malfeasance from the Defendants – he set the purported deal up for a time when Webb was at home with members of his family. Tr. 2267-68. Bray's plan only succeeded in resulting in the indictment of Plaintiff because the

9

Defendants bypassed control procedures that are designed to avoid precisely the scenario of manipulation by an informant. Indeed, Defendant Cross acknowledged at Lucas's trial that the Webb investigation violated DEA procedures for controlled drug buys. Tr. 2987.

At some point prior to October 14, 2005, the day of the staged drug purchased, Bray and Webb discussed a car trade on the phone, and this call was recorded by Metcalf. Defendants allege that this call took place on October 13 and that it resulted in an agreement for Bray to buy drugs from Webb the following day. *See* Declaration of Lee Lucas, Dkt. # 139-2, paras. 21-22; Supplemental Declaration of Defendant Cross, Dkt. # 177-1, para. 11. In his DEA-6 report dated October 14, Lucas stated that Metcalf monitored and recorded a set-up call placed by Bray to Webb. Ex. 5, DEA-6 Report by Lee Lucas, October 14, 2005, at 1. However, the evidence shows that there was no set-up call on October 13. The DEA-6 report lists a phone number which was not Webb's phone number. Tr. 2008-09. Moreover, telephone records show that the mystery number which Bray said was Webb's number received no calls on that day. Tr. 1873-74. Telephone records also show that Webb's actual phone number received no calls from any known phone number associated with Bray on October 13. *Id.* The alleged set-up call between Bray and Webb did not, therefore, take place one day before the alleged deal.

Defendants also misrepresented the content of the call to make an innocuous conversation sound like an agreement to sell drugs. In fact, there was never any set-up call, at any date. In this phone conversation, Webb understood that Bray wanted to trade his car, a Suburban, for Webb's car, a Chevelle. Bray offered an additional "two stacks," or two thousand dollars, for the trade. Tr. 2265-66. At no point did either Webb or Bray directly mention drugs. According to Lucas's DEA-6, "two stacks" is "code" for two thousand dollars' worth of drugs – an explanation that is patently wrong given that Webb was never involved in any drug transaction with Bray. Ex. 5, at

10

1. Both Metcalf, who monitored and recorded this conversation, and Cross, who listened to the recording, were aware that this conversation contained no reference to a drug deal between Webb and Bray. Cross Supp. Decl., Dkt. # 177-1, para. 11. Cross, who read Lucas's DEA-6 report, also knew that the report contains lies about the existence of the set-up call. Tr. 2976.

On October 14, 2005, Bray ran into Jeremiah Conrad, a friend of Bray's girlfriend, and asked him to help him conclude a drug deal with a client whom he had previously "burned" by posing as a seller. Tr. 265-66, 2217. Conrad was a small-time dealer and perceived Bray as a powerful figure in the drug trade. Tr. 2215-16, 2218. Conrad therefore agreed to do him this favor and got into Bray's car. They drove to Bray's apartment, where Bray picked up his own crack cocaine which he intended to sell to law enforcement. Tr. 2217-20. Bray handed Conrad the drugs, and Conrad placed them on the armrest between the car's front seats. Tr. 268, 2220-21.

Bray then called Lucas and informed him that he was in the car with Webb. Tr. 266-67. Lucas agreed to meet Bray and "Webb" to conduct a drug deal. Tr. 266.  This phone call was never recorded, and Lucas's DEA-6 report makes no reference to this call. Instead, the DEA-6 states that the day after the set-up call, Defendants Lucas, Cross, Metcalf and DEA Agent Verhiley met with Bray to coordinate the controlled purchase, and that following this meeting, Lucas called Bray to arrange the details of the transaction. Ex. 5, Lucas DEA-6, at 1-2. Lucas fabricated the existence of the pre-buy meeting and his subsequent call to Bray.

Additionally, contrary to what is stated in Lucas's DEA-6, there was no pre-buy meeting with Bray on October 14, 2005. Ex. 5, Lucas DEA-6, at 1; Cross Supp. Decl., Dkt. 177-1, paras. 12-13. Because there was no pre-deal meeting, neither Bray nor his car were searched prior to

11

the transaction. The Defendants therefore did not verify that Bray went into the controlled drug deal without any drugs of his own.

Defendants were aware that by bypassing the pre-buy search and set-up call, the Webb transaction violated DEA procedures. Tr. 2987, 3241. Metcalf stated that he "really would like to get [Webb]." *Id*.

Immediately following the phone call between Bray and Lucas, the Defendants drove to the appointed meeting place, a gas station in Mansfield. Tr. 266, 3242. Mayer filmed Bray's car during the transaction. Bray's car's windows were tinted and the events in the car are not visible on the video. Tr. 1871.

Upon arriving, Lucas observed Bray standing outside a car. Bray got into the driver's seat, and Lucas sat behind him. Conrad sat in the front passenger seat. Bray introduced Conrad as "Josh" (Webb's first name) and Lucas as "Todd."  Tr. 268-69, 2223. When Conrad saw Lucas arrive, he feared that Lucas might be a police officer, because Lucas looked neither like a drug user nor a drug seller. Conrad therefore stared straight ahead of him and interacted with Lucas as little as possible. Tr. 2223-25.

In the car, Bray handed the drugs to Lucas and handed him a scale to weigh the drugs. Tr. 2226. Nevertheless, Lucas stated in his DEA-6 report that the target handed him the drugs and the scale. Ex. 5, at 2. Without the direct handover of drugs from the target, and without the prior search of Bray and his vehicle, it would have been impossible to assert that the target – or in this case, the man impersonating the target – ever had possession of the drugs prior to the sale.

Lucas weighed the drugs, found the weight acceptable, and handed Bray the purchase money. Bray handed Conrad the money, and Conrad counted the money in a cursory fashion, in the manner of someone who "didn't care if he shorted him or not." Tr. 2227. Conrad then handed

12

the money back to Bray. Tr. 2227. Lucas later stated falsely in his DEA-6 report that he handed the money directly to the suspect. Ex. 5, at 2.

