**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSHAWA WEBB, ET AL.,** | ) | **CASE NO.1:07CV3290** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE CHRISTOPHER A. BOYKO** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **LEE LUCAS, ET AL.,** | ) | **OPINION AND ORDER** |
| | ) | |
| **Defendant.** | ) | |

**CHRISTOPHER A. BOYKO, J:**

This matter is before the Court on the Motions for Summary Judgment based on

Qualified Immunity by the remaining Defendants Lee Lucas (ECF # 175), Matt Mayer (ECF #

176), Robert Cross (ECF # 177), and Charles Metcalf (ECF # 179).  For the following reasons,

the Court grants these Defendants' Motions.

**Background Facts**

The case arises from a First Amended Complaint filed by Joshawa Webb ("Webb")

alleging constitutional violations, stemming from his arrest and incarceration for an alleged drug

conspiracy.  Webb contends he was innocent of the charges and his arrest and incarceration were

the result of wrongful acts by Defendants based on testimony from confidential informant Jerrell

Bray ("Bray").   The Court previously held that Plaintiffs' First Amended Complaint does not allege any constitutional violation claims on behalf of Webb's fellow Plaintiffs, to wit; his mother Juanita Brooks, his unnamed adolescent sister, or his child; further, Webb has not provided any evidence that he is a guardian authorized to bring suit on behalf of his adolescent sister.  Finally, there are no federal claims brought on behalf of his wife.

**Plaintiffs' First Amended Complaint allegations**

The following recites the allegations in Plaintiffs' First Amended Complaint as stated in the Court's Opinion and Order granting summary judgment to Cross and Ansari. Webb contends he was wrongfully arrested, indicted and incarcerated for nearly twenty-one months on fabricated evidence.  Bray confessed to fabricating evidence to frame innocent people, including Webb.  Webb alleges audiotapes used to obtain the warrant for Webb's arrest were tampered with or fabricated by Defendants, and a "stand-in" was used to play the part of Webb in the fictional controlled buy, which "stand-in" confessed to his role.

Plaintiffs' First Amended Complaint contends the following: Webb  never met Agent Lucas prior to being indicted and was not involved in the alleged drug ring.  On November 9, 2005, Defendants Lucas, George (subsequently dismissed) and other unidentified individuals kicked in the door of the home of Juanita Brooks, Webb's mother, looking for Webb.  They attempted to force Webb's adolescent sister to accompany them.  Lucas, George and other unidentified personnel then forced their way into Webb's home where they arrested Webb in the presence of Webb's wife, Lakeisha their infant child.  Plaintiffs contend that Defendants then unlawfully searched Webb's home, where no evidence of criminal activity was found.

The First Amended Complaint further states that two experts have reviewed the audio

2

recordings used to indict Webb and found they were tampered with or fabricated.  According to

the First Amended Complaint, Bray admitted the controlled buy was simulated and recorded to

make it sound like Webb was involved in the drug ring.  The First Amended Complaint further

alleges Defendants fabricated, destroyed and/or withheld evidence that would have exonerated

Webb and alleges Defendants coached and manipulated witnesses and withheld doing so from

prosecutors.  The First Amended Complaint alleges Defendants violated  Webb's rights under

the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments; Defendants conspired to deprive

Webb of his constitutional rights; the municipal defendants failed to train their employees; and,

in addition, their policies and practices violated Webb's constitutional rights, and finally, alleges

violations of Ohio state law for malicious prosecution and intentional infliction of emotional

distress.  The First Amended Complaint does not separate or state the causes of action nor does it

distinguish particular acts of the individual defendants except for those described above.

Instead, the First Amended Complaint pleads its constitutional claims in general against

Defendants as a group.

### Procedural History

The Court issued a series of rulings back in September of 2009 on the issue of qualified

immunity granting the Defendants' Motions, due, in part, to Plaintiffs' insufficient 56(f) Motion

and granted Defendant Lucas's Motion to Dismiss, due in part to Plaintiff's failure to oppose the

Motion.  Plaintiff moved to reconsider under Fed. R. Civ. R. 59 and 60, citing to a ruling by the

Sixth Circuit on similar cases with similar Fed. R. Civ. P. 56(f) motions holding that limited

discovery should have been granted.  Plaintiff also offered an explanation supporting a finding

that his failure to oppose Lucas's motion was due to excusable neglect.  The Court granted the

Motion in part and reopened the case against Defendants Lucas, Cross, Metcalf and Mayer.  In the intervening period, Lee Lucas's criminal trial had concluded with Lucas's acquittal.  The Court allowed limited discovery and ordered the parties to resubmit their Motions for Summary Judgment based on qualified immunity.  Those motions are now before the Court.

**Defendants' Version of the Facts**

According to Defendants' affidavits in this suit, on November 9, 2005, Plaintiff Joshawa Webb was indicted for violations of federal criminal drug laws. The investigation began in December of 2004 due to a murder that occurred in Richland County of a Timothy Harris.  The Richland County Sheriff's investigation of the murder indicated it was drug related and, as a result, the Richland County Sheriff's Department began an investigation of drug trafficking in Richland County.  At the request of the Richland County Sheriff's Department in late August or early September of 2005, the Drug Enforcement Agency ("DEA") Task Force began working collaboratively with the Richland County Sheriff's Department in investigating drug trafficking in and around Richland County.

As part of the investigation, on October 13, 2005, Richland County Sheriff's Department Detective Chuck Metcalf monitored and recorded a phone conversation between Bray, a paid DEA informant, who was also a confidential informant used previously by the Richland County Sheriff's Department, and a man Bray identified as Joshawa Webb, wherein Bray relayed he had $2,000.00 to purchase crack the next day.

On October 14, 2005, Detective Metcalf, Richland County Sheriff's Department Sgt. Matt Mayer, DEA Special Agent Lee Lucas, DEA Task Force Officer Tom Verhiley and DEA Special Agent Robert Cross met at the Richland County Sheriff's Office to arrange a controlled

4

buy of two and a half ounces of crack cocaine from the person identified by Bray as Plaintiff, Joshawa Webb.  That same day Lucas, operating undercover, contacted Bray, who informed Lucas that Webb was with him.  After securing money for the buy from federal government funds wherein the serial numbers were previously recorded, Lucas, wearing a wire, along with Metcalf, Cross, Mayer and Verhiley, drove to the location of the controlled buy.  Agent Lucas drove in a separate vehicle and pulled into a gas station next to a vehicle with tinted windows. The other agents and Richland officers were unable to observe the vehicles from their monitoring location.  Agent Lucas later informed Agent Cross that he entered the vehicle with Bray where a large white male was seated in the front passenger seat.  Bray identified the individual as "Josh."  Lucas exchanged $2600.00 dollars for approximately 70 grams of crack cocaine.  After the transaction, Bray returned to the Richland County Sheriff's office for a debriefing.

In March of 2006, Webb was indicted under a superceding indictment for the alleged sale of crack cocaine as described above.  Sometime in 2007 Bray was arrested.  Bray then recanted his previous statements regarding the controlled buy allegedly involving Webb.  As a result, the government moved to dismiss the charges against Webb and on July 16, 2007, the Court granted the government's motion and dismissed the superceding indictment against Webb.  On October 24, 2007, Webb filed his Complaint with this Court.