Lucas wore a recording device during the staged buy. Tr. 3245. Despite knowing that the sale was being recorded, Bray played loud music in his car, so that the recording is inaudible Tr. 492-93, 1872. Three different experts analyzing the recording found that it had been tampered with or altered. Expert Greg Stuchtman opines that anomalies in the recording lead him to believe the recording tendered to Webb's defense was edited or altered. Ex. 6, Stuchtman Expert Report, January 2, 2007. *See also* Ex. 7, Defendant Webb's Motion to Continue, November 29, 2006, at 4. Analyst Steve Cain found at least three separate anomalies during the recording of the alleged deal. Ex. 8, Notice of Report of Expert Steve Cain and Explanation of Statement in Mr. Webb's Motion to Continue, February 13, 2007. And court-appointed expert Tom Owen found that the recording device was stopped and started in order to omit material. Ex. 9, Owen Expert Report, March 6, 2007.

During the early stages of the Mansfield prosecutions, there was frequent contact between the Defendants and the lead prosecutor, Blas Serrano, with regard to the charges arising out of the Mansfield investigation. Defendants Lucas, Cross, Metcalf and Mayer met with Serrano "numerous times," and Bray was also present at many of these meetings. Tr. 3345. All Defendants also participated in numerous proffer meetings which took place between the USAO and the Mansfield investigation targets, with Cross taking a more prominent role. Tr. 3348. At none of these meetings did Defendants ever inform a prosecutor of Bray's history of obvious deceptions, nor of the misrepresentations and falsehoods in their written reports.

## Argument

There is ample evidence to show that Defendants knew of Bray's repeated deceptions during the investigation. Despite this knowledge, during the Webb investigation, Defendants not

13

only relaxed their mandated control procedures over Bray, they also fabricated evidence in order to corroborate Bray's false information and build a bogus case against Plaintiff. Defendant's actions thus directly caused Webb, who never ceased to claim his innocence, to be wrongfully prosecuted, indicted and imprisoned. Furthermore, throughout the investigation and ensuing criminal proceedings against Plaintiff, Defendants acted in bad faith by withholding information about Bray's unreliability and their own fabrication of evidence. In light of these facts, Plaintiff's claims for malicious prosecution, fabrication of evidence, unlawful detention and *Brady* violations, all in contravention of his federal constitutional rights, should prevail on summary judgment. At the very least, the available evidence demonstrates the existence of genuine factual disputes which should be resolved by a jury following full discovery.

## I.       The Relevant Legal Standards for Adjudicating Summary Judgment on the Basis of Qualified Immunity

### A.       The Standard for Adjudicating Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 546 (6th Cir. 2008); Fed. R. Civ. P. 56(d).  The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Nance*, 527 F.3d at 547 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986)).  When deciding a motion for summary judgment, a court must view the evidence in favor of the non-moving party and draw all reasonable inferences in that party's favor.  *Hardesty v. Hamburg Twp*., 461 F.3d 646, 650 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

14

### B.    The Standard For Assessing Qualified Immunity

Government actors are shielded from liability by qualified immunity when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In order to determine whether a defendant is entitled to qualified immunity, the Sixth Circuit usually uses a two-part test, asking:  (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated; and (2) whether that right was clearly established.  *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008) (citations omitted).  Qualified immunity is an immunity from suit, rather than a mere defense to liability, and, as such, it is an issue that should be resolved as early as possible in the litigation.  *Dixon v. Donald*, No. 07-5587, 2008 WL 4148515, at *2 (6th Cir. Sept. 5, 2008) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985))

### II.    The Defendants Are Not Entitled to Summary Judgment on Plaintiff's Fourth Amendment Malicious Prosecution Claim

There is abundant evidence supporting the proposition that Defendants deliberately lied in order to support the indictment against Webb.  If Plaintiff can establish a dispute of fact regarding that contention, then Defendants are not entitled to summary judgment on the issue of good faith qualified immunity.

Contrary to Defendants' assertions, Webb has never ceased to claim his innocence. A stand-in, Jeremiah Conrad, has come forward and testified under oath that he impersonated Webb in the drug deal used to incriminate Webb. Bray has also admitted that Conrad, not Webb, participated in this drug deal. At this stage, Webb is certainly entitled to the reasonable inference that Conrad, not Webb, was present in the car with Lucas during the staged drug deal used to indict Webb.

15

A.      **The Legal Standard to Adjudicate Malicious Prosecution**

In order to successfully claim malicious prosecution, a plaintiff must show that (1) a criminal prosecution was initiated against the plaintiff and that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308-309 (6th Cir. 2010).

Defendants do not dispute that Webb can meet the final two requirements for malicious prosecution. Plaintiff suffered a deprivation of liberty when he was incarcerated for over 21 months as a result of his indictment following the Mansfield investigation. Furthermore, it is undisputed that the criminal proceedings were resolved in Plaintiff's favor when the indictment against him was dismissed on the government's motion in July 2007. The dispute at bar centers on the first two elements: whether there was probable cause to arrest and prosecute Plaintiff, and whether the Defendants influenced or participated in the decision to prosecute him.

B.      **The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For Malicious Prosecution in a Manner For Which Qualified Immunity Is Not Available**

1.      **A Reasonable Jury Can Conclude That There Was No Probable Cause to Arrest Plaintiff**

"In § 1983 cases, the existence of probable cause usually poses a jury question." *Painter v. Robertson*, 185 F.3d 557, 570 (6th Cir. 1999). Here, too, the issue must be left for a fact-finder to decide.

Defendants argue that, whatever evidence may have subsequently come to light regarding Bray's misconduct, at the time of Webb's investigation they were justified in concluding that

16

they had probable cause to proceed with Webb's arrest. The evidence before us contradicts that contention, and provides more than enough evidence to raise a genuine dispute of fact.

First, as a matter of law, Defendants Metcalf and Mayer are mistaken in relying upon the grand jury indictment to conclusively dispose of the issue of the existence of probable cause. *Malley v. Briggs*, 475 U.S. 335 (1986) (rejecting argument that neutral magistrate's independent determination of probable cause broke the causal chain where officer misled the magistrate and improperly requested warrants.). The rule in *Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006), is inapplicable here, where the grand jury relied upon Defendants' deliberate concealment of key evidence impeaching Bray and Defendants' fabricated inculpatory evidence. As the Court of Appeals for the Sixth Circuit has stated, "[i]f police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him … They cannot hide behind the officials whom they have defrauded."  *Sykes*, 625 F.3d at 317 (citing *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988)). *See also Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989) (An officer cannot rely on the fact that an indictment issued to establish his right to immunity when that judicial determination was based on his own deliberate subterfuge.)  The question of whether the indictment would have been issued, even without a defendant's knowingly or recklessly false statement, is one that must be left for the jury.  *Hill v. McIntyre*, 884 F.2d 271, 276 (6th Cir. 1989).