Lucas was subsequently indicted,  tried and acquitted.  At the trial, Lucas, Webb and Bray and the alleged stand-in Jeremiah Conrad ("Conrad") all testified and were cross examined on the underlying drug buy at issue here.

5

**Summary Judgment**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); *accord Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006); *Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005).  The initial burden to demonstrate the absence of a genuine issue of material fact rests with the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute.  An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury."  *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *accord Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2004); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).  A fact is material only if its resolution "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.

When deciding a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006); *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005).  "Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true."

6

*Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004).  However, summary judgment should

be granted if the party bearing the burden of proof at trial does not establish an essential element

of its case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*,

477 U.S. 317).  Furthermore, the Court is not required "to search the entire record to establish

that it is bereft of a genuine issue of material fact."  *Betkerur v. Aultman Hosp. Ass'n.*, 78 F.3d

1079, 1087 (6th Cir. 1996).  Rather, the burden falls on the non-moving party to designate

specific facts or evidence in dispute.  *Anderson*, 477 U.S. at 249-250.

### 42 U.S.C. §1983, *Bivens* and Qualified Immunity

In order to prevail on a claim under 42 U.S.C. § 1983, a plaintiff must prove two

elements**.**  First, he must demonstrate that he was deprived of a right secured by the Constitution

or the laws of the United States, and second, he must demonstrate that the deprivation was

caused by a person acting under color of state law.  *Redding v. St. Edward*, 241 F.3d 530, 532

(6th Cir. 2001).

When the cause of action concerns violations of constitutional rights by federal agents

sued in their individual capacities, the United States Supreme Court in *Bivens v. Six Unknown*

*Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 390-97 (1971), implied a right to

damages for Fourth Amendment violations.  Since then, the Supreme Court has extended *Bivens*

twice, " to provide an otherwise nonexistent cause of action against *individual officers* alleged to

have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked *any*

*alternative remedy* for harms caused by an individual officer's unconstitutional conduct."

*Correctional Services Corp. v. Malesko,* 534 U.S. 61, 70 (2001).  *Bivens* acts as a counterpart to

42 U.S.C. §1983 actions where the former is the proper vehicle for bringing constitutional

7

violation suits against federal actors while the latter is used for suits against state actors.  *Id* at

66-67.  A *Bivens* action permits the defense of qualified immunity, the analysis of which is

identical under either *Bivens* or §1983.  *Wilson v. Layne,* 526 U.S. 603, 609 (1999).

"Government officials performing discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,*

457 U.S. 800, 818 (1982)  "Qualified immunity 'is an affirmative defense that must be pleaded by

a defendant official.'"  *Harlow*, 457 U.S. 800, 815 (1982).  But qualified immunity "is an

immunity from suit rather than a mere defense to liability."  *Hunter v. Bryant*, 502 U.S. 224, 227

(1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  "Immunity ordinarily should be

decided by the court long before trial." *Hunter* at 228 (citing *Mitchell* at 527-29).  "Unless the

plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading

qualified immunity is entitled to dismissal before the commencement of discovery."  *Mitchell* at

526 (citing *Harlow* at 818).  The issue of qualified immunity must be addressed at the earliest

possible point in the litigation. *Saucier v. Katz,* 533 U.S. 194, 200-201 (2001), *overruled on*

*other grounds by Pearson v. Callahan,* 555 U.S. 223 (2009). *Siegert v. Gilley,* 500 U.S. 226, 232

(1991).  The Supreme Court has stated that, "[u]ntil this threshold immunity question is resolved,

discovery should not be allowed. " *Harlow*, 457 U.S. at 819.  A district court should resolve

the immunity question before permitting discovery. *Crawford-El v. Britton,* 523

U.S. 574, 598 (1998).  Indeed, one of the core purposes of the immunity is to shield

officials from "the burdens of broad-reaching discovery." *Crawford-El,* 523 U.S. at

588 (quoting *Harlow,* 457 U.S. at 817-818).

The analysis of a qualified immunity claim is distinct from the merits of the underlying claim itself. *Saucier,* 533 U.S. at 204; *Dunigan v. Noble,* 390 F.3d 486, 491 n.5 (6th Cir. 2004). Qualified immunity is a purely legal question which must be determined early in the proceedings. *Saucier,* 533 U.S. at 200; *Siegert,* 500 U.S. at 232.

Defendants bear the initial burden of coming forward with facts which suggest that they were acting within the scope of their discretionary authority at the time in question. *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir. 1992). The burden then shifts to the plaintiff to show that the defendants are not entitled to qualified immunity. *Untalan v. City of Lorain,* 430 F.3d 312, 314 (6th Cir. 2005); *Cartwright v. City of Marine City,* 336 F.3d 487, 490-491 (6th Cir. 2003).

## ANALYSIS

### Lucas' Motion for Summary Judgment

Defendant Lucas has been an agent with the DEA for over sixteen years, has participated in over a thousand drug cases and investigations, and has worked in an under cover capacity on over one hundred drug cases, including this case. Lucas moves for summary judgment based on qualified immunity on Webb's *Bivens* claims because Lucas contends Webb cannot demonstrate Lucas's actions regarding Webb's criminal investigation and arrest violated Webb's constitutional rights.

The only non-conclusory facts alleged in Plaintiffs' First Amended Complaint are stated as follows:

> In or about October of 2005, Joshawa Webb was falsely implicated in a drug conspiracy. According to the fabricated charges in Mr. Webb's criminal case, he allegedly sold Defendant Lee Lucas crack cocaine.

9

> In reality, Mr. Webb never met Defendant Lee Lucas prior to being charged with this crime. Mr. Webb was not involved in the alleged drug ring for which he was arrested.

> On November 9, 2005 Lee Lucas, Dan George, and yet-unidentified Defendants kicked in the door of Juanita Brooks' home.  In an effort to locate Mr. Webb, Lucas and Dan George attempted to force Mr. Webb's adolescent sister to accompany them.

> Later on or about November 9, 2005, Lee Lucas, Dan George, and yet-unidentified Defendants forced their way into Mr. Webb's residence with their guns drawn and falsely arrested Mr. Webb.  Lakeisha Webb and Kalib Webb, who was 15 months old at the time, were present for those events.

> After arresting Mr. Webb, the Defendants searched the Webb home without lawful justification.  The search did not uncover evidence of any crime.

Webb now alleges that his constitutional claims against Defendants are: Fourth Amendment violations for malicious prosecution, false arrest/false imprisonment, and fabrication of evidence and violation of his Fifth Amendment rights to *Brady* materials.

Lucas argues Webb's claims against him fail based on the evidence presented at his criminal trial and due to a lack of evidence against him.  According to Lucas, Bray testified at trial that he, Bray, acted alone in framing others and testified that Lucas and the other officers at issue did not participate in the frame up despite what Bray had stated earlier.  According to Lucas, in his criminal trial, the government conceded there was no conspiracy to frame innocent victims.  Given Bray's wholesale unreliability due to his oft changing representations, there is no competent evidence against Lucas.