Defendants, ignoring the record from Lucas's criminal trial and relying instead on the self-serving affidavits crafted in support of their motions, argue that they had probable cause because Bray was a reliable informant. However, there is ample evidence to show that the Defendants knew of Bray's unreliability almost from the beginning of Operation Turnaround.

*Painter*, 185 F.3d at 571 ("[I]n assessing probable cause to effect an arrest, [an officer] may not ignore information known to him which proves that the suspect is protected by an affirmative legal justification for his suspected criminal actions.") *See also Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999) (same). Defendants' self-interested and unsupported assertions that they had no notice of issues with Bray's reliability cannot, by fiat, overcome Plaintiff's substantial evidence, and entitle Defendants to summary judgment. All of the Defendants worked closely with Bray on the individual drug purchases. Plaintiff's factual overview of the investigation presents numerous instances in which Bray's lies about the identity of targets and his ability to set up drug purchases with those targets were obvious to Defendants, and establishes a jury question as to whether Defendants were sufficiently aware that Bray had an incentive to lie because he was paid for every transaction and was stealing government funds as well.

Even assuming that Defendants were, at one time, reasonable in considering Bray reliable, that assessment could not be maintained in the face of the numerous and flagrant instances of deceit described above. And as Judge Pearson noted a related case arising from the same investigation, "the record shows Defendants resisted even the slightest efforts of corroboration despite unequivocal events casting doubt upon Bray's reliability. …Plaintiff shows Defendants knowingly and repeatedly turned a blind eye to any suggestion their handling of Bray and the staged drug buys were worrisome. … The point at which Bray stole buy money was a point where any lay version of common sense, let alone the judgment of reasonable and trained police officers and federal agents, should have dictated the informant was no longer, if he ever had been, reliable." Ex. 10, Memorandum of Opinion and Order, *Mott v. Lucas et al.*, Case No. 1:10-CV-164, at 23.

18

Beyond a dogged insistence that Bray was reliable, Defendants do not justify their continued high opinion of him in the face of evidence that Bray was anything but reliable. Metcalf states that prior to the beginning of Operation Turnaround, Bray had supplied "accurate and reliable information to the RCSO." Affidavit of Chuck Metcalf, Dkt. #179-1, at para. 6. To date, no discovery has been permitted that would allow Plaintiff to test or rebut Defendants' self-serving assertions that Bray provided reliable information in other cases. However, Mayer's testimony at Lucas's trial reveals that Bray had been used only once before Operation Turnaround, in a non drug-related investigation (Bray was a suspect in a burglary and later assisted the police in identifying the recovered goods). Tr. 1151-52. Metcalf adds that he had information "from several other sources" regarding Bray's reliability, but fails to detail those other sources or explain how they outweighed his own observations of Bray over the course of the investigation. Metcalf Affidavit, Dkt. #179-1, at para. 8.

Given these obvious problems with Bray's credibility, a finding of probable cause could not be reached without substantial corroboration of the information provided by Bray. *U.S. v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009) (Overturning district court's finding of probable cause where informant's reliability was not asserted and minimal police corroboration occurred.). The Defendants not only failed to corroborate Bray's information in Webb's case, they went further and bypassed the usual safeguards they followed in most of the other Mansfield transactions to ensure that a drug purchase was indeed "controlled." Tr. 2987.

Defendant Lucas lists five facts which allegedly support his finding of probable cause at the time Plaintiff was arrested: (1) Bray identified the person in the car as Webb; (2) Bray called this person Josh, and he did not object; (3) the phone call of October 13 took place between Bray and Webb and they discussed a drug deal; (4) Webb had a criminal history involving drug

19

offenses; and (5) the resemblance between Conrad and a photograph of Webb that Lucas viewed after the deal. Lucas Motion for Summary Judgment, Dkt. # 175, at 7. Lucas goes so far as to characterize Bray's identification of Webb as "heavily corroborated" by these facts. Lucas Motion to Dismiss, Dkt. #139, at 9-10. None of these purported supporting facts hold up to even a superficial scrutiny of the evidence, and none are undisputed so as to entitle Defendants to summary judgment.

Facts (1) and (2) rely entirely upon the credibility of Bray. Given the widespread use of street names and false names in the drug trade, no inferences can be drawn from not objecting to being called any given name during a drug sale, especially where the apparent target is making obvious efforts to speak as little as possible. Tr. 2223-25, 3245. Moreover, as stated above, Defendants were on notice that Bray was (with their acquiescence) using stand-ins for drug buys, which, by definition, defeats their attested reliance on these facts. As for fact (3), as explained in Plaintiff's statement of facts, the phone call did not even take place on October 13, and did not contain any reference to a drug deal between Plaintiff and Bray. Webb's criminal history referenced in fact (4) is not relevant, as Plaintiff's only prior drug conviction involved marijuana, and he had no history of dealing crack cocaine. *See* Ex. 11, Government's Response to Defendant's Motion to Vacate Detention Order, *United States v. Webb*, Case No. 1:05-CR-537, February 7, 2007, at 5.

Ultimately, Lucas's claim of probable cause rests upon the alleged resemblance between the person he saw in the car, and a photograph of Webb he allegedly viewed after the deal. This photographic comparison fails to conclusively establish probable cause. For starters, Conrad and Webb, do not look sufficiently alike. Webb is a large man at 6'3", while Conrad is a smaller sized man at 5'9", approximately the same height as Bray. A difference of that magnitude

(between a very tall man and an average-sized man) would have been readily noticeable in the close quarters of the car, even without seeing Conrad standing, if only because it would have been easy to notice that he was not taller than Bray. Lucas notes today that he had "no way to determine the height of the drug suspect since he was seated" (Lucas Declaration, Dkt. 139-2, para. 27). To the contrary, on the day of the staged buy, he was willing and able to describe the man he had seen in the car as being 6'3" tall, both at the debriefing meeting which took place shortly after the buy and in his DEA-6 report. Cross Supp. Decl., Dkt. # 177-1, at para. 18; Ex. 5, at 3. Whether or not he was able to assess the suspect's height on the day of the buy, it is clear that Lucas fabricated evidence about the target's height in order to falsely incriminate Webb and create the appearance of probable cause. Secondly, resemblance is a question of fact best left for a jury – the Court should not decide as a matter of law that Webb and Conrad look alike. Painter, 185 F.3d at 570 ("In § 1983 cases, the existence of probable cause usually poses a jury question."). Even assuming *arguendo* that there is at least a minimal resemblance between Webb and Conrad, the question of whether the viewing of a single photograph, outside of a photographic line-up, can rise to the level of probable cause in the absence of any other evidence is also best left to a jury. *United States v. Hamilton*, 684 F.2d 380, 382-83 (6th Cir. 1982) (holding that the proper weight to put on comparisons between photographs is a jury question in the suggestiveness context).