10

Lucas further argues that the decision to indict Webb was made by a grand jury, not him, therefore, the determination that there was probable cause cannot be challenged.  Lucas contends there was sufficient, independent corroborating evidence to support a finding of probable cause.  These include the following: 1) that Bray represented to Lucas that the man in the car a the drug buy was Webb; 2) that Bray introduced the man in the car with him as "Josh" and that person did not deny it; 3) that Webb has a prior drug conviction for selling; 4) the phone call to set up the deal was made to Webb's phone; and 5) the person in the vehicle at the controlled buy looked like a photo of Webb Lucas reviewed after the drug deal.  (Lucas declaration ECF #139-2).

Lucas further asserts that no one has offered any evidence that Lucas knew Bray was using a stand-in.  He further attests it is undisputed Conrad and Webb had the same general appearance, both are white males with tattoos and short hair and at that Conrad (Webb) at the most glanced at Lucas the entire time the transaction took place.  Additionally, Conrad (or Webb) was seated the entire time preventing Lucas from determining any height discrepancy.  Lucas also contends that he is entitled to absolute immunity for his testimony to a grand jury and had no duty to provide exculpatory evidence at the grand jury.

Lucas also argues that there is no evidence of a *Brady* violation because any alleged exculpatory evidence regarding Bray's conduct and reliability involved his work on other cases and did not involve his work in the Webb case.  Furthermore, any evidence that Bray acted improperly in other criminal investigations does not lead to the conclusion it would have produced a different result for Webb if he went to trial.  Lucas cites to a decision by Judge Nugent in a similar case wherein Judge Nugent determined that Defendant Lucas was entitled to summary judgment on a *Brady* claim because none of the allegedly omitted evidence about Bray

11

demonstrated that Lucas's own grand jury testimony regarding Webb was "in any way incomplete or untrue." (Memo. Opinion and Order Judge Nugent 1:08CV1253 etc. ECF # 137).

Lastly, Lucas contends Webb is not entitled to maintain a conspiracy claim under 42 U.S.C. §1985 because he has failed to allege he was a member of a protected class and no evidence supports a conspiracy claim.

**Matt Mayer**

Mayer alleges he merely provided surveillance and security during the drug buy and never identified Webb as present at the drug buy.  He did not testify before the grand jury.  He further attests the investigating officers relied on Bray because Bray had previously provided reliable evidence to the Sheriff's office and they had no reason to believe the evidence provided the grand jury was faulty or deficient.  He further attests he never fabricated any evidence and further points out that Plaintiff cannot point to what evidence was allegedly fabricated by Mayer.

Mayer also contends there cannot be a *Brady* violation where a defendant was not tried but had charges dismissed before trial.  Finally, Mayer argues there is no factual allegation describing an act by Mayer supporting a conspiracy claim.

**Robert Cross**

Cross moves for summary judgment on qualified immunity because his only role was transporting audio disks containing the pre-buy phone conversation and drug buy recordings. Cross also contends that Webb's allegations that Cross violated DEA procedures in conducting this investigation cannot support a claim for a constitutional violation because the DEA procedures were not violated and, even if a violation occurred, they cannot form the basis of a constitutional violation.

12

Cross contends that he did not create the DEA-6 Report, a report prepared by Lucas which recounted the events of the drug buy at issue.  Cross never observed the drug buy and did not identify Webb as present at the buy.  Cross prepared certain DEA-6 reports concerning Bray's debriefing on January 10, 2006; the DEA-6 Report of June 21, 2006 chronicling the proffer meeting with the U.S. Marshal's; and the DEA-6 Report of December 21, 2006, describing the proffer meeting with the U.S. Attorney's Office.

Cross represents in his declaration he had minimal participation in the Webb investigation and prosecution.  He declares his involvement included:

- meeting with Richland Sheriff's officers and DEA agents to coordinate a controlled drug buy;

- He was present with other law enforcement officers on October 14, 2005 when officers held a telephone conversation with an individual identified by Bray as Webb, setting up a controlled drug buy;

- He was in a surveillance vehicle during the controlled drug buy;

- He was present during Bray's debriefing of after the controlled buy but did not question Bray or conduct the debriefing;

- He took control of the crack cocaine purchased during the controlled buy and took custody of the audio recordings of the October 13, 2005 initial call from Bray to man he identified as Webb.  The recording was made by Metcalf;

- He took custody and control of the audio recording of the drug buy made by Metcalf;

- He attended Bray's debriefing on January 10, 2006 at the DEA Cleveland Office

13

and prepared the report as well as attended the June 21, 2006 and December 21, 2006 proffers of evidence on Webb and others and prepared the report;

- He further retrieved certain evidence for examination and review.

Cross contends there is no evidence he tampered with the audio recordings.  He never maintained control of the original recording of the drug buy made by Lucas.  Instead Lucas gave the tape to Metcalf, who made a CD of the recordings and gave it to Cross.

As to the allegation that the recordings were tampered with, Cross points out that two experts opined that there were "anomalies" in the recordings.  These anomalies were defined as starts and stops.  Cross contends that experts that considered the compact disks that were in the custody of Cross did not show any anomalies showing it deviated from the original recordings made by Lucas.  A court appointed expert opined that there were no anomalies during the drug conversation.

**Charles Metcalf**

Metcalf alleges his only role in the drug investigation was providing surveillance and security at the drug buy.  He contends he never identified the person present as Webb.  He attests he never testified to the grand jury.  Metcalf contends Webb cannot maintain a lack of probable cause to effect his arrest when the decision to indict was made by a grand jury.  Metcalf further contends there is no *Brady* violation when a Defendant is exonerated before trial, as was Webb.  Finally, there is no evidence supporting a conspiracy claim.  Metcalf alleges his role was simply surveillance and security at the controlled buy and also being present during the recorded calls.

**Webb's Opposition**

14

Webb opposes Defendants' Motions, contending there is sufficient evidence to demonstrate triable issues of fact that his constitutional rights had been violated.

First, Webb has alleged that his indictment and incarceration were based on fabricated evidence and demonstrate a violation of clearly established rights. He further alleges that Defendants knew that Bray had framed others in companion drug investigations preceding Webb's. While Conrad, the purported stand-in, admitted he acted as an unwitting stand-in, Lucas failed to inform anyone that the man in the car during the controlled drug buy was not Webb. Webb argues that Defendants knew Bray was unreliable, stole from law enforcement in the past, misidentified suspects and repeatedly lied.

In a companion case arising from the same Richland County drug investigation and involving largely the same Defendants, Judge Gaughan summarized Defendants' wrongdoings in other investigations involving Bray as follows:

With respect to the Mansfield defendants other than Westerfield, it is unrefuted that the following occurred:

> Dwayne Nabors:
> • Defendants Metcalf and Lucas testified that no video was taken of the drug deal involving Nabors, even though Metcalf later admitted that he videotaped the transaction;
>
> • Defendants Ansari, Lucas, and Metcalf identified Nabors as the individual involved in the drug deal. The real perpetrator looks nothing like Nabors. According to plaintiff, the videotape would have disclosed the discrepancy; and
> • Defendant Metcalf now admits that he signed an affidavit in support of a search warrant without reviewing or fully understanding its contents. The affidavit contains a number of untruthful statements. The DEA drafted the search warrant affidavit.
>
> Lowestco Ballard:
>
> • A stand-in, Darren Transou, impersonated Ballard during the drug deal. Ballard

and Transou look nothing alike;
• During a recorded telephone conversation, Transou referred to Ballard in the
third person, even though he was supposed to be Ballard;
• In the written transcript of that call, defendant Lucas deleted the third-party
references to "Ballard" and inserted the name "Davis;"
• In addition, the third party reference to Ballard was deleted in the written
transcript and replaced with a series of ellipses, even though the recording was
audible; and
• Defendant Metcalf recorded all of the telephone calls and testified at the trial.