Without these "corroborating" facts, the only evidence which remains to support probable cause is the unsupported word of Bray. In view of Bray's record of obvious deceptions over the course of the investigation, Lucas is not entitled to summary judgment on the grounds that there was probable cause to arrest and prosecute Plaintiff at the time of his investigation. The remaining Defendants have as little reason to rely on Bray's statements as Lucas, and reliance on

Lucas's statements alone, even were it justified, also fails to amount to probable cause without the informant's key evidence that he had set up the buy with Webb. *Higgins*, 557 F.3d at 390.

Moreover, a jury could consider Defendants' ready willingness to testify falsely, suborn perjury, and fail to correct patently false testimony in deciding this issue. For example, it is now established that Metcalf perjured himself at Nabors' trial, while Lucas sat silently at the prosecutors' table. Lucas was aware that Metcalf's testimony was false, but did nothing to address the perjury. Likewise, Lucas sat silently while Bray perjured himself, and Lucas knew the testimony to be false and even backed up Bray's false testimony. All of these facts support the inference that in the Webb case, Lucas knew that there was insufficient probable cause to indict Webb when he told the grand jury that Webb sold him drugs, when in fact Conrad did so. "Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process." *Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (citing *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 130 (2d Cir.1997)) (citations omitted).

Therefore, Defendants cannot prevail on summary judgment based on the claim that there was probable cause to arrest and incarcerate Plaintiff.

## 2. A Reasonable Jury Can Conclude That Each Defendant Influenced or Participated in the Decision to Prosecute Plaintiff

The Defendants each argue that they took no part in the decision to prosecute Plaintiff, and are thus shielded from liability for malicious prosecution. Contrary to their assertions, however, it is not necessary for them to have taken the final decision to prosecute Plaintiff in order for them to be liable for the tort of malicious prosecution. As discussed at length by the Court of Appeals for the Sixth Circuit in *Sykes v. Anderson*, influence over or participation in the

decision to prosecute is sufficient to trigger liability. To be liable for "participating" in the decision to prosecute, the officer must participate "in a way that aids in the decision, as opposed to passively or neutrally participating." *Sykes*, 625 F.3d at 309, n. 5. Where, as here, parties other than the Defendants took the final decision to commence criminal proceedings, the question is "whether [the officer's] falsehoods, misrepresentations, and omissions, which clearly led to the Plaintiffs' arrests, can survive a number of intervening decisions by others such that [the officer] can still be said to have influenced or participated in the decision to institute criminal proceedings." *Id*. at 314.

The Sixth Circuit held that officers participate in the decision to prosecute if there were "knowing misstatements made by the officers to the prosecutor." *Id*. at 315-16. Furthermore, "the chain of causation need not be considered broken in a malicious-prosecution claim against an officer if the officer deceived the subsequent decision maker or could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty." *Id*. at 316 (citing *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007)) (citations omitted).

In order to overcome summary judgment, "Plaintiffs needed to present some evidence that the impact of [the officer's] misstatements and falsehoods in his investigatory materials extended beyond the Plaintiffs' initial arrest and ultimately influenced the Plaintiffs' continued detention." *Id*. at 316. In *Sykes*, the defendant officer was found to have participated in the decision to prosecute because his investigatory materials were in the prosecution's possession, contained knowing misstatements, and the prosecution relied on the defendant's falsehoods. *Id.*

Similarly, here, the Defendants participated in the decision to prosecute because their investigatory materials and conclusions contained knowing misstatements regarding both the

reliability of the informant and the corroboration of his information, and the prosecutor relied upon these falsehoods in deciding to institute criminal proceedings against Plaintiff. The United States Attorney's Office was in possession of the Plaintiff's investigation file created by Defendants, including the DEA-6 in which Lucas inserted false incriminating evidence. Moreover, during the early stages of the Mansfield prosecutions, lead prosecutor Blas Serrano met frequently with the Defendants, Bray, and various investigation targets with regard to the charges arising out of the Mansfield investigation. The prosecution's case was wholly based upon Defendants' deliberate misstatements and critical omissions. Without reliable informant information and falsified corroboration, there would have been insufficient evidence to prosecute Plaintiff. Indeed, this is why the government moved to dismiss the indictment against Webb as soon as it became aware of Bray's deceptions.

Specifically, as to each Defendant, Plaintiff can present evidence that the prosecution relied upon the following knowing misstatements and omissions in deciding to prosecute Plaintiff:

- Lucas: a failure to include in his investigation notes or to inform the USAO of a pattern of incidents where Bray stole government funds, misidentified targets, and provided wholly incorrect drug-related information; the false assertion that Webb and Bray discussed a drug sale on the phone the day before the staged buy; a description of control procedures which never took place (the call purportedly setting up the staged buy, and the pre-buy meeting with Bray); a false description of a direct handover of drugs from the suspect in the car, without which the suspect's custody of the drugs could not be established given the absence of a pre-buy search; a false confirmation that the suspect in

the car resembled Webb despite a glaring height discrepancy; and tampering with the audio recording of the staged buy conversation.

- Cross: a failure to include in his investigation notes or to inform the USAO of a pattern of incidents where Bray stole government funds, misidentified targets, and provided wholly incorrect drug-related information; a failure to correct the misstatements of which he was aware in Lucas's DEA-6 report (including the false phone drug conversation/ set-up call, and the control procedures which never took place); and tampering with the audio recording of the staged buy conversation. Defendant Cross acknowledged at Lucas's trial that he knew the Webb investigation violated DEA procedures for controlled drug buys, yet he did not address this issue in any report and he did nothing to bring this violation to the prosecutor's attention. Cross now attempts to re-characterize his statement, and argues that he meant only that the drug sale did not conform to the procedures usually followed in the rest of the Mansfield investigation. The question he was asked, however, was as unequivocal as his answer:

     Q: Can we agree that the manner in which the Webb deal was conducted violated DEA procedures?

     A: It was not the way that a standard deal should go, yes. Tr. 2987.