Danny Lee Brown:

• Bray made two recorded telephone calls to Brown. Thereafter, Bray told officers
that Brown changed his phone number. The phone number Bray provided was
actually the phone number for Robert Harris, who was also a target of the
investigation;
• During an ensuing drug deal falsely attributed to Danny Brown, a courier was
used. Bray's body recording showed that Bray said, "here, give that to Chris."
This statement was omitted from the transcription.
In May of 2009, defendant Metcalf was charged with a criminal civil rights
violation for his actions and testimony pertaining to Westerfield's co-defendant,
Dwayne Nabors.


        Metcalf pled guilty to presenting false evidence against Nabors at trial.
Metcalf admits that he falsely identified Nabors as a participant in a drug deal.
Metcalf indicated that he testified falsely because he believed that was "what
everybody else was going to testify to." He indicated that his testimony at the
Nabors trial consisted of a "regurgitation" of the DEA report.

    In another Mansfield investigation of Noel Mott, Bray admitted using the same stand-in,

 Darren Transou, used as a stand-in in the Ballard case, to impersonate Mott.

    Webb contends that the murder of Timothy Harris in January of 2005 led the Richland

County Sheriff's Office to implement Operation Turnaround in an attempt to break the drug

rings in Richland County.  The Sheriff's Office used Bray as a confidential informant after his

release in April 2004 from prison after fourteen years imprisonment for involuntary

manslaughter.  From February of 2005 through August 2005 Bray set up and assisted in

controlled buys orchestrated by the Richland Sheriff's Office.  Sometime in early 2005, Bray was arrested for drug possession but Webb contends Metcalf interceded on his behalf.  Bray was never charged for the drug possession.   In August of 2005, the DEA joined the Richland County drug operation.  The Richland County Sheriff's Office recommended Bray to Lucas.  From September of 2005 through November of 2005, the DEA performed a number of controlled buys.  In one of these buys, Webb contends Bray used another stand-in, which Defendants knew or should have known about since it was the same person used in the Ballard and Mott investigations described above.  Bray also attempted to steal money provided him by the DEA to purchase drugs in a controlled buy but was discovered by the law enforcement officers involved in the controlled buy when they searched Bray's car after the buy.  According to Webb, the officers never reported this.

In another investigation Metcalf falsely identified a defendant who was subsequently indicted and plead.  In yet another incident, Webb contends Lucas deleted from his report the presence and identification of an Officer Wheeler, who challenged Bray's identification of a defendant in a controlled buy.  According to Webb, Bray's multiple bad acts put the Defendants on notice that Bray was unreliable.  By failing to inform the U.S. Attorney, Defendants violated Plaintiff's constitutional rights by not disclosing their knowledge of Bray's unreliability.

With regards to Webb's alleged controlled buy, Webb contends he knew Bray because he had previously sold Bray a car.  He denies he talked to Bray on the phone on October 13, 2005, and contends his phone records show no such call occurred.  Webb also contends the DEA-6 Report lists a number that was not Webb's number.  He does admit he talked to Bray at some point but that conversation was about purchasing another car.

17

Conrad admitted at Lucas's criminal trial he was the stand-in for Webb at Bray's request. Webb argues there was no pre-buy meeting with Bray and Lucas and there was no search of Bray's car before the controlled drug buy.  Webb contends this violates DEA procedures.  Due to the heavy tinting of the windows in Bray's car used in the controlled buy, no film or photos could be used to identify the person Bray identified as Webb.  Finally, Webb contends it was Bray that handed Lucas the drugs and the scale, not the stand-in calling into question Lucas's representations to the grand jury and in his DEA 6 Report.

Webb offers the following theories as supporting his claim for a violation of his constitutional rights.

Webb contends that an officer cannot hide behind a grand jury indictment when the officer was instrumental in a defendants prosecution or continued incarceration to escape liability.   At least one other judge in this district determined that officers should have known Bray was no longer a reliable confidential informant when he was caught stealing buy money. *Mott v. Lucas,* 1:10CV164 at 23 (Judge Pearson).   Also, although defendants say Bray provided previous reliable information they do not give any specifics, while Metcalf's testimony at Lucas's trial demonstrated they had only used Bray once before.  Webb further contends the law holds that probable cause determinations are usually jury questions.

Webb also attacks Lucas's alleged corroborating evidence to support a finding of probable cause.  First, Webb contends Lucas's represents that he was sitting the whole time of the controlled buy therefore, he could not establish the target's height.  However, Lucas had, in fact, identified the person in the car as being 6'3" in both the DEA 6 report and in the debriefing after the buy, as found in Cross's supplemental declaration (ECF 177-1 at para 18). Webb alleges

18

he is 6'3" tall while Conrad is 5'9"- a substantial difference.  Thus, there is evidence

demonstrating that Lucas fabricated evidence to implicate Webb.  Also, Lucas contends he

confirmed Webb's presence by reviewing a picture of Webb after the drug buy but this,

according to Webb, presents a question for the jury on the similarity between Webb and Conrad.

Bray's introduction of Conrad as Josh and Bray's identification of the person as Webb rely on

Bray's discredited representations and thus, cannot provide a credible source of corroborating

evidence supporting probable cause.

Webb disputes Lucas's contention that a phone call took place between Webb and Bray

on October 13, 2005 and disputes that he ever talked about drugs.  Lastly, Webb argues his prior

drug conviction was for marijuana, not crack, and therefore, does not support a probable cause

finding.

Webb further contends all the defendants can be liable for malicious prosecution because

the prosecutor relied on their misstatements and omissions as to Bray's reliability.  Lucas never

challenged Bray or Metcalf's perjured testimony in other criminal proceedings when he knew

they were not being accurate.  Furthermore, malicious prosecution only requires participation

that aids in a decision to prosecute or continuing to detain.  As to each Defendant's separate

roles Webb states:

Lucas-

failed to inform the U.S. Attorney of a pattern of misdeeds by Bray; falsely
stating Bray and Webb talked about a drug sale on the phone before the drug buy;
falsely describing control procedures (i.e. the pre-buy call) that never took place;
falsely describing the drug handover, describing the target as handing over the
drugs when it was Bray; falsely confirming drug suspect was Webb given the
known height differential and tampering with the audio recording of the
controlled buy.

19

Cross-

Failed to include in his investigation notes or inform the US Attorney of Bray's misdeeds in other investigations; failing to correct Lucas's misstatements as recounted in the DEA-6 reports, including the false representation of a phone call and control procedures and tampering with audio recordings.  Cross also allegedly admitted DEA procedures were not followed in the controlled buy such as searching Bray's car prior to the buy.

Metcalf-

same failure to report Bray's misdeeds, tampering with the audio recordings and falsely asserting the October 13, 2005 phone call took place, involved discussions of a drug sale and that the alleged call set up the drug buy.