- Metcalf: a failure to inform the USAO of a pattern of incidents where Bray stole government funds, misidentified targets, and provided wholly incorrect drug-related information; tampering with the audio recording; and a false assertion that Webb and Bray discussed a drug sale on the phone on October 13, and that this call set up the staged buy of October 14.

25

- Mayer: a failure to inform the USAO of a pattern of incidents of which he was aware, where Bray stole government funds, misidentified targets, and provided wholly incorrect drug-related information.

Finally, the Court should disregard Lucas's assertion that the government's decision not to charge him criminally with conspiring with Bray establishes that he committed no wrongdoing during the Mansfield investigation. Lucas Motion to Dismiss, Dkt. #139, at 3-4. The indictment against Lucas and the government's concessions during Lucas's criminal trial have no bearing on what evidence Plaintiff can use to prove his claims or on the standard which Plaintiff must meet to defeat summary judgment. Moreover, Bray's denial of Lucas' involvement in the spate of wrongful prosecutions is just one piece of evidence, creating a dispute of fact in the face of the abundant evidence to the contrary presented herein, demonstrating Lucas' efforts to violate Webb's clearly established constitutional rights.

### C. For All Of The Reasons Set Forth In Prior Sections, Defendants Are Also Not Entitled To Qualified Immunity

This is not a qualified immunity case: if Plaintiff's evidence is credited, then Defendants engaged in violations of clearly-established constitutional rights.  And all of the foregoing discussion does sufficiently establish that with all reasonable inferences drawn in Plaintiff's favor, the Defendants engaged in a malicious prosecution without probable cause – or, at a minimum, with the issue of probable cause turning on credibility determinations that can only be properly made by a jury.  There can be no serious dispute that such misconduct violated clearly established rights.  *Newsome v. McCabe*, 260 F.3d 824 (7th Cir. 2001) (the prohibition against maliciously prosecuting someone "ha[s] been around for a very long time").  Moreover, "The law has been clearly established since at least the Supreme Court's decision in *Carroll v. United States*, 267 U.S. 132, 162 (1925), that probable cause determinations involve an examination of

all facts and circumstances within an officer's knowledge at the time of an arrest." *Painter*, 185

F.3d at 570-71 (denying qualified immunity).

### III.    The Defendants Are Not Entitled to Summary Judgment Based on Plaintiff's Fourth Amendment Fabrication of Evidence Claim

#### A.    The Legal Standard to Adjudicate Fabrication of Evidence

Officers are liable for violating a defendant's constitutional rights if they intentionally

developed false evidence, tampered with evidence, assisted a witness in committing perjury,

and/or misled prosecutors, in an effort to cause an accused to be wrongfully prosecuted for a

crime that he did not commit. *See*, *e.g.*, *Gregory v. City of Louisville*, 444 F.3d 725, 745 n.2 (6th

Cir. 2006) (fabricating evidence violates clearly established law); *Napue v. Illinois*, 360 U.S.

264, 269 (1959) (knowingly using false evidence violates clearly established rights); *United

States v. Bagely*, 473 U.S. 667, 679 n.7 (1985) (use of perjured testimony and the deliberate

suppression of favorable evidence violates established rights). The Sixth Circuit has made plain

that "a person's constitutional rights are violated when evidence is knowingly fabricated and a

reasonable likelihood exists that the false evidence would have affected the decision of the jury."

*Gregory*, 444 F.3d at 737.

The evidence here raises a genuine question of fact as to whether Defendants fabricated

evidence falsely incriminating Webb, and whether, without this evidence, there would have been

any basis for a jury to issue an indictment.

#### B.    Defendants Fabricated The Set-Up Call of October 13, 2005

As explained in Plaintiff's factual background section, there are genuine issues of fact as

to whether the recorded phone conversation between Bray and Webb did indeed take place on

October 13, 2005; whether this call included an agreement setting up a drug deal between Bray

27

and Webb, or whether the conversation solely related to a car deal; and whether this call in any way prepared or set up the staged drug purchase of October 14, 2005. Given Webb's testimony that the conversation never touched on a drug deal with Bray, and Bray's testimony that the staged buy of October 14 arose out of his chance encounter with Conrad, there is sufficient evidence to show that there is a genuine issue of fact on this issue.

Metcalf monitored and recorded this purported call. He therefore would know if, as Plaintiff alleges, the call did not take place on October 13, and if Lucas's DEA-6 report indeed mischaracterized its date, content and meaning. Cross listened to this recording and read Lucas's DEA-6 report. He would also therefore be aware that the call was not a set-up call. Cross Supp. Decl., Dkt. 177-1, para. 11. The Defendants needed to record the existence of a set-up call in order to create the impression that the following day's staged purchased was properly controlled.

Based on this evidence, a jury could reasonably find that Lucas, Metcalf and Cross fabricated the existence of a set-up call to bolster the false case against Plaintiff.

### C.    Defendants Tampered with the Audio Recording of the Drug Purchase

During Plaintiff's criminal proceedings, three experts, including a court-appointed expert, agreed that the audio recording of the drug purchase had been tampered with.  One expert concluded that the anomalous starts and stops in the recording occurred when it was being made, not after it was transferred from the recorder to a compact disc. On these grounds, Cross argues that he cannot have been involved in any tampering. Cross Motion, Dkt. # 177, at 10-12. However, this was not the opinion of the remaining two experts. Expert Stuchtman concluded that the anomalies were not made by the recorder, and identified three gaps in the recording, including two which occurred while background music was playing, i.e. during the drug transaction. Ex. 6, Stuchtman Report, at 4. Moreover, expert Cain was unequivocal that the

28

recording provided to him was not the original version. He was of the opinion that the recording was either copied from some other source with different additional information, or that the recording was sporadically paused during recording. Mr. Cain concluded that either the original recording was paused by Agent Lucas during the recording, or the original was destroyed in violation of law enforcement protocols. Ex. 8, Notice of Cain Report, at 3.

According to two independent experts, therefore, either Lucas stopped and re-started the recorder while the recording was being made, or the recording was tampered with after it was transferred from the recorder. According to the final expert, the anomalies could only have been caused by the person using the recorder - Lucas. Metcalf transferred the recording to a compact disc, and Cross had custody of this disc. Based on this evidence, a jury could easily find that any of these three Defendants, or all three, tampered with the audio recording of the deal in order to conceal evidence favorable to the Plaintiff.