Mayer- failure to inform the U.S. Attorney of Bray's misdeeds

## **Fabrication of Evidence**

Webb argues there are genuine issues of fact whether there was a phone conversation between Webb and Bray on October 13, 2005 and whether the conversation involved a discussion of drugs and set up a controlled buy.   According to Webb, he did engage in a phone conversation with Bray prior to the controlled buy, but it did not involve a discussion of drugs.  Instead, it concerned Bray purchasing a car from Webb.  This stands in direct contrast to Lucas's representation that the conversation involved drugs.  Cross listened to the recording and read the DEA-6 report and must have known the conversation did not involve drugs.  Metcalf made the recording and monitored it, therefore he would also have known the call was not a set-up call for a drug buy.  Therefore, Webb contends there is sufficient issues of fact to warrant denying Defendants' qualified immunity motions.

Webb further contends there are issues of fact regarding the audio recordings.  Three experts agreed that the audio recordings at issue were tampered with, either at the time it was originally recorded or after it was transferred to CD.  Because Lucas used the recording device,

20

Metcalf recorded the conversation and Cross maintained control of the recordings, there are issues of fact as to each one, precluding summary judgment on the issue of evidence tampering.

The DEA-6 report, chronicling the events of the October 14, 2005 controlled buy, was drafted by Lucas and reviewed by Cross and contains all the alleged misrepresentations outlined previously, including the existence of an October 13, 2005 pre-buy call between Webb and Bray and the contents of that call; the handover of drugs from Conrad to Lucas at the buy and Lucas's representation that the person in the car was 6'3" tall.

Given the fabricated evidence and clearly established law that fabricating evidence violates a constitutional right, Webb argues he is entitled to proceed on this claim.

**False arrest/false imprisonment**

Webb argues that the key determination is whether the officers lacked probable cause to arrest.  While a valid arrest warrant on its face is a defense to lack of probable cause claim, if the warrant was obtained due to an officers perjury, fraud or suppression of evidence probable cause does not exist.  As Webb described above, Defendants tampered with evidence, such that, had a grand jury or magistrate known the truth, no probable cause would have existed.

***Brady* Claims**

Webb argues that Defendants violated his Fifth Amendment rights by failing to provide him with exculpatory or impeaching evidence concerning Bray's prior misdeeds.  The duty to produce to Defendant such evidence applies to prosecutors and police officers.  In *Moldowan v. City of Warren,* 578 F.3d 351, 379 (6th Cir. 2009) the Sixth Circuit held that officers violate a defendants rights by hiding, destroying, concealing or withholding and failing to disclose material exculpatory evidence.  See *Kyles* 514 U.S. 442, 445-46 (*Brady* violation where

21

government failed to disclose impeachment evidence against informant).  Webb's criminal

defense counsel requested the information and the government responded it had no such

evidence.  Thus, Webb argues his Brady claim should survive.

**Reply**

Lucas replies that there is sufficient corroborating evidence to demonstrate probable

cause to arrest and prosecute Webb.  The undisputed evidence demonstrates that Bray identified

the man in the vehicle as Webb and referred to him as Josh.  There was a phone call the day

before the buy between Bray and Webb and the two discussed drugs.  Webb had a prior criminal

conviction for drugs.  Everyone who testified at Lucas's trial, including Bray, admitted Bray

acted alone and no one but Bray and Conrad knew Bray was using a stand-in.  The audio

recording of the drug buy confirms Bray called the guy in the car "Josh."  Webb testified at

Lucas's trial and admitted he talked about selling cocaine to someone during a pre-buy phone

conversation with Bray.  Lucas contends Bray chose Conrad, if indeed Conrad was a stand-in,

(Lucas still believes it was actually Webb in the car), because Conrad and Webb resemble each

other.  Both are white men with shaved heads and tattoos.  Lucas also attests the person selling

the drugs made no eye contact, fearing Lucas was a cop, a representation supported by Conrad's

trial testimony.  Lucas also contends the description of Webb as 6'3" in the DEA-6 report was

contained in the index and not the narrative prepared by Lucas.  Further, Conrad (or Webb)

remained seated the entire time during the buy so Lucas could not determine any height

discrepancy.  Also, on claims nearly identical to the ones before this Court, Judge Oliver

dismissed Plaintiff's *Brady* claims against Defendants because his charges were ultimately

dismissed before trial.

22

Lucas also argues there was no tampering with the recordings since all present admit Bray identified the person in the vehicle as Josh.  Furthermore, Webb cannot say how the alleged tampered with evidence affected Plaintiff's constitutional rights.  Also, at his criminal trial, the government conceded the phone call between Bray and Webb took place on October 13, 2005.  Finally, Lucas replies there is no constitutional violation for violating DEA procedures.

Mayer simply replies that there is no general duty to provide exculpatory evidence to a jury and Webb's opposition alleges no specific facts against Mayer regarding fabricating evidence and is wholly silent on any alleged conspiracy claim.

Cross disclaims any knowledge that Bray used a stand-in for Webb and contends he never saw or identified Webb in the drug deal.  With respect to Bray's alleged prior misdeeds in other investigations, Cross argues he was not involved in the Ballard drug deal and did not find drug buy money hidden by Bray in his car and did not prepare the report afterward.  He was never informed that Detective Wheeler disputed the Williams identification.  Finally, Webb does not dispute he spoke to Bray before the buy and admitted as much on the stand.  Webb did not dispute the date of the call at trial and offers no explanation why Cross should have known the call never took place on October 13, 2005.

Cross further alleges no DEA procedures were violated because this was not an informant drug buy where one would need to check the informant's vehicle before and after the buy but was done in Lucas's presence as an undercover buy.

Metcalf simply claims his only role was recording audio and providing it to the DEA.  He never tampered with the recording, never testified against Webb and there is no explanation what was removed from the recordings that would have been material exculpatory or impeaching

23

evidence.

**Analysis**

**Malicious Prosecution/False Arrest and False Imprisonment Under the Fourth Amendment**

"The Sixth Circuit 'recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment,' which 'encompasses wrongful investigation, prosecution, conviction, and incarceration.'" *Sykes v. Anderson* 625 F.3d 294, 308 (6th Cir. 2010) *quoting Barnes v. Wright,* 449 F.3d 709, 715-16 (6th Cir.2006). "The 'tort of malicious prosecution' is 'entirely distinct' from that of false arrest, as the malicious-prosecution tort 'remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process.'" *Sykes at 308 quoting Wallace v. Kato,* 549 U.S. 384, 390, (2007).

In order to establish a Fourth Amendment violation for malicious prosecution a plaintiff must show: 1)" a criminal prosecution was initiated against the plaintiff and that the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute; 2) the plaintiff must show that there was a lack of probable cause for the criminal prosecution; 3) as a consequence of a legal proceeding, the plaintiff suffered a deprivation of  liberty; and 4) the criminal proceeding must have been resolved in the plaintiff's favor." *Sykes* at 308-09.  Defendants' do not dispute that Webb's right to be free from malicious prosecution under the Fourth Amendment was clearly established at the time of his arrest.