## D.  Defendants Lucas and Cross Fabricated Evidence of a Controlled Drug Purchase in the DEA-6 Report of October 14, 2005

Plaintiff has proffered evidence to show that the DEA-6 of October 14, 2005, drafted by Lucas and reviewed by Cross, contains numerous deliberate misstatements which have already been discussed: the fabricated set-up call of October 13, the non-existent pre-buy meeting, the fictitious direct handover of drugs and money between Lucas and Conrad and its attendant inference that Conrad was the real seller of the drugs; and finally, the false statement that the suspect in the car was of Webb's height (6'3") when in fact he was not even close. Taken cumulatively, the fabricated facts brought into dispute by Plaintiff created the impression that the Webb buy followed proper control procedures, that the informant received adequate supervision, that Lucas dealt directly with the suspect and that the identity of the suspect was properly corroborated – none of which is true. Even were Bray the reliable informant the Defendants

painted him to be, a genuine question of fact arises as to whether the staged buy as it truly happened produced enough incriminating evidence to meet the standard of probable cause.

**E.     There Is a Reasonable Likelihood That the False Evidence Affected the Grand Jury's Finding of Probable Cause**

The fabricated evidence, taken cumulatively, presents an investigation very different from the actual investigation which led to Plaintiff's indictment and incarceration. According to the fabricated investigation, the controlled purchase of October 14, 2005 was a by-the-book controlled transaction involving a confidential informant with a solid prior relationship with law enforcement. Without the fabricated evidence, there are enough holes in this investigation that it would be apparent to any reasonable law enforcement officer that there was insufficient evidence to go to a prosecutor, let alone a grand jury. Quite the opposite, once the truth came to light, it was the law enforcement officers who were themselves prosecuted. Moreover, the evidence falsified by the Defendants must be added to the Defendants' knowledge of Bray's deceptions, which they concealed from all investigatory reports and from their discussions with the prosecution. There is every likelihood that had the grand jury been aware of Bray's lying and stealing, and of the shortcuts taken during Webb's investigation, it would not have found that there was probable cause to indict Plaintiff. Plaintiff therefore easily prevails on summary judgment here, where he only needs to demonstrate that he raises a genuine issue as to whether knowledge of the fabricated evidence would have changed the outcome of a jury proceeding.

Finally, it goes almost without saying that the constitutional violation alleged here is not one for which good faith qualified immunity is available.  No one could or would dispute that it was clearly established that law enforcement officers could not fabricate false evidence to secure false convictions.  *See California v. Trombetta*, 467 U.S. 479, 486 (1984) (referring to the "constitutional obligation to report to the defendant and to the trial court whenever government

witnesses lie under oath"); *Napue*, 360 U.S. at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State" must fail under the Fourteenth Amendment).

**IV.**    **The Defendants Are Not Entitled to Summary Judgment Based on Plaintiff's Fourth Amendment False Arrest and False Imprisonment Claim**

**A.**    **The Legal Standard to Adjudicate False Arrest/ Imprisonment**

Law enforcement officers are also not entitled to qualified immunity where they violated Plaintiff's right to remain free of unreasonable searches and seizures. In order to succeed on a federal constitutional claim of false arrest/ false imprisonment, a plaintiff must show that he was detained without legal process. This requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff. *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005) (citing *Fridley v. Horrighs,* 291 F.3d 867, 872 (6th Cir.2002)). An arrest made pursuant to a facially valid arrest warrant is a defense to a claim of false imprisonment. *Barnes*, 449 F.3d at 716 (citing *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)). If, however, the issuance of the warrant was tainted by an officer's perjury, fraud, suppression of evidence, or similar bad faith act, probable cause will not be found based upon the warrant. *See, e.g., Hinchman v. Moore*, 312 F.3d 198, 205-6 (6th Cir. 2002) ("falsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional and has been so."). *See also Sykes*, 625 F. 3d at 305 (citing *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir.2000)) (a warrant will not afford a defense to an officer who "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood and such statements or omissions were material, or necessary, to the finding of probable cause.") (citations omitted).

### B.      The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For False Arrest/ False Imprisonment

As Plaintiff has laid out above, Defendants lacked probable cause to arrest Plaintiff. By concealing key information about Bray's credibility, and falsifying facts to create the appearance of probable cause, the Defendants directly and personally caused the arrest, indictment and imprisonment of an innocent person. Furthermore, they persisted in their deception, causing the Plaintiff's continued detention for over 21 months. Webb was only released after Bray confessed to his role in Mansfield's wrongful prosecutions, not as a result of any action on the part of Defendants. The available evidence, canvassed in detail above, at the very least creates a genuine factual dispute about Defendants' liability for false arrest and false imprisonment.

This right, too, was clearly established at the time, and good faith immunity thus has no applicability here. *Ahlers v. Schebil,* 188 F.3d 365, 371 (6th Cir. 1999), citing with approval both *Kuehl v. Burtis*, 173 F.3d 646, 651 (8th Cir.1999) (rejecting officer's qualified immunity defense where the officer ignored exculpatory evidence which would have negated a finding of probable cause) and *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir.1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.").

## V.      The Defendants Are Not Entitled to Summary Judgment on Plaintiff's Fifth Amendment *Brady* Claim

### A.      The Legal Standard to Adjudicate a *Brady* Claim

Law enforcement officers are not entitled to qualified immunity for committing *Brady* violations because such conduct violates a defendant's clearly established constitutional rights. In accordance with *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

32

evidence is  material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution."  Even when the defense has not specifically requested information in

discovery, the prosecution has a duty to volunteer exculpatory evidence if it is "material."  *Kyles*

*v. Whitley*, 514 U.S. 419, 433 (1995), quoting *Brady*, 373 U.S. at 108.  Material evidence is

evidence that, if disclosed, "undermines confidence in the outcome of the trial."  *United States v.*

*Bagley*, 473 U.S. 667, 682, 678 (1985). It was equally well-established that the disclosure

obligations under *Brady* apply to police officers.  *Kyles*, 514 U.S. at 438-40.

In keeping with that definition of materiality, for *Brady* purposes, exculpatory evidence includes

evidence that impeaches a witness for the prosecution.  See *Johnson v. Bell*, 525 F.3d  466, 496

(6th Cir. 2008) ("The Supreme Court has repeatedly 'disavowed any difference between

exculpatory and impeachment evidence for Brady purposes.'"), citing *Kyles*, 514 U.S. at 433;

*Napue*, 360 U.S. at 269 ("jury's estimate of the truthfulness and reliability of a given witness

may well be determinative of guilt or innocence"); *Bagley*, 473 U.S. at 676. Each individual bit

of impeachment should not be considered separately; rather the impeachment evidence should be

considered cumulatively to assess whether the collective evidence was material.  *Kyles*, 514 U.S.

at 437-38.