Here, Defendants contend there was sufficient probable cause to arrest and prosecute Webb.  "Probable cause" denotes "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the

circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Painter v. Robertson,* 185 F.3d 557, 569 -570 (6th Cir. 1999) quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "If the circumstances, viewed objectively, support a finding of probable cause, the arresting officer's actual motives are irrelevant.  In section 1983 cases, the existence of probable cause usually poses a jury question." *Painter* at 570 (internal citation omitted).

Where, as here, a decision to indict is made by a grand jury, probable cause is conclusively determined.  "[I]t has been long settled that 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer.' "*Barnes v. Wright* 449 F.3d 709, 716 (6th Cir. 2006) *Higgason v. Stephens,* 288 F.3d 868, 877 (6th Cir.2002).  However, if a police officer's malfeasance has played a role in the grand jury's determination to indict, the officer cannot escape liability simply because the grand jury made the decision to indict.  If  "police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him." *Jones v. City of Chicago,* 856 F.2d 985, 994 (7th Cir.1988). "They cannot hide behind the officials whom they have defrauded."  *Sykes, at* 317.  The Sixth Circuit has held the "question whether the judicial officer issuing the warrant would have done so even without the knowingly or recklessly false statement is one for the jury." *Yancey v. Carroll County,* 876 F.2d 1238 (6th Cir.1989).

Here, the Court has Lucas's grand jury testimony and cannot say it demonstrates any false statements. Lucas testified:

25

October 14, 2005 Joshawa Webb, another one of their guys that was involved out there, dealing with a lot of – he was the connection to a lot  of the white guys that were buying drugs. I was introduced to Joshawa Webb. I met him  in a parking lot.  He had several contacts with the police before. He was real careful  on the phone. I had to go meet him, do the deal. We didn't have – the contact before would say  we've got two stacks. A stack is $1,000. I met him with the informant, got in the back  seat of the car, he pulled out 85.4 gross grams of crack cocaine, was 2-and-a-half ounces. I think  it weighed 63 grams, something like that when I weighed it out. He pulled it out of his pocket,  pulled out the scale, weighed it. Turned around, weighed it on the center console, I gave him I think it was 2000 or $2,500 that day I bought from Joshawa  Webb on October 14, 2005. (Grand Jury Testimony, at p. 30).

He testified of a pre-buy phone call between Bray and Webb and describes the controlled

buy as he witnessed it personally, thus, Defendants contend there was sufficient probable cause

to arrest and prosecute Webb regardless of any prior bad acts of Bray because Lucas in particular

was able to corroborate key evidence.

Lucas relies on the following evidence to support probable cause, all of which he

personally corroborated.  This undisputed evidence includes: a recorded phone conversation

which took place the day before the controlled buy wherein Bray spoke to Webb, Webb

indicated he knew Bray and had Bray's number in his phone. Webb discussed selling drugs to

others on the phone with Bray.[1]  Bray told Webb he had "two stacks" which Lucas contends

refers to $2,000 for drugs and agreed to meet Bray the following day.  All of this evidence is

outlined in Lucas's declaration (ECF # 139-2) and reflects the transcript of the October 13, 2005

recording.  Webb testified at Lucas trial that he did talk to Bray before the buy and admitted

describing his selling cocaine to others while on the phone with Bray.  (Trial transcript pg. 2288-

2290).  There is no dispute that Bray identified the person in the car with him at the controlled

---

[1]     Webb admitted he talked to Bray and discussed selling cocaine to others when he testified at Lucas's trial.

buy.  Lucas, Conrad and Bray all stated Bray introduced the person in the car with Bray as "Josh."  No one, including Webb, offers any evidence that Lucas conspired with Bray to use a stand-in or knew Bray was using a stand-in.  It is also undisputed that Webb had a prior federal drug conviction for selling illegal drugs.

In his testimony at Lucas's trial, Conrad admitted Bray asked Conrad to go with Bray on a drug deal.  Conrad stated, "he (Bray) said that he had burned a guy on a dope sale and he needed me to go along with him.  That way it looked like the drugs were my drugs." (Lucas trial transcript pg. 2217).  Conrad admitted only glancing at Lucas and only saying one or two words to him, fearing he was a cop.  (Lucas trial transcript pg 2222-2225).  Conrad testified he handed the dope to Bray or Bray grabbed it off Conrad's seat. (Lucas trial transcript pg. 2225-2226).  Conrad denied handing the dope to Lucas, while Lucas declares Webb handed him the cocaine.  (Lucas declaration para. 25).  Lucas declares he handed the money to Webb but Conrad testified he handed the money to Bray and Bray handed the money to Conrad.  "Jerrell handed me the money because it was supposed to have been my transaction."  (Lucas trial transcript pg. 2227).

In light of the above evidence, the Court finds probable cause existed to arrest and prosecute Webb.  Unlike some of the other prior controlled buys involving Bray wherein Bray either attempted to steal the buy money or used the same stand-in for deals not involving an undercover purchase in the presence of an officer, Lucas was actually present at this buy and could corroborate much, if not all, of Bray's information. The Sixth Circuit has held that when a confidential informant's reliability cannot be proven, substantial police corroboration of the informant's information will support a finding of probable cause.  *United State v. Bryant* 2005 WL 1312473 at *2 (6th Cir. May 13, 2005).  Here,  Lucas could testify to his belief that the

person who sold him drugs was Webb because he met him.  Regardless of whether it was Bray, Webb or Conrad who handed Lucas the drugs, Conrad testified he could not remember if he gave Bray the drugs to give to Lucas or if Bray reached over to Conrad's seat to take the drugs, Conrad admitted the whole deal was intended to look like Conrad's deal.  Conrad testified he held the drugs, the money from Lucas was given to him, and he counted it in Lucas's presence. Thus, Bray's representations aside,  the drugs came from Webb or Conrad and money went back to Webb or Conrad.  Furthermore, although not dispositive of the issue, Webb's prior drug conviction also supports a probable cause finding.  See *United States v. Wagers,* 454 F.3d 534, 541 (6th Cir. 2006).

Although there is a height difference between Webb at 6' 3" and the stand-in Conrad at 5' 9", everyone present at the controlled buy agreed the person with Bray remained seated in the car the whole time Lucas was present.  Lastly, Lucas represented, and Plaintiff does not dispute, that the person in the vehicle at the time of the buy looked like a photo of Webb which Lucas reviewed after the buy.  In fact, Bray testified he chose Conrad because he had Webb's same general appearance.

It is Plaintiff's burden to "prove by a preponderance of the evidence that in order to procure the warrant" officers "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood" and "such statements or omissions [we]re material, or necessary, to the finding of probable cause."  *Sykes* at 305. Plaintiff has failed to do so and no reasonable jury would disagree.  The undisputed evidence in this case supported a finding of probable cause to indict, and prosecute Webb.

Therefore, Lee Lucas is entitled to qualified immunity on Plaintiff's claim for malicious

prosecution.

**Robert Cross**

Cross contends his only role in the Webb investigation was his custody and control of the audio recording CD's of the pre buy conversation between Webb and Bray and the controlled buy.  Passive or neutral participation in a decision to prosecute does not impose liability on a law enforcement agent. See *Sykes* 625 F.3d at 309.  Here, Cross declares he did not testify to the grand jury and did not identify Webb as the person at the drug buy.  While he drafted several DEA-6 Reports, those reports reference Lucas's representations of the controlled buy, not Cross's.  Plaintiff admits as much in his opposition brief wherein he states "the United States Attorney's office was in possession of the Plaintiff's investigation file created by Defendants, including the DEA-6 in which Lucas inserted false incriminating evidence."  (Opposition Brief. Pg. 24).