     Moreover, a police officer commits "a constitutional deprivation analogous to that

recognized in *Brady* by withholding or suppressing exculpatory material."  *Moldowan v. City of*

*Warren*, 578 F.3d 351, 379 (6th Cir. 2009).  In other words, officers inflict "constitutional injury

when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory

information." *Moldowan*, 578 F.3d at 379; see also *Id*., quoting *Trombetta*, 467 U.S. at 488 (a

constitutional violation occurs when an officer  makes a "calculated effort to circumvent the

disclosure requirements established by *Brady* […] and its progeny.").  Where exculpatory

33

evidence is withheld or destroyed by the police, the defendant is not required to prove that the officer acted in bad faith.  *Moldowan*, 578 F.3d at 382-89.

A police officer's failure to disclose impeachment evidence is particularly significant when the impeachment of an informant reflects on both the informant's credibility and the caliber of the police work.  *Kyles*, 514 U.S. 442, 445-45.  In *Kyles*, for instance, the prosecution was aware of evidence impeaching the government's informant.  *Id*. at 424-27.  Specifically, the police did not report or question the informant's numerous inconsistencies in accusing the defendant.  *Id*. at 426-27.  The Court held that such evidence was *Brady* material that had to be disclosed both because it undermined the witness directly and also because it was evidence of the police officers' shoddy work.  *Id*. at 442 n.13, 445 ("disclosure would have revealed a remarkably uncritical attitude on the part of the police"), 446 n.15 (when "the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it").

In this case, Plaintiff's successive defense counsel requested *Brady* materials on several occasions, and government attorneys affirmed that they had none.  *See*, *e.g*., Ex. 12, Letter from Defense counsel Billak to AUSA Serrano, June 1, 2006; Ex. 13, Letter from Defense counsel Warner to Serrano, Aug. 23, 2006. The government asserted that it had disclosed all relevant documents. *See* Ex. 14, Letter from Serrano to Billak, June 26, 2006.

### B.    The Available Evidence Creates a Dispute of Fact About Whether Defendants Are Liable For *Brady* Violations

Plaintiff has already laid out myriad examples of Bray's flagrant deceptions, Defendants' knowledge of these lies, and their decision to continue pretending he was a reliable informant. It seems self-evident that instances of Bray stealing from the police, lying about the identity of

34

targets and providing wholly unreliable tips would be material to any investigation which relies

even in part on information provided by Bray, let alone in an investigation like Plaintiff's, in

which in which the Defendants sought almost no corroboration for any of Bray's assertions.

Nevertheless, Defendant Lucas seeks to claim that evidence relating to Bray's misconduct during

other parts of the Mansfield investigation does not meet the materiality requirement of a Brady

claim, "logically," because "there is no likelihood that the disclosure of the material related to

others would have produced a different result for Webb had he proceeded to trial." Lucas

Motion, Dkt. # 175, at 14. On the contrary, information about Bray's systematic misconduct

during Operation Turnaround, coupled with the Webb investigation's lower standards of

supervision, creates a jury question as to whether the result "undermines confidence in the

outcome of the trial." *Kyles*, 514 U.S. at 434 (citing *Bagley*, 473 U.S. at 678);  *United States v.*

*Agurs*, 427 U.S. 97, 104 (1976) (showing requires an inference that the withheld evidence "might

have affected the outcome of the trial").  This is especially so when one considers that the

withheld evidence must be considered in the aggregate, rather than each piece in isolation, when

assessing whether there is a reasonable probability of a different result if the withheld evidence

had been disclosed.  *Kyles*, 514 U.S. at 434-37.[2]

Were there any doubt, the government, too, thought this almost certain, and consequently

moved to dismiss the indictment against Plaintiff as soon as the true circumstances of the

Mansfield investigation came to light. Given that concession, Defendants are on very thin ground

in arguing otherwise now.

---

[2] The fundamental basis of the *Brady*  right, therefore, is "avoidance of an unfair trial to the accused."
*Brady*, 373 U.S. at 87-88. As the Supreme Court put it, "[s]ociety wins not only when the guilty are
convicted but when criminal trials are fair; our system of the administration of justice suffers when any
accused is treated unfairly." *Id.* at 87.  The Supreme Court recognizes that a *Brady* violation offends due
process precisely because it has the effect of misleadingly inducing the defense to believe that the
requested or exculpatory information does not exist, causing him "to make pretrial and trial decisions on
the basis of this assumption." *Bagley*, 473 U.S. at 682-83.

Aside from the stand-in Jeremiah Conrad, who was not identified prior to the criminal trial, there were only two witnesses against Webb – Lucas and Bray.  A jury could certainly infer that had Webb and the prosecution been aware of all of the impeaching evidence buried by Defendants, Webb's prosecution never would have gone forward.  There is a strong claim, supported by significant evidence, that Lucas, Cross and Metcalf personally concealed material exculpatory evidence from Webb's defense.

Moreover, Plaintiff has presented this Court with evidence that before Webb's criminal trial, Lucas was aware that Bray was stealing money and drugs from the DEA, framing innocent people, falsely relating his encounters with suspects, targeting personal enemies, and lying with abandon.  Lucas drafted false case reports and failed to report any of the exculpatory evidence he unearthed, often altering reports or transcripts to hide the exonerating evidence.  Cross was wholly aware of these fabrications and did nothing to bring them to light. Plaintiffs are entitled to the inference that Defendants were aware of their own subterfuge in all of the Mansfield investigations, all of which occurred before Webb's criminal trial.  Finally, at this juncture, Webb is entitled to the reasonable inference that Lucas, and Cross and/or Metcalf, doctored the audio recordings in the Webb investigation.

Additionally, Plaintiff asserts Brady violations with regard to his own investigation as well. Defendants had knowledge of the evidence they fabricated, described above, and their withholding of information about the falsification also violates the Brady rule. Moreover, in at least one expert's estimation, Plaintiff's defense counsel were never provided with an original, un-doctored recording of the conversation which took place in the car during the staged buy, in violation of Defendants' *Brady* obligations. *See* Ex. 8, Notice of Cain Report.