Plaintiff contends he can show Cross failed to inform the USAO of the pattern of Bray's misdeeds in other investigations, failed to correct Lucas's misstatements, tampered with the audio recordings and admitted DEA procedures were not followed.

Plaintiff has not demonstrated what information the prosecution relied on to indict Webb and fails to point to any such evidence in his opposition.  In fact, the only evidence presented to this Court is Lucas's own grand jury testimony, which was discussed previously.  Plaintiff also fails to demonstrate how Bray's misdeeds in other investigations support a finding of a constitutional violation of Webb's rights in this case, particularly, when, unlike some of the other investigations where Bray was given a free hand in conducting the controlled buys on his own, Lucas was present and participated in this buy.  Since Cross was not a witness to the Webb

29

controlled buy he had every right to rely on Lucas's representations in filling out his reports. Even so, the DEA-6 Report containing the description of the controlled buy that was the basis for the indictment was drafted by Lucas, not Cross.  Cross also denies any prior knowledge that Bray used stand-ins in other investigations since he did not see the participants in the Mott investigation and did not participate in the Ballard investigation.

Finally, Cross denies that he testified DEA procedures were not followed in the Webb investigation.  Cross distinguished the difference between the informant purchasing the drugs from the target and one where an undercover officer participates with the informant.  He also asserts that violating DEA procedures does not demonstrate a constitutional violation.  *Bell-Bey v. Williams*, 87 F.3d 832, 836 (6th Cir. 1996).  Nor was Cross informed that in the *Williams* case, an officer disputed Williams' identification.

As to the phone calls at issue, Cross says Metcalf monitored the calls, no one disputed the date of the calls at Lucas's trial, nor is there any explanation how Cross should have known the call never took place.  Even though the experts felt some anomalies were present in the recordings, there is no dispute none were found in the portion reflecting the actual drug sale.

The Court holds that absent a showing that the prosecution relied on falsified evidence or Cross's testimony to indict Webb, Cross is entitled to qualified immunity on Webb's malicious prosecution claim.   Furthermore, there is no indication that the recording of the controlled buy deleted material evidence, especially in light of the fact that all three people allegedly involved in the drug buy testified at Lucas's trial and Plaintiff points to no evidence that something was said or not said that was deleted or included in the recording.  Because Plaintiff points the Court to no such evidence, the Court grants Cross's motion on the malicious prosecution claim.

**Matt Mayer**

Mayer contends Plaintiff's brief in opposition contains no specific allegations against Mayer other than Mayer was tasked with videotaping the controlled buy.  However, Mayer claims the car in which the buy took place had heavily tinted windows, therefore, the buy was obscured.  Thus, the only remaining allegations are generalized: that Mayer had a duty to report to the government Bray's bad acts in other investigations.

Webb's opposition brief contains a single paragraph containing Mayer's alleged wrongdoings, none of which pertain to any role in the Webb investigation.  Without something more, Plaintiff has not demonstrated Mayer deprived Webb of a constitutional right simply by videotaping the controlled buy.  There is no allegation he offered any evidence or testimony the prosecutor relied on to indict Webb and again, had no reason to dispute evidence when Lucas was present at the drug buy and was the only person who could testify to the facts of the case. Since the evidence before the Court shows only Lucas's testimony in the grand jury regarding the controlled buy, Mayer's limited role and failure to see or identify the alleged target, would have presented no obligation by Mayer to report Bray's prior misdeeds since there is nothing to indicate he knew what evidence was relied on in the decision to prosecute Webb, other than Lucas's own testimony.

Therefore, for the foregoing reasons, the Court finds Mayer is entitled to qualified immunity on Webb's malicious prosecution claim.

**Charles Metcalf**

Metcalf's only role in the Webb investigation was monitoring, recording and providing

31

the pre-buy and controlled buy audio to the DEA.  Metcalf contends he accurately recorded the conversations as they occurred and neither proffered evidence nor identified Webb as present at the controlled buy.

Again, Plaintiff must show no probable cause to arrest and prosecute Webb and the Court has already determined such probable cause existed.  As to the recordings at issue, Webb admitted he talked to Bray prior to the controlled buy, admitted he talked about selling drugs to another person in the conversation and admitted knowing Bray and having prior dealings with Bray.  Even if there were tampering of the recordings, Webb has failed to show the recordings were relied on by the Government in obtaining a grand jury indictment.  The evidence before the Court demonstrates only that the grand jury relied on Lucas's eye witness testimony concerning the controlled buy.  Without more, Metcalf's role can only be described as passive and neutral and demonstrates no constitutional violation.

Therefore, for the foregoing reasons, the Court grants Metcalf's motion for summary judgment based on qualified immunity on Plaintiff's malicious prosecution claim.

### *Brady* **Violation**

Plaintiff contends the suppression, fabrication and distortion of evidence by Defendants resulted in his being falsely arrested and violates his Fifth Amendment rights under *Brady v. Maryland,* 373 U.S. 83, 87 (1963).  However, it is undisputed that Webb was never tried but had his charges dropped before he went to trial.  Therefore, under binding Sixth Circuit precedent, Plaintiff cannot maintain a *Brady* violation.  "Because the underlying criminal proceeding terminated in appellant's favor, he has not been injured by the act of wrongful suppression of exculpatory evidence." *McCune v. City of Grand Rapids* 842 F.2d 903, 907 (6th Cir.,1988).  See

32

also *Flores v. Satz*, 137 F.3d 1275, 1278-1279 (11th Cir. 1998) which held;

> Brady protects an accused's due process right to a fair trial. And, due process is violated when a defendant is convicted in a trial in which the prosecution failed to disclose to the defense exculpatory or impeachment evidence that undermines confidence in the outcome of the trial. Plaintiff, however, was never convicted and, therefore, did not suffer the effects of an unfair trial. As such, the facts of this case do not implicate the protections of *Brady*. (So long as the evidence is disclosed at trial in time for it to be put to effective use, a new trial will not be granted 'simply because [the *Brady* evidence] was not disclosed as early as it might have and, indeed, should have been. (Internal citations omitted).

Therefore, Defendants are entitled to qualified immunity on Plaintiff's *Brady* violations claim because it is undisputed that the Government dropped the charges prior to trial.

**False Arrest/False Imprisonment**

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir.2005).  "Generally, the claims of false arrest and false imprisonment by police officers acting while on duty are essentially the same since the alleged false imprisonment arises out of and logically follows the arrest of plaintiffs." *Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir.1988). Probable cause is a defense to false imprisonment. *Id.*

Because this Court has already determined there was probable cause to arrest Webb, Defendants are entitled to qualified immunity on Plaintiff's claim for false arrest/ false imprisonment.