There is sufficient evidence here to raise a genuine issue of fact about Defendants committing *Brady* violations, violations for which good faith qualified immunity is unavailable given the well-settled line of Supreme Court case law prohibiting this type of misconduct. Consequently, Defendants are not entitled to summary judgment on this claim.

**VI.      Should The Court Be Inclined Not to Find the Evidence Sufficient to Overcome Summary Judgment, Plaintiff Should Be Granted Further Discovery Before Any Dispositive Order Is Issued**

It is clear from Defendants' motions that they unfairly request that the Court grant summary judgment based on their purported lack of liability, rather than on their defense of qualified immunity, and this, before Plaintiff has had a chance to conduct full discovery. Defendants do not argue that, considering the evidence in the most favorable light for the Plaintiff, they did not violate Webb's clearly established constitutional rights. Rather, they each assert that, on the facts, which they present as undisputed, their conduct was fully lawful. Remarkably, they all insist that they had no reason to doubt Bray's credibility throughout Operation Turnaround, up to and including the time when Plaintiff was being investigated. In light of Plaintiff's exposure of the long history of obvious deceptions practiced by Bray, which at this stage must be given credence, this position is untenable.

Nor is reliance on the criminal record and transcript a sufficient substitute for discovery. First, the exhibits relevant to Defendant Lucas's criminal trial do not encompass the whole universe of documents which are relevant in the present suit. The scope of criminal trial exhibits and the purpose for which they are assembled are much narrower than the breadth of evidentiary material which is open to discovery requests in a civil suit, even on the limited issue of qualified immunity.

Secondly, despite Plaintiff's repeated requests, Defendants have never certified the exact scope of the documents produced. *See* Ex. 15, Correspondence between counsel Aaron Mandel and Larry Eiser, January 2012. In prior pleadings, Defendants have emphasized the number of pages included in the disclosures, but they neglect to mention that only a small portion of the record is directly relevant to Plaintiff. Of the 23,000 pages counted by Defendants, less than three hundred are directly relevant to the investigation of Webb.

Defendants have also asserted that the disclosures include (1) all the investigative reports of all the Mansfield drug transactions; (2) all of the proffers of the Mansfield drug defendants; (3) the statements of Jerrell Bray relating to the Mansfield drug transactions; and (4) all audio and video recordings of the Mansfield drug transactions and transcripts thereof. *See* Defendant Lucas' Response to the List of Discovery Sought by Plaintiff Webb Regarding Qualified Immunity, Dkt. # 158, at 3. Dkt; Objections of Defendant Metcalf to Plaintiff's Request for Discovery, Dkt. # 160, at 2. On the face of the record, without even the benefit of further discovery, Plaintiff can identify omissions and deficiencies which show that Defendants' characterization of the record is, to say the least, hyperbolic.

The following documents which are directly related to the investigation of Plaintiff were not to be found in the record:

(1) The arrest warrant for Webb issued on November 10, 2005 by Judge Vecchiarelli, and any documents supporting the request for this warrant. *See* Cross Supp. Decl., Dkt. # 177-1, para. 30.

(2) Any report memorializing the events which occurred during the arrest of Webb and immediately prior. (Indeed, Plaintiff has found no reports documenting the November 2005 arrests of any of the Mansfield targets.)

38

(3) Any reports documenting the dates and amounts Bray was paid for his participation in the Webb investigation.

(4) Any report memorializing the first in-person encounter between Lucas and Webb which allegedly took place at a U.S. Marshal's office in either late 2006 or early 2007. *See* Ex. 16, Memorandum from Serrano to Bakeman, November 28, 2006.

(5) A complete copy of the expert report drafted by Steve Cain, dated February 8, 2007, regarding the audio recording created during the staged Webb buy. *See* Ex. 8, Notice of Cain Expert Report.

(6) Any report on the Webb investigation drafted by Deputized DEA Task Force Agent Verhiley for the Bureau of Criminal Investigations, which provided funds for the staged buy in Plaintiff's investigation. *See* Ex. 5, at 2.

Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, Plaintiff should not be required to defeat summary judgment without access to this discovery.

Thirdly, even were all the investigation documents in Defendants' possession made available to Plaintiff, this would be insufficient, because Webb's file was apparently lost by lead prosecutor Serrano three years before Lucas's trial. The file was "reconstituted" but there is likely "correspondence and other documents missing." Ex. 17, Memorandum to FOIA and Privacy Staff re: Request by Joshawa Webb, May 23, 2006. *See also* Ex. 16, Memorandum from Serrano to Bakeman.

The transcript of Lucas's criminal trial fails to provide any kind of substitute for discovery, especially as regards Defendants Metcalf, Mayer and Cross. The proceedings focused on wrongdoing alleged in the indictment against Lucas, and virtually no questions were asked regarding the misconduct of other Defendants.

In order to respond to Defendants' motions for summary judgment, Plaintiff has therefore had to mainly rely on an incomplete set of written files from his investigation and the transcript of Lucas's criminal trial. Further discovery, including depositions of all the Defendants, is the only way to determine what really happened during Plaintiff's investigation. Deciding Defendants' present motions for summary judgment would be premature without expanded discovery.[3]

## Conclusion

Even though Plaintiff has not yet been allowed the benefit of full discovery, Defendants argue their motions for summary judgment with respect to their liability, rather than on their defense of qualified immunity. On the standard that is proper at this stage of the proceedings, Plaintiff has fully met his burden and should prevail on summary judgment. Based on the available evidence, Plaintiff has demonstrated a clear dispute of fact with respect to each of his allegations against Defendants.

Defendants' motions for summary judgment on qualified immunity have no merit. Plaintiff asks that summary judgment be denied so that discovery can finally begin.

---

[3] For purpose of compliance with Rule 56, Plaintiff's counsel respectfully submits this Section of this memorandum as the requisite affidavit, attested to by her signature below.

RESPECTFULLY SUBMITTED,


/s/ Debra Loevy-Reyes
Attorney for Plaintiff

Jon Loevy
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900

## <u>CERTIFICATE OF SERVICE</u>

       I, Debra Loevy-Reyes, an attorney, certify that on July 13, 2012, I delivered a copy of the attached PLAINTIFF JOSHAWA WEBB'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT BASED UPON QUALIFIED IMMUNITY to counsel of record in this matter via the ECF system.


                                       /s/ Debra Loevy-Reyes
                                       Attorney for Plaintiff


Jon Loevy
Debra Loevy-Reyes
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
(312) 243-5900