**Fabricating Evidence**

The Sixth Circuit has held that, "a person's constitutional rights are violated when

33

evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville,* 444 F.3d 725, 737 (6th Cir.2006).   While Plaintiff's First Amended Complaint alleges generalized allegations of constitutional rights violations under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments, Plaintiff makes clear in his Brief in Opposition that his fabrication of evidence claim is brought under the Fourth Amendment.  (Plaintiff's brief in opposition pg. 27).  There is no dispute that a law enforcement officer violates a person's constitutional right when he manufactures probable cause, and such a right was clearly established at the time of Webb's arrest and detention. "[A] reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures."  *Spurlock v. Satterfield* 167 F.3d 995, 1006 (6th Cir. 1999).

Here, the Court has already determined there was sufficient, corroborative evidence relied on by Lucas, wholly apart from Bray's, that supported a probable cause determination. Thus, Plaintiff's claim of a Fourth Amendment violation for fabricating evidence must fail. Furthermore, Lucas has absolute immunity from liability under §1983 for his testimony before the grand jury even if he committed perjury.  See *Macko v. Bryan* 760 F.2d 95 (1985).

Concerning the alleged fabricated phone conversation setting up the controlled buy, Webb claims the date of the alleged phone conversation is an issue of fact and was fabricated to look like the controlled buy was properly controlled.  Webb contends the phone number listed in the DEA-6 Report for the October 13, 2005 pre-buy call was not his phone number and there was no record of the call.  However, it is undisputed that the date of the alleged October 13, 2005

conversation was not an issue or even disputed at Lucas's criminal trial.  Webb does not dispute that the transcript of the alleged October 13, 2005 phone conversation introduced at Lucas's trial was discussed by Webb while on the stand at Lucas's trial and Webb never indicated that the transcript itself was inaccurate.  It appears that according to Webb's testimony the transcript accurately reflects the conversation Webb admitted having with Bray.  As discussed previously, Lucas's grand jury testimony as relates to the alleged phone conversation of October 13, 2005, said only "He was real careful on the phone;" and "... the contact before would say we've got two stacks."  Lucas relayed to the grand jury that a stack was slang for $1,000.  The DEA -6 Report indicates that two stacks was code for $2,000 to buy crack.

It is also undisputed and admitted by Webb on the stand at Lucas's trial that in the recorded phone conversation, he mentioned to Bray that he sold another person a car along with some cocaine.  Webb also agreed on the stand that the parties talked about meeting the next day. (Lucas trial transcript pg 2267).   So, while Webb alleges the conversation was entirely about Bray purchasing a car from Webb, given Webb's recounting of another dual sale of a vehicle and drugs, it cannot be said that law enforcement were unreasonable in interpreting the conversation, as accurately transcribed, to also possibly include the sale of drugs.  Thus, there is no constitutional violation for fabricating the October 13, 2005 recorded call.  No evidence of fabrication exists.

Plaintiff further alleges the October 14, 2005 controlled buy recordings were tampered with based on expert testimony that there were several anomalies (i.e. starts and stops) during the recordings.  However, Plaintiff wholly fails to point to any evidence as to what would have been cut out or covered over.   Plaintiff has the testimony of two individuals in the vehicle at the time

of the buy that could have provided evidence of deleted discussions or exculpatory conversations, but none is provided the Court.  Plaintiff has the burden to show some issue of fact as to what was deleted from the recordings.  Regardless of what occurred before or after the buy, it was unquestionably Lucas's recounting of the events at the buy to the grand jury that resulted in Webb's indictment and not one of the person's present at the buy, to wit: Lucas, Conrad or Bray, disputed the events that occurred therein with the exception of the disputed exchange of drugs and money.  Both Bray and Conrad would have first hand knowledge of what was said in the vehicle during the controlled buy but neither testified that the transcript of the buy reflected anything other than what actually transpired.  All admit Bray turned the music up loud during the buy but no one testified that some discussion that would have supported Plaintiff's claims for violation of his constitutional rights was deleted.  Because all three individuals testified to the events of the controlled buy and none reported discussions that occurred that were deleted from the recordings, Plaintiff has not presented an issue of fact sufficient to defeat summary judgment.

Lastly, Plaintiff contends the DEA-6 Report of the October 14, 2005, controlled buy contains numerous falsehoods, including the fabricated October 13, 2005 phone call, a non-existent pre-buy meeting, fictitious handover of drugs and money from Conrad to Lucas and the alleged false statement that the person in the car was 6'3" tall.

The Court already determined the above alleged fabrications do not rise to the level of a constitutional violation.  There is no question based on Conrad's own testimony that the drugs were either given by him to Bray to give to Lucas or Bray took them from Conrad to give to Lucas and the money from Lucas was given ultimately to Conrad because, as Conrad testified,

36

the drug buy had to look like Conrad's deal.  Also, importantly, the DEA-6 Report contains Webb's height, weight and Social Security number in the portion titled Indexing and not in the narrative.

Therefore, because there are no genuine issues of fact that the alleged fabricated evidence does not rise to the level of a constitutional violation, and because there existed probable cause to arrest Webb, all Defendants are entitled to qualified immunity on Plaintiff's claim for constitutional violation for fabricating evidence.

### Conspiracy

For purposes of clarity, the Court has previously determined Plaintiff's First Amended Complaint failed to allege with specificity sufficient particular factual allegations against each defendant to support a claim for conspiracy.  Furthermore, Plaintiff cannot support a 42 U.S.C. §1985 claim for Conspiracy because he has not alleged he is a member of a protected class. Therefore, in the absence of any violation of Plaintiff's rights, no conspiracy claim can survive.

Furthermore, because Webb's First Amended Complaint alleges his state law claims for malicious prosecution and intentional infliction of emotional distress resulted from Webb's prosecution without probable cause, the Court's determination that Defendants had probable cause to arrest Plaintiff necessarily means Webb's state law claims fails.

Also, Plaintiff First Amended Complaint alleges Plaintiff's wife and infant son suffered loss of companionship and consortium due to Webb's unjustified arrest and incarceration.  These claims must also fail as they are dependent on Webb's claims and must be dismissed as they fail as a matter of law.

Finally, Webb's wife and son plead a claim for intentional infliction of emotional distress. In Ohio, "a plaintiff who alleges the tort of intentional infliction of emotional distress charges that the defendant, by extreme and outrageous conduct, has intentionally or recklessly caused serious emotional distress to him and is subject to liability for such emotional distress, and if bodily harm results from it, for such bodily harm." *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369.

The Court has determined that Defendants are entitled to qualified immunity on Webb's constitutional claims and found that his state law claims that are dependent on an absence of probable cause must also be dismissed. Therefore, the Court orders Plaintiffs to show cause why their remaining state law claims should not be dismissed. Plaintiffs shall submit their brief no later than April 12, 2013.

Therefore, for the foregoing reasons Defendants are entitled to qualified immunity on all Plaintiff's claims alleging constitutional injury and the Court grants Defendants Lee Lucas (ECF # 175), Matt Mayer (ECF # 176), Robert Cross (ECF # 177), and Charles Metcalf (ECF # 179) motions. Furthermore, the Court dismisses Plaintiff's state law claims for Malicious Prosecution and Intentional Infliction of Emotional Distress since they are dependent on a finding that no probable cause existed and the Court expressly found probable cause.

IT IS SO ORDERED.

s/ Christopher A. Boyko
CHRISTOPHER A. BOYKO
United States District Judge

Dated: March 28, 2